# In The Matter Of:

*Julie Ann Hamstead v.*
*Former Trooper D.R. Walker*

---

*Julie Ann Hamstead*
*December 9, 2019*

---

*Sapphire Court Reporting*

Original File Julie Ann Hamstead.txt

Min-U-Script® with Word Index

**EXHIBIT 1**

31

1    Q.   Okay.

2    A.   I've never been stopped.

3    Q.   Okay.  So I'd like to move forward to the actual day

4 at issue, April 25th, 2016.  I understand that you made a

5 911 call prior to pulling into the parking lot; is that

6 correct?

7    A.   I made -- excuse me?

8    Q.   Did you make a 911 call on April 25th, 2016, prior to

9 pulling into the parking lot?

10    A.   Yes, but can I say something about the Kyle

11 Copenhaver?

12    Q.   Sure.

13    A.   You're probably wondering why does she know the name

14 of Kyle Copenhaver and she doesn't know the name of Hedrick

15 and, you know.  That's probably what you're wondering.

16         Kyle Copenhaver is on Facebook and on everything, and

17 I -- and I looked him up.  And he -- that's Kyle Copenhaver,

18 so I can identify him, you know, physically and know his

19 face and know his appearance.  Yeah.

20         So anyway, so back to your other question.  Did I

21 make a call, 911?  Yes, prior.

22    Q.   Okay.  About what time did you make that 911 call?

23    A.   Okay.  It was approximately 4 o'clock, little before

24 4:00.

25    Q.   Where were you when you made the call?

1    A.    I was in my car in front of my property, 509 Fairfax

2   Boulevard.  I was parked, in the car.

3    Q.    And a why did you make this call?

4    A.    Because we had been promised the week before in the

5   field office, the engineer had promised that we were going

6   to get parking spaces back in front of 509.  We were going

7   to get three spaces, and he said he was going to work on

8   that and he was going to email my husband with -- with that

9   resolution.  Okay?  He had not.  He had not.  And it was

10  Monday, and there was no email and nothing had come from

11  him.

12         So I saw -- it was easy to see that we were not going

13  to get any spaces back because there was no room for any

14  spaces in front of the humongous sidewalk that they had

15  poured.  You know, they'd come out so far into the street

16  that there was absolutely no way that anyone could park

17  there because of the turn, you know, off of First Avenue,

18  because this turn off of First Avenue would have been right

19  into the parking spaces.

20   Q.    So they had already laid the forms, I guess, for the

21  --

22   A.    They'd laid the forms.  They had laid the forms by

23  that time.  The forms were way out into the street.  So I --

24  I knew that we weren't going to get those three parking

25  spaces.  So I guess I parked there kind of to prove a point,

33

1  we're not going to get three parking spaces back and they've

2  lied to us, you know, so...

3      Q.   You said you parked there to prove a point.   What

4  point were you going to prove?

5      A.   The point was that no one could park there, that it's

6  unsafe to park there, that we were never -- we would never

7  get three parking spaces back there, we were going to lose

8  the parking in front of our commercial/residential property

9  that I was trying to market, and so here we are.

10     Q.   Were you calling 911 so that they would send an

11 officer down to give you a ticket for parking there?

12     A.   Sure.   Yeah.

13     Q.   So you were basically --

14     A.   And I told them it was not an emergency.   I said this

15 is not an emergency, but I'm basically parked in front of

16 property, but I would like to see if you think it's safe --

17 if it's going to be safe to park here.

18     Q.   So you were basically calling 911 on yourself?

19     A.   I was basically calling to just get an officer there.

20 I didn't know how else to do that.

21          (Deposition Exhibit No. 2 was marked for

22     identification.)

23 BY MR. JEFFRIES:

24     Q.   Ms. Hamstead, you've been handed what's been marked

25 as Exhibit 2.   These are 911 call reports.   Mr. Hamstead

SAPPHIRE COURT REPORTING

39

1    A.    In that area.

2    Q.    -- wasn't there at the time, was it?

3    A.    Right, but -- but there's always a truck there and --

4  and there's always McKinney's truck.  And then there were

5  other vehicles behind it.  Yes.

6    Q.    Were you a student at APU at the time you pulled into

7  the parking lot?

8    A.    I was not a student.

9    Q.    Were you an employee of APU when you pulled into the

10 parking lot?

11   A.    I was not.

12   Q.    Were you trespassing when you pulled into the parking

13 lot --

14       MR. HAMSTEAD:  Objection to the form of the question.

15   A.    There were no "No Trespassing" signs.  I didn't think

16 I was trespassing.

17   Q.    Do you know about what time you pulled into the lot?

18   A.    Yes, about -- I'd say it was about six, seven minutes

19 -- seven minutes after 4:00, I would believe, because I -- I

20 made my second call to Martinsburg Journal, which is on my

21 call log, at about 4:06.  I made the second call and then

22 just left a message with the Martinsburg Journal.  I wanted

23 them to come to -- to maybe cover the story because I wanted

24 to get some friends and we wanted to put some signs up the

25 next day to not pour the sidewalk, to not block us in.

54

1    A.    Correct.

2    Q.    Did you direct that to any particular officer?

3    A.    Nope.

4    Q.    When you and Mr. Morris both made your comments, did

5  the officers at that point say anything?

6    A.    No.  They took the two -- they took the men and went

7  over to the middle of the parking lot.  They went back here,

8  right at the corner of the all of the concrete.

9    Q.    You said they took the men.  Who is "they"?

10    A.    That would be Newlin and Sigulinsky, the other two --

11  the other two police officers.  They left me with him.  Left

12  me with Walker.

13    Q.    When you say "they took the men," would that be

14  Morris and DeGrave?

15    A.    At least Morris and DeGrave.  And I don't know if

16  there were other men there.  I think there were other men

17  who were mulling about at that time and joined them, I

18  think.  So I don't know who they are.

19    Q.    Possibly witnesses?

20    A.    Possibly a couple of other men.

21    Q.    But you don't know their names?

22    A.    I don't know their names.

23    Q.    And you're not even sure if they went?  It might have

24  just been Morris and DeGrave?

25    A.    Right.  It was -- it was a group of men.  I think --

72

1    Q.    So Trooper Walker takes you to the ground, handcuffs

2   you, correct?

3    A.    Uh-huh.

4    Q.    How long after he handcuffed you was it before you

5   were put into his cruiser?

6    A.    Right away.

7    Q.    Can you mark on here with a W your best approximation

8   of where Trooper Walker's cruiser was parked when you were

9   put into it?

10    A.    (Deponent complies.)

11    Q.    Is it marking there?  It looks like it's kind of

12   dried up.

13    A.    There we go.   (Deponent complies.)

14    Q.    Paragraph 48 says that "Trooper Walker used

15   unnecessary and excessive force to arrest you on false

16   charges."

17         What false charges did Trooper Walker charge you

18   with?

19    A.    Everything.   Everything is a false charge.

20   Destruction of property is a false charge because I didn't

21   destroy anyone's property.   There was no property destroyed

22   except for mine.   There was no disorderly conduct because I

23   was never disorderly.   And so what could I have been

24   obstructing?   What is obstruction if you're not obstructing

25   anything?   I'm obstructing an illegal arrest?   Is that what

1    Q.    Who was there for you to say that to?

2    A.    Like I said, I think I said that in the beginning, I

3    wanted -- I said I think I need to call my husband.

4    Q.    Before he put you in the cruiser?

5    A.    Before he arrested me I think I said that to them.

6    Q.    Okay.  I'm sorry.  I misunderstand your testimony.  I

7    thought you said that after you got put in the cruiser you

8    told someone you wanted to call your husband.

9         So before you were arrested you mentioned you'd like

10   to call your husband, correct?

11   A.    I think so, yeah.

12   Q.    Okay.  And then it's your understanding that somebody

13   must have gone over and got him?

14   A.    I know exactly who went over to get him.

15   Q.    Who went and got him?

16   A.    Mr. McKinney from McKinney's Auto, who does all of

17   the police towing.  Ninety percent of their towing, he does.

18   Q.    Did Mr. Hamstead stop by Trooper Walker's cruiser to

19   speak to you?

20   A.    He did, and I mouthed to -- the words to him that I

21   was hurt, but I couldn't hear him and he couldn't hear me,

22   of course.  We didn't talk.

23   Q.    So you couldn't hear anything that Mr. Hamstead said

24   to you?

25   A.    I could just see his mouth, you know, moving.  I

80

1   Q.   Can you take the marker and put an R where the dump

2   truck was?

3   A.   Okay.   (Deponent complies.)

4   Q.   How close was the dump truck to Trooper Walker's

5   cruiser?

6   A.   About from here to that wall, like that.   How far

7   away is that?

8   Q.   I'll represent that appears to me to be about five

9   foot.

10   MR. HAMSTEAD:   About what?

11   MR. JEFFRIES:   From the edge of this table to this

12   wall appears to be about five foot to me, Braun.   Do you --

13   THE DEPONENT:   We were on the edge of the road and

14   then he was in, you know, into the parking lot somewhat.

15   Q.   Was it to the right side of Trooper Walker's cruiser?

16   A.   If this is the backseat of Trooper Walker's cruiser,

17   then it was right there.

18   Q.   Okay.   So Trooper Walker's cruiser, was it facing

19   towards Samuel or George?

20   A.   Samuel.

21   Q.   And was the dump truck facing in the same direction?

22   A.   No.

23   Q.   It was facing towards George?

24   A.   Correct.

25   Q.   So in Paragraph 53 of the complaint you allege that

85

1    A.    Who created?

2    Q.    Yeah.   Who came up with it?

3    A.    Who created what?

4    Q.    Who came up with the conspiracy?

5    A.    The conspiracy of -- the conspiracy of Trooper Walker

6  and the men or the conspiracy of...

7    Q.    Well, how many conspiracies are there?

8    A.    We have -- we have these men who are not wanting me

9  to stop their project.  Okay?  This is a perfect opportunity

10  -- the men, the Department of Highways and Jefferson Asphalt

11  men --

12    Q.    Can you give me names?

13    A.    Well, Schutz -- Alan Schutz, Hedrick, all the main

14  guys in the Department of Highways.  Of course, Kyle

15  Copenhaver would have been part of that.  And then you have

16  the Jefferson Asphalt workmen, you know.  So there are

17  several of those men.  Anybody who worked for Jefferson

18  Asphalt or worked for the Department of Highways.  They're

19  just all wanting to get the project done.

20    Q.    So every employee at the Department of Highways and

21  every employee of Jefferson Asphalt is in on this

22  conspiracy?

23    A.    Except one man who's not there anymore.

24    Q.    Okay.

25    A.    He's told us the whole truth and nothing but the

SAPPHIRE COURT REPORTING

86

1   truth, so you'll be hearing that.

2       Q.   Who is that?

3       A.   That would be Guy Greenfield.

4       Q.   Okay.  So everyone -- every employee of the West

5   Virginia Division of Highways and every employee of

6   Jefferson Asphalt except Guy Greenfield is in on a

7   conspiracy?

8       A.   It's -- it's -- what it --

9            MR. HAMSTEAD:  Object to the form of the question.

10      A.   Yeah.  This is crazy.  What it is is they were

11  obviously wanting to get me out of their way.  They don't

12  want questions.  They don't want their project to be slowed

13  down.  So, yes, they conspired to slow me down.

14      Q.   Do you know who was --

15      A.   To stop me.

16      Q.   Do you know who was the ring leader of the

17  conspiracy?

18      A.   Who was the ring leader of that conspiracy?

19      Q.   Yes.

20      A.   I would say that it would have been Schutz and it

21  would have been Copenhaver and Hedrick 'cause they're the

22  top three at that location.

23      Q.   Why --

24      A.   They're the ones who are all the ones making the

25  calls and the ones talking to everyone and stirring it up

SAPPHIRE COURT REPORTING

1      Q.    Do you recall in your magistrate court trial he

2   testified under oath that you hit him?

3      A.    Uh-huh, after he had talked to Matt Schutz a couple

4   days before that.  Yes, I do.

5            MR. HAMSTEAD:  Objection to the form of that

6   question.

7            MR. JEFFRIES:  What's that?

8            MR. HAMSTEAD:  He testified both ways.  I object to

9   the form of that question because he testified both ways in

10  the magistrate trial.

11           MR. JEFFRIES:  Okay.

12  BY MR. JEFFRIES:

13     Q.    You go on to allege in your complaint that "video

14  that depicts the fabrication of evidence was produced by

15  American Public University," or APU, "at your request and

16  provided to you shortly after your arrest but the video was

17  selectively chosen" -- that's the words in your complaint --

18  "selectively chosen by APU for a time subsequent to

19  Plaintiff's arrest and it reveals that your vehicle entered

20  the APU lot over one minute after Schutz had called 911

21  stating that you had ran into one of their trucks."

22           Is APU in on the conspiracy too?

23     A.    I think APU -- I don't know about that, but I think

24  that APU was given a time from us that we wanted 2:15 to

25  4:15.  And for some reason they gave us 4:17 to 4:03 --

SAPPHIRE COURT REPORTING

1   5:03.

2       Q.    Did you know why?

3       A.    They -- they say they couldn't see anything.   Now,

4   even though we told them, even though you can't see

5   anything, we'd like you to keep that -- keep that video for

6   us.   So I really do believe someone from one of the police

7   went over there to APU and viewed the -- viewed the video

8   and -- with Mr. -- with Timothy Howard and told them this is

9   not the part, you don't need this, you can erase this or

10  something.

11      Q.    Do you know which officer did that?

12      A.    I don't know.   We'll be deposing Timothy Howard and

13  find out if there was an officer who did that.

14      Q.    Who is Timothy Howard, just for the record?

15      A.    He's the head of safety.

16      Q.    At APU?

17      A.    Uh-huh, APU.   He's the one who -- he's the one who

18  dropped these odd-timed videos, footage segments onto video,

19  so...

20      Q.    Why didn't you name APU and Timothy Howard as

21  defendants?

22          MR. HAMSTEAD:   Excuse me?   I didn't hear the

23  question.

24      Q.    Why didn't you name APU and Timothy Howard as

25  defendants in the lawsuit?

1    A.    In the left and then the -- if you're coming from

2    APU, the south side is the right.

3    Q.    Right.  Correct.  So you testified that at the

4    beginning of the north-side video, Trooper Walker's vehicle

5    could be seen in the frame and that you were in the backseat

6    of it in handcuffs already arrested.  Do you recall that

7    testimony?

8    A.    I do.

9    Q.    Do we still have the marker?

10   A.    I've got them in my purse, yeah.

11   Q.    Would you mind taking the marker and drawing a circle

12   around the vehicle that you were referring to as Trooper

13   Walker's vehicle?

14   A.    Uh-huh.  Sure.  (Deponent complies.)

15   Q.    Okay.  And you also testified at that hearing that

16   there was a red tow truck from McKinney's that was in the

17   video at the beginning.  Would you draw a square around the

18   tow truck you were referring to at that hearing?

19   A.    I don't know if you can see the tow truck because of

20   this big tow truck of McKinney's.  Are you talking about

21   McKinney's or are you talking about the other dump truck.

22   Q.    You had testified that there was a McKinney's red tow

23   truck in the frame.

24   A.    Yes.  This would be the tow truck.  That's the tow

25   truck.

1    Q.   Okay.  Can you draw a square around it?

2    A.   Square.  (Deponent complies.)

3    Q.   I wasn't at the hearing watching the video as you

4    testified so I just -- I kind of followed along with my copy

5    of the video that was provided by your counsel and read

6    along with the testimony and I was pretty sure I knew what

7    you were referring to, but I just wanted to be sure --

8    certain.

9         Okay.  So you say that -- you mentioned another

10   vehicle that can't be seen.  What were you talking about

11   there?

12   A.   I'm talking about the red dump truck.  It's back

13   there.  It's back there behind this tow truck.

14   Q.   And you can't see it because of the tow truck?

15   A.   Well, yeah.  You -- from this angle, you couldn't --

16   couldn't draw a picture of it.  There are angles in the

17   video that you could see it.

18        (Deposition Exhibit No. 4 was marked for

19   identification.)

20   Q.   Okay, Ms. Hamstead.  I've handed you another

21   screenshot.  This is from the -- what's been referred to as

22   the south-side camera, which you testified kind of covers

23   the right side of the parking lot as you're looking at it

24   from the APU building.

25        You testified at the hearing on November 9th, 2018,

1   following your arrest Trooper Walker transmitted you to --

2   in the backseat of his cruiser with your arms handcuffed

3   behind your back, unbuckled to Jefferson Medical Center.

4           About what time did you leave the parking lot area?

5       A.   Well that's all fuzzy because I wasn't -- I wasn't

6   watching my clock that day.  So I know it was very late.  I

7   guess they'd have that in my records at -- at the hospital,

8   what time I arrived because we were 30 seconds away, so he

9   drove off and...

10      Q.   You've -- I'm sorry.  I didn't mean to interrupt you.

11  Are you done?

12      A.   Uh-huh.  Go ahead.

13      Q.   You've testified that you watched these APU videos

14  numerous times, correct?

15      A.   Right.

16      Q.   Do the APU videos depict you leaving the scene in

17  Trooper Walker's vehicle?

18      A.   They do not.  They do not.  They cut it off early.

19  I'm in the car that's still parked there when the north side

20  is cut off, in the backseat of that car.

21      Q.   Did Mr. Hamstead follow you and Trooper Walker to the

22  hospital?

23      A.   He followed -- he followed a -- he followed another

24  car and it was not me.

25      Q.   Do you know whose other car he --

1    A.    I do not know.  I think it was a decoy car.  It could

2    have been -- you know, who knows.  It was an extra car

3    called there to the scene.

4    Q.    Was it a state police cruiser?

5    A.    You'll have to -- you'll have to look at the video.

6    And it's the last one to leave on the left side.  So I don't

7    know what type of car that is really.  I think it's a state

8    cruiser.  I'm not sure.

9    Q.    About how long after you arrived at the hospital did

10   Mr. Hamstead arrive?

11   A.    That, I don't know either.  I know that he was there.

12   I think that he got there first and he was waiting in their

13   parking lot.  And so I didn't get there until some time

14   later.  I get there approximately ten minutes later after he

15   had already gotten there.

16         We came down a back alley.  We -- he cut through the

17   BB&T parking lot and went the back way to get to the

18   hospital.

19   Q.    In your complaint you allege, "Upon information and

20   belief, prior to his arrival with the plaintiff at the

21   hospital, Trooper Walker contacted or caused to be contacted

22   Nurse Kelly Halbert who was waiting at the hospital

23   emergency room receptionist's desk when Trooper Walker

24   arrived there with the plaintiff."

25         How did Trooper Walker contact Nurse Halbert?

1    daughter's school up in Martinsburg.  And she's a nurse

2    there and she looked over at me, so she was there.  I can't

3    remember her name, but we took our children to school

4    together at St. Jo's up in Martinsburg.  It was very

5    embarrassing for her -- for me to scream out in pain and

6    then see her watching.

7        Q.    Did I understand you correctly that this -- this

8    nurse had a child who went to school with your daughter at

9    the time?

10       A.    The nurse standing in the background who was walking

11   by.

12       Q.    But you don't know her name?

13       A.    I can't remember her name.  I'd have to give that to

14   you sometime.

15       Q.    Your complaint alleges that "The hospital staff

16   subsequently advised plaintiff's counsel that the video

17   camera located at the ER entrance was nonoperable when you

18   arrived.  But upon a subsequent inquire, the hospital's

19   attorney stated that the video recording had been destroyed

20   because of the passage of time."

21            Is it your position that the hospital deliberately

22   destroyed or withheld security camera video of your arrival

23   at the ER?

24            MR. HAMSTEAD:  Object to the form of the question.

25       A.    I have no idea if it was deliberate.  I -- it seems

SAPPHIRE COURT REPORTING

1    possible that it was because it's just too ironic that

2    hospital cameras don't work, nothing works.  It seems to be

3    a little ironic.

4        Q.   So is the hospital in on the conspiracy as well?

5        A.   The hospital is in on the suit.  You know that.

6        Q.   But are they in on the conspiracy against you?

7        A.   Well --

8             MR. HAMSTEAD:  Object to the form of the question.

9        A.   I'm not sure.  If they -- if they helped -- if they

10   helped with procuring false evidence against me, then yes.

11   And I would say that Nurse Halbert absolutely, you know,

12   gave false evidence.

13       Q.   Okay.  And I think that's what you're talking about

14   here in Paragraph 75.  "In an effort to cover up his

15   excessive use of force in Plaintiff's arrest and to conceal

16   his battery and the resulting injuries to Plaintiff, Trooper

17   Walker conspired with Kelly Halbert, R.N., to violate

18   Plaintiff's privacy rights and obtained a false statement to

19   the effect that Plaintiff had suffered no injuries and that

20   she was abusive to Trooper Walker and created a disturbance

21   falsely crying out in pain when entering the hospital."

22            That's not what Nurse Halbert said, was it?

23       A.   Tell me what Nurse Halbert said.  Do you have it?

24       Q.   I do.

25       A.   Let's read it.  She said it exactly the way Trooper

SAPPHIRE COURT REPORTING

120

1    Walker talks, so it wasn't Nurse Halbert's statement.   It
2    was Trooper Walker's statement that she signed.
3             (Deposition Exhibit No. 5 was marked for
4        identification.)
5        Q.    I've handed you what's been marked as Exhibit 4
6    [sic].   This is the --
7        A.    Exhibit 5.
8        Q.    I'm sorry.   Are we up to Exhibit 5?   My apologies.
9             Exhibit 5, this is the statement from Nurse Halbert.
10   Can you show me in here where she said that you had suffered
11   no injuries or any words to that effect?
12       A.    Okay.   So all the way through this she says, "Patient
13   was moving neck back and forth and verbally being abusive."
14   Patient -- she was "screaming that she could not move her
15   neck and that her arm was broken, but she had a normal
16   pulse, normal range of motion to left arm and was able to
17   move neck without difficulty."
18            These are all lies.   I was not moving my head back
19   and forth, left and right.   I couldn't move my head at that
20   time.   These are all lies that would have been shown by a
21   video of the emergency room door.   Okay?   But we don't have
22   that video, do we?   And I wonder why we don't have that
23   video.   It's pretty ironic that we don't have that video.
24            I was put in a neck brace when I entered the hospital
25   and kept in the neck brace, so this is just stuff that was

122

1   Why would she have said, "Patient moving neck back and

2   forth"?

3       Q.    Well, I think I explained --

4       A.    That makes absolutely no sense.

5       Q.    I think I explained at the beginning, Ms. Hamstead,

6   that the role here is for me to ask the questions --

7       A.    Okay.

8       Q.    -- not for you to ask the questions of me, so I'm

9   going to ask my question again and I'd like a short simple

10  answer.

11          Have you examined Nurse Halbert's writing samples so

12  that you know how she writes?

13      A.    I've not been given that opportunity.

14      Q.    Does that mean no?

15      A.    That's a no because I haven't been given the

16  opportunity to do discovery.

17      Q.    You go on to allege that "Plaintiff was further

18  abused, mistreated, and battered by hospital staff who

19  forced Plaintiff's injured left arm above her head to take

20  x-rays, laughing at her when she cried out in pain as her

21  arm was yanked above her head.  They further would not

22  assist her in getting down from the steel imaging table and

23  made her roll off and again they laughed as she slipped."

24          Can you provide me with the names of anyone who did

25  any of those things in Paragraph --

SAPPHIRE COURT REPORTING

123

1    A.   I have all those names in my medical records which

2  you have.

3    Q.   Sitting here today, you can't provide me with any

4  names --

5    A.   I do not -- I have not memorized the names of those

6  two people.  It was a man and a woman.  And I did put that

7  in -- I did put that in the complaint that I filed with the

8  board of nursing as well, and so it's in the hospital

9  records, the two people who did that.  They thought it was

10  funny.

11    Q.   So you said they were a man and a woman?

12    A.   The female was the one who raised my hand above my --

13  my arm above my head and it hurt really bad.

14    Q.   Do you know their positions?  Like, were they an

15  x-ray tech and --

16    A.   I guess x-ray tech.  I don't know.  Maybe she was the

17  assistant.  The x-ray tech was the male.  And he's the one

18  who went in the back, and he actually took the pictures.

19  She was the one who took me there in a wheelchair.

20    Q.   Took you to the x-ray room?

21    A.   Took me to the x-ray room, did not help me get up,

22  told me to stand there by the machine and jerked my head --

23  arm above my head.

24    Q.   Are these two in on the conspiracy as well?

25    A.   You know, I don't like the way you asked that.

SAPPHIRE COURT REPORTING

124

1    Q.    Well --

2    A.    Do you know what a conspiracy means?  Can I read that

3  to you?

4    Q.    No.  That's all right.

5          Ms. Hamstead, you've alleged throughout your

6  complaint and throughout the magistrate court proceedings

7  that there's this conspiracy to get you, to create false

8  charges against you.  And I'm just asking are the two

9  hospital staff who you mentioned in Paragraph 78, "has

10  abused, mistreated, and battered" you, are they in on the

11  conspiracy as well?

12          MR. HAMSTEAD:  Objection to the form of the question.

13    A.    Well, you see -- I don't know what you -- if you want

14  to say they are or not, but they did -- they did act with a

15  group to do something unharmful -- to do something harmful

16  and unlawful.  They did not act professional.  They did not

17  do their jobs professionally.  They acted as if I was a

18  criminal and they treated me like so.

19    Q.    When you say they did something "with a group," what

20  group are you referring to?

21    A.    Well, the two police officers who were out there

22  bringing information into the hospital and hanging out

23  and...

24    Q.    In Paragraph 80 you allege that although

25  undocumented, one sympathetic nurse showed Plaintiff finger

SAPPHIRE COURT REPORTING

1    Q.   Yes.

2    A.   Matthew Harvey.

3    Q.   He was in April of 2016?

4    A.   Well, that's a good question.  I have no idea.  I

5 have no idea.  I'm assuming he was.

6    Q.   In Paragraph 84 of your complaint you allege that,

7 "Even after arrangements were made to have a magistrate

8 appear for arraignment" -- who made the arrangements for a

9 magistrate to appear?

10    A.   The magistrate called him.  She made the

11 arrangements.

12    Q.   How did the magistrate know to call Trooper Walker?

13    A.   Well, she just called.

14    Q.   She just thought I'm going to call Trooper Walker and

15 see what's up?

16    A.   She was -- she was -- she was called earlier in the

17 day.

18    Q.   Okay.  Who called her earlier in the day?

19    A.   Probably my husband.

20    Q.   Why was it necessary to make arrangements for a

21 magistrate to appear?

22    A.   Because he wanted to put me to jail -- put me in jail

23 for something that I didn't do.

24    Q.   Is a magistrate not normally available for

25 arraignment after hours?

1    A.    Yes, another trooper named Chris.  I don't know his

2  name.  I know his first name, Chris.  I heard him say.

3    Q.    Anyone else you can identify?

4    A.    He's the only one in the building besides Walker and

5  me.

6    Q.    You said that while you were sitting in that song

7  [sic] Trooper Walker sang sex songs.

8    A.    Yep.

9    Q.    What songs did he sing?

10    A.    He sang -- it was -- now it was country songs.  It

11  was like -- let me think.  I'm going to do something with

12  you or we're going to do this, we're going to do that.  It

13  was just like songs, country songs, that had explicit-type

14  -- what he wants to do to them, you know.

15    Q.    You don't know the title of any songs?

16    A.    I might be able to provide you with that.  They were

17  horrible.  It was disgusting.  And all he did was eat his

18  food, that's it, for an hour.

19    Q.    You said he made strange noises behind his desk --

20    A.    Yeah.

21    Q.    What kind of noises did he make?

22    A.    He was singing, humming.  I don't know what he was

23  doing.  There was a -- there was a cubicle up.  I was in the

24  hall in front of the cubicle on a metal chair, and he was

25  back there just -- I don't know -- grunting around.  I don't

1   know if he was singing.  I don't know what it was that he

2   was doing.  I know he heated up his food.

3       Q.    So singing and grunting were the strange sounds?

4       A.    Yeah.  The guy, Chris, asked him if he needed help,

5   and he said no.  That was in the beginning.  And then, after

6   30 minutes more went by and I was throwing up in a can, he

7   -- he asked him again, do you need help processing her.  And

8   he said, no, I've just got to call Magistrate Rissler.

9       Q.    So you threw up in the trash can while you were

10  sitting on the chair?

11      A.    I felt like I was going to throw up.  I had dry

12  heaves.  I was shaking so violently that I couldn't hardly

13  sit on the chair.  I was so cold.  I didn't have a blanket.

14  I didn't have anything.  I was just sitting there freezing

15  and, yeah, was getting, like, dry heaves.

16          And then the other guy, I think, brought me a trash

17  can and -- of course, nobody brought me a blanket or

18  anything.  I just couldn't -- I just couldn't stop.  My

19  teeth were chattering.  I was freezing.  I was just being

20  punished, I guess, because I didn't shut up.

21      Q.    You go on to allege that after Trooper Walker took

22  you to magistrate court "he remained in his car with you in

23  the seat in front of the magistrate court until the clock

24  struck midnight."

25          About what time did you arrive at the courthouse?

1    the purpose of intimidating and coercing you into a guilty

2    plea on false charges and to abet Trooper Walker in carrying

3    out his malicious plan to ensure that you would spend one

4    night in jail."

5         Did Trooper Walker even know about the state project

6    before April 25th, 2016 or the Fairfax Project?

7    A.    You would have to ask him.  I don't know.

8    Q.    Do you know -- you don't have any knowledge that he

9    knew about it; is that correct?

10   A.    I don't know.

11   Q.    Why is everyone out to get you, Ms. Hamstead?

12        MR. HAMSTEAD:  I'm sorry.  I didn't hear the

13   question.

14   Q.    Why is everyone out to get you?

15   A.    Well, let's see.  I've already explained that.

16   Because they don't want me in the way of their beautiful

17   sidewalk beautification project, un-vetted beautiful

18   sidewalk project, I guess.

19   Q.    Why would the police officers care about the sidewalk

20   project?

21   A.    I think the police officers just look for something

22   to do.  And when they have something to do and they get

23   involved, it just keeps them from being bored, I think.

24   Q.    Why does APU care about the sidewalk project?

25   A.    I think APU just doesn't want to get involved because

145

1          MR. HAMSTEAD:   Objection.

2     Q.   In your complaint you allege that "Walker, Newlin,

3   and Sigulinsky acted in concert or individually to violate

4   your Fourth Amendment Right by unlawfully entering,

5   searching, and seizing your property from your vehicle

6   without probable cause."

7          Didn't you testify in circuit court last year that

8   the APU video showed it was a contractor employee who

9   entered your vehicle and got your license?

10    A.   There's -- at one point there is an APU contractor.

11  It looks like a contractor getting in initially.

12    Q.   So why do you allege --

13    A.   And then there's a police officer getting back in.

14  My door was opened several times.

15    Q.   Do you know which police officer it shows getting in?

16    A.   Sigulinsky.

17    Q.   Have you gotten a new license since this incident in

18  2016?

19    A.   Yes, sir.  I had to get a new license because I never

20  got mine back.  It was lost.  It was somewhere around

21  Walker's desk and it was lost.

22    Q.   How much did you spend to get a new license?

23    A.   I don't know.  I forget what it costs.  It's more so

24  how much trouble did you go through because you always have

25  to get -- when you've been married before and divorced, you

1    she can't speculate on what he did or didn't do.

2            MR. JEFFRIES:   Okay.

3    BY MR. JEFFRIES:

4      Q.    Let's move down to the second paragraph.   Midway

5    through this paragraph it says, "Another huge discrepancy is

6    that the passenger, the convicted felon, made a 911 call to

7    report the," quote, "crime before my car had even entered

8    the parking lot.   He called in the crime at 4:25 p.m.,

9    saying," quote, "the crazy bitch done hit our truck," end

10   quote.

11           Are you saying that John Morris made a 911 call

12   reporting the accident?

13     A.    Is that a typo?   That could be a typo.

14     Q.    You're not aware --

15     A.    That would be Alan Schutz.   Yeah.   He called in

16   twice.   That would probably have been him.

17     Q.    Let's go to the next page.

18     A.    Okay.

19     Q.    "Ten-hour magistrate court trial, November 11th,

20   2017.   Magistrate Senseney, the final judge in [your] case,

21   took one look at the damaged door and dropped the

22   destruction of property charge."   And then you go on and

23   state, "yet, to appease the system, he still yet found me

24   guilty of disorderly conduct and obstruction."

25           Is Magistrate Senseney in on the conspiracy?

178

1    A.   Well, he's certainly an enabler.  Let me just call

2    him that.

3    Q.   Let's go to the next page, 241.  Towards the bottom

4    of this large paragraph, eight lines up from the bottom of

5    the paragraph it says, "He" -- and I believe this is

6    referring to Trooper Walker.

7         "He must also get some sick pleasure from collecting

8    driver's licenses from his victim as he does not return

9    them."  And then you go on to state, "But we know that this

10   is his pathologically sick routine, collecting the licenses

11   of his victims."

12        Are you aware of any other instances where Trooper

13   Walker did not return an arrestee's driver's license?

14   A.   Yes.

15   Q.   When?

16   A.   We were told about -- that he -- that he does this.

17   Q.   Who told you that?

18        MR. HAMSTEAD:   Object to attorney/client privilege on

19   that.

20   A.   Yeah.  I'm going -- I'm going to say attorney/client

21   privilege on that one.

22   Q.   Has anyone told you that Trooper Walker collects

23   driver's licenses from arrestees?

24   A.   That would be my lawyer who knows more about that.  I

25   don't.

SAPPHIRE COURT REPORTING

192

1    Q.   You told the physical therapist that your left

2    shoulder was already sore --

3    A.   I absolutely did.   That's why I kept screaming for

4    Office Walker to please let go of my bad shoulder -- my bad

5    arm, which he ignored.

6         MR. JEFFRIES:   All right, Ms. Hamstead.   That's all

7    I've got for now unless Mr. Hamstead wants to follow up with

8    some questions.

9         MR. HAMSTEAD:   I have a couple things I want to ask.

10                       CROSS-EXAMINATION

11   BY MR. HAMSTEAD:

12   Q.   So I'm not sure if it's clear on what you believe to

13   be the approximate time when you were placed in Former

14   Trooper Walker's cruiser.   I'm not sure if it's clear on the

15   record.   What do you estimate to be the approximate time you

16   were placed in the vehicle?

17   A.   I would say -- I would say it was approximately 11

18   minutes, probably -- 4:11.

19   Q.   Okay.   Do you actually know the details with regard

20   to the status of the foreclosure of the Kearneysville

21   property?   Do you -- do you know what that status really is?

22   A.   No, not really.   I've kind of been not involved with

23   that.

24   Q.   And the bankruptcy proceeding, we are represented --

25   you are represented by an attorney on that, correct?

SAPPHIRE COURT REPORTING