IN THE MAGISTRATE COURT FOR JEFFERSON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA,

     Plaintiff,

vs.

JULIE HAMSTEAD,

     Defendant.

## REPORTER'S TRANSCRIPT

The trial in this matter was held on the 14th day of November 2018, commencing at 9:15 a.m., at the Jefferson County Magistrate Court, located at 110 North George Street, Charles Town, West Virginia, before the Honorable William Senseney, Magistrate.

**EXHIBIT 2**

3

# INDEX

PRELIMINARY MATTERS                                                    PAGE

    BY MS. MASCHAT.................................................................................  7

    BY MR. HAMSTEAD..............................................................................  7

    BY MS. MATSCHAT..............................................................................  7

WITNESSES:

 JEFF POLCZINSKY

    BY MS. MASCHAT................................................................................  16

    BY MR. HAMSTEAD.............................................................................  19

    BY MS. MASCHAT................................................................................  36

    BY MR. HAMSTEAD.............................................................................  40

 ALAN SHUTTS

    BY MS. MASCHAT................................................................................  46

    BY MR. HAMSTEAD.............................................................................  71

    BY MS. MASCHAT................................................................................  93

    BY MR. HAMSTEAD.............................................................................  94

RODNEY HENDRICK

    BY MS. MASCHAT................................................................................  96

    BY MR. HAMSTEAD.............................................................................  105

    BY MS. MASCHAT................................................................................  133

I N D E X (CONTINUED)                                                          4

WITNESSES:

    (OFFICER SIGULINSKY'S TESTIMONY CONTAINED IN SEPARATE VOLUME)

OFFICER NEWLIN                                                    PAGE NO.

    BY MS. MASCHAT.............................................................   136

    BY MR. HAMSTEAD..........................................................   148

    BY MS. MASCHAT.............................................................   189

KELLY HALBERT

    BY MS.  MATSCHAT.........................................................   191

    BY MR. HAMSTEAD..........................................................   195

JOHN MORRIS

    BY MS. MATSCHAT..........................................................   203

    BY MR. HAMSTEAD..........................................................   221

    BY MS. MATSCHAT..........................................................   251

DALE DeGRAVES

    BY MS. MATSCHAT..........................................................   253

    BY MR. HAMSTEAD..........................................................   261

    BY MS. MATSCHAT..........................................................   279

    BY MR. HAMSTEAD..........................................................   281

5

**TROOPER WALKER**                                          PAGE NO.

    By Ms. Matschat.................................................. 285

    By Mr. Hamstead............................................... 310

    By Ms. Matschat.................................................. 347


**JULIE HAMSTEAD**

    By Mr. Hamstead............................................... 354

    By Ms. Matschat.................................................. 402


**(Toni Erchak's testimony contained in separate volume)**


**LARRY PETERS**

    By Mr. Hamstead............................................... 429

    By Ms. Matschat............................................... 432

    By Mr. Hamstead............................................... 435

    By Ms. Matschat............................................... 445

    By Mr.  Hamstead............................................... 451

**REBUTTAL TESTIMONY OF TROOPER WALKER**

    By Ms. Matschat............................................... 453

    By Mr. Hamstead............................................... 456

6

# I N D E X (Continued)

**Closing Arguments**                                                    **PAGE**

    By Ms. Matschat.............................................................. 462

    By Mr. Hamstead............................................................ 470

    By Ms. Matschat.............................................................. 479

**State's Exhibits**

    No. 1    CAD Reports...................................................... 17,18

    No. 2    CAD Reports...................................................... 17, 18

    No. 3    911 Disk.............................................................. 297

    No. 4    Photograph....................................................... 297

    No. 5    Photograph....................................................... 297

    No. 6    Photograph....................................................... 297

    No. 7    Photograph....................................................... 297

    No. 8    911 disk............................................................. 297

**Defendant's Exhibits Entered Into Evidence**

    No. 26A  FOIA Request.................................................. 44

    No. 3    Diagram............................................................ 44

    No. 6    Morris Statement.......................................... 44

    No. 22.................................................................................. 440

    No. 23.................................................................................. 440

    No. 24.................................................................................. 440

1   and state. .

2       Q.   Where you there in that parking initially?

3       A.   No, ma'am.

4       Q.   So what caused you to go down to the parking lot?

5       A.   I was working about two blocks north of the

6   parking lot.  We had a subcontractor working for us

7   pouring concrete work.  He called me and asked me if I

8   would come up, that he was dealing with a citizen who was

9   upset.

10      Q.   Okay.  And when you went down to the parking lot,

11  when did you initially make contact with the defendant?

12      A.   Immediately.  I got out of my vehicle and

13  approached her.

14      Q.   And where was she sitting?

15      A.   She was in front of a residence facing northbound

16  on the boulevard.

17      Q.   Was she on the sidewalk?  In her car?

18      A.   I believe she on sidewalk.  I think she was on the

19  phone at the time.

20      Q.   And do you recognize that female individual at

21  this time in the courtroom?

22      A.   Yes, ma'am.

23      Q.   And where is she seated?

24      A.   (Pointing.)

1           MS. MATSCHAT Judge, I would like the record

2    to reflect that he has identified the defendant.

3    BY MS. MATSCHAT:

4       Q.  So you start talking with her.  She's upset and

5    you said she was cussing and being irate, correct?

6       A.  Yes.

7       Q.  Were there other individuals around besides

8    yourself?

9       A.  I did.  When I got the initial call, I took the

10   state inspector with me.

11      Q.  Okay.  And you said were not able to come to any

12   kind of resolution at that point with her, correct?

13      A.  No.

14      Q.  And at that point, you called 911, correct?

15      A.  Yes.  She was still they're at the time.  And I

16   just didn't want any issues the next day, so did make a

17   call to 911 to see if they could send an officer out to

18   talk with her.

19      Q.  And during this period of time when she was

20   yelling or cursing, was she inside the parking lot or was

21   she on the street?

22      A.  Well, when we had the initial conversation, we

23   were on the sidewalk in front of the residence.

24      Q.  I would like to play your 911 call, if I could?

1          MS. MATSCHAT:  Judge, there are several

2     clips, so it will take a little while for me to pick out

3     all of them.

4               (WHEREUPON, the Alan Shutts 911 call was

5     played.)

6     BY MS. MATSCHAT:

7       Q.  Okay.  Is that an accurate depiction of how your

8     911 call went?

9       A.  Yes, ma'am.

10      Q.  Okay.  And at some point, did you see the

11    defendant making some movements or turn around?

12      A.  I did not.

13      Q.  Okay.  So what was the cause for you to make

14    another 911 call?

15      A.  Well, as I sat there, I got out the vehicle.  I

16    was working with a contractor.  At some point, she turned

17    her vehicle around and came through the parking lot.

18           And when seen the initial accident, it looked like

19    she had run into the side of our pickup.

20      Q.  Did you actually see the defendant coming through

21    the parking lot?

22      A.  I did.

23      Q.  Okay.

24      A.  I did not see her enter the parking lot, I seen

51

1    accident right as it occurred.

2        Q.  Okay.  Can you tell the Court about with a little

3    bit more detail how that accident occurred?

4        A.  From where I was at, our vehicle was parked at the

5    east end of parking lot, and she entered from the north

6    side of the parking lot.

7        Q.  Is that answer an entrance there?

8        A.  I don't think it's supposed to be a designated

9    entrance from the parking lot.  It actually comes off

10   Valley Place.  But we do cut across, we do cut across

11   there at times.

12       Q.  Okay.

13       A.  And she entered that way, and she ran into the

14   side of the truck.

15       Q.  Can you tell us a little bit about how fast she

16   was going?

17       A.  My opinion is that it was a higher rate of speed

18   than normally what you would drive in a parking lot.

19       Q.  Were other individuals standing around?

20       A.  Yes.

21       Q.  Can you tell us about like who was around and what

22   you guys were doing in the parking lot that day?

23       A.  I know Mr. Degraves and Mr. Morris, they were

24   getting off from work.  Mr. Degraves was dropping.  Mr.

1    about the whole incident, so I preceded to tried to tell

2    him what happened.

3        Q.  Where was the defendant while you were speaking

4    with enough Officer Newlin?

5        A.  We were at the east end of the parking lot close

6    in proximity.

7        Q.  Who all was there?  Can you kind of give us a

8    picture who was standing where?

9        A.  It was me, Rodney Hendrick, all three officers,

10   Dale Degraves, John Morris.  And there were some

11   contractors, but they were not around, so I believe that

12   was it.

13       Q.  Can you give us an idea as how close the defendant

14   was to you and Officer Newlin?

15       A.  I would say probably from you to me.

16       Q.  While you were speaking with the officer, what was

17   the defendant doing?

18       A.  As I started to speak to the officers, she came

19   over and told the officer she wanted to hear what I was

20   saying and interrupted the conversation, which at that

21   point, the Trooper Walker asked her to stay with him.  So

22   then I proceeded to speak to the Charles Town officer,

23   which she interrupted again.

24       Q.  When you say she interrupted, what was she doing?

1      A.  I think she made the statement that I have a right
2  to hear what he was saying, I want to hear what he's
3  saying, things like that.  And at some point, she
4  actually asked Trooper Walker to take her to jail.
5      Q.  When you say she was saying that I have a right,
6  can you tell us what her demeanor was at that point?
7      A.  She was pretty irate.  She was upset.
8      Q.  At some point, she told Trooper Walker to take her
9  to jail?
10      A.  Yes.  She made a gesture to put her wrist together
11  and said take me to jail.
12      Q.  Approximately, how many times did Trooper Walker
13  try to get her to stay back from you and Officer Newlin?
14      A.  I'm pretty sure it was twice.
15      Q.  And so what happened then at that point?
16      A.  I proceeded to talk with the officer and she
17  interrupted again.
18      Q.  Okay.  And then what happened when she interrupted
19  a third time?
20      A.  At that point, Trooper Walker reached out to
21  restrain her by her arm, and at that point she turned
22  around and swatted Trooper Walker's hand away from him.
23      Q.  So you saw the defendant swat at Trooper Walker?
24      A.  Yes, ma'am.

1     Q.  What happened after that?

2     A.  He proceeded to try to take her into custody.

3     Q.  When you say he tried to take her into custody,

4  what happened?

5     A.  She somewhat resisted.  He got her in the vehicle

6  and tried to take her into custody but she resisted.  And

7  at so some point, they -- I don't know if Trooper Walker

8  placed her on the ground or if she lost her footing, at

9  some point they went to the ground and he arrested her.

10     Q.  Throughout that period of time, did she eventually

11  start complying with Trooper Walker's requests?

12     A.  She did.  After he got her in handcuffs, she did

13  comply.

14     Q.  Okay.  Did you have any concerns at any point

15  about the way Trooper Walker handled the incident?

16     A.  No, ma'am.  I thought he was very patient in the

17  situation.

18     Q.  Okay.  At some point, you saw Mr. Hamstead enter

19  the scene, correct?

20     A.  Yes, ma'am.

21     Q.  And how quickly was that after Trooper Walker had

22  taken her into custody?

23     A.  I would say it was probably within a matter of 10

24  minutes.

1     A.   No.

2     Q.   Okay.  When did you arrive on scene?

3     A.   The accident had just happened prior to me getting

4  there.  And I was there when Alan Shutts was still on the

5  phone with 911 prior to any of the police officers

6  arriving.

7     Q.   And what was the defendant's demeanor at that

8  point right after the accident?

9     A.   Just care free, not a problem in the world.

10    Q.   And then how did her demeanor change when law

11  enforcement got on scene?

12    A.   When law enforcement got on scene, the Ranson and

13  Charles Town police officers got on scene, the state

14  police officer, he arrived on the scene.

15         The Ranson Charles Town was questioning the two

16  Jefferson employees.  He went over there and questioned

17  them, and the state officer took Ms. Hamstead to -- told

18  her to wait over here while the other officers.  She was

19  mouthing, saying that I have a right to hear what they

20  are saying and this that and the other.  And he said,

21  Ma'am, just calm down, you need to calm down.  Let them

22  tell their side of the offer story, then you can tell

23  your side of the story.

24         And how far do you want me to go through, do you

1   want me to go through everything?

2       Q.   How would you describe her demeanor?  Was she

3   calm?  Was she upset?

4       A.   At that time, it was just like you flipped a

5   switch.  She went from being calm once the police

6   officers came on scene, to being irate, saying that

7   Jefferson Asphalt had hit her and this, that and the

8   other.

9            And when they went to question the two Jefferson

10  Asphalt employees, the one that was outside of the

11  vehicle and the one inside the vehicle, she became irate.

12  "You tell them the truth," and just talking and hollering

13  and carrying on.  And she was asked several times to calm

14  done.

15      Q.   And who asked her to calm down?

16      A.   The state police.

17      Q.   Okay.

18      A.   I don't know his name.

19      Q.   Okay.  Trooper Walker.  Okay.  So after she was

20  being irate and you said hollering and carrying on,

21  Trooper Walker, do you know, approximately, how many

22  times he asked her to calm down?

23      A.   He asked her to calm down several times.

24      Q.   And did she calm down?

1      A.   No.

2      Q.   And then what happened next?

3      A.   Then she went to walk toward the other two

4  officers and the Jefferson guys, and the trooper kind of

5  put himself in the mix of them.  "Ma'am, you need to wait

6  back here, you need to calm down and wait your turn. "

7  And at that point, she put her hand out like this, "just

8  cuff me, go ahead, take me to jail."

9      Q.   Okay.  Let me back up.  You said she was walking

10  towards the other officers?

11     A.   She was trying to walk towards them, yes.

12     Q.   And which way were they facing in proximity to the

13  defendant?  Were they facing in the same direction back

14  to it?  How was everyone facing?

15     A.   If you had to be right here, Ranson and Charles

16  Town cop were standing by the front of the vehicle, the

17  trooper had her right here, and I was standing pretty

18  much between the two right back about equal with the

19  trooper as the judge would be right there, and Ms.

20  Hamstead would then be on the other opposite.  We were

21  not that quite far apart.

22     Q.   Were the officers facing the defendant or did they

23  have their backs to her?

24     A.   The officers had their back, as far I could tell,

1    to her because they were facing the other two gentlemen

2    which were facing toward me.

3        Q.   And you said she approached the officers who had

4    their backs to her, correct?

5        A.   She made the motion to try to approach them, yes.

6        Q.   And you said Trooper Walker kind of stepped in

7    between them?

8        A.   Yes.  And faced her in front and stated, "Ma'am,

9    you need to stay back here, you need to quit."  That's

10   when she put her hands together and put them out in front

11   "Arrest me, go ahead, just arrest me. "

12       Q.   And then did she calm, do you think, after that?

13       A.   No.

14       Q.   And what happened after that?

15       A.   Then after that, she went like she was going to --

16   she stood there for, it may have been a couple of

17   seconds.  But then she went to move toward them again,

18   and the trooper put his arm out, "Ma'am, you need to stay

19   back here."

20            And at that time, she grabbed his hand and thrown

21   it down to the side.  And when that happened, he grabbed

22   her and put her over against the vehicle.

23       Q.   Okay.  You saw the defendant kind of push Officer

24   Walker -- or how did you describe it again?

1     A.  She took her right hand, and it was his right

2    hand, she grabbed it and flung it down like this, and was

3    walking away as if she could go on.

4         And when she did that, the officer grabbed her by

5    the arms and put her over against the vehicle.

6     Q.  At that point, did she comply?

7     A.  No, she did not comply.  She started kicking and

8    hollering and screaming and trying to resist in my book.

9     Q.  Okay.  What did the officer telling her to do at

10   that point?

11    A.  He was telling her to calm down, give me your

12   hand.  He was going to try to hand cuff her, but she

13   wouldn't comply.  So I don't know if he took her to the

14   ground or she stumbled to the ground.  Either way, that's

15   only way he could have got her subdued to hand cuff her.

16    Q.  So you felt like she was that combative that he

17   really had to?

18    A.  Yes, ma'am.  With my background in the military,

19   being military, military police, as collateral duty, I

20   felt that's what he needed to do to get her under

21   control.

22    Q.  Okay.  Did you have any concerns at any point

23   regarding how law enforcement treated the defendant?

24    A.  No, ma'am.

1     A.  I don't recall if I ever throughout the whole

2    curse of this ever have any verbal interaction with her

3    at all.  I do not recall that.

4     Q.  So who were you speaking with then when Trooper

5    Walker got on scene?

6     A.  One of the Department of Highway workers.  I

7    believe it was the driver of the truck, the elderly

8    gentleman.  I do know it was one of the male workers but

9    which one I don't recall.

10    Q.  When Trooper Walker arrived on scene, did she make

11    any comment to him?

12    A.  When Trooper Walker arrive on scene, I think he

13    was given a rundown of what happened.  But he stood back

14    well behind me trying to keep the peace and tended to Ms.

15    Hamstead while I was dealing with the Department of

16    Highway guy over by one of Department of Highway trucks.

17    Q.  So Trooper Walker kind of took on staying with Ms.

18    Hamstead while you guys were doing the investigation?

19    A.  Yes.  And he was well behind me.  I think I was

20    one side of parking lot, and he was completely on the

21    other.

22    Q.  Did you hear Ms. Hamstead say anything at that

23    point once Trooper Walker got on scene?

24    A.  During the conversation I was having with the

1   Department of Highways workers, I couldn't focus my

2   attention to him because of the yelling and screaming

3   that was going on in the background.

4       Every time I would turn around to see exactly what

5   was going on, I would see Trooper Walker try to talk to

6   Ms. Hamstead telling her she needed to stay back with

7   him, I will be over with you in moment or whatever the

8   case might be.

9       Again, the yelling and screaming profanity, it

10  took place the entire time why were on scene.

11      Q.  And you said had to keep turning around, so which

12  way were you facing in proximity to the defendant?  Don't

13  give me east or west, that kind of thing.

14      A.  I was facing in the exact direction that Ms.

15  Hamstead's vehicle was.  I had my back to East 1st

16  Avenue.

17      Q.  And Ms. Hamstead was behind you?

18      A.  Yes.

19      Q.  So you had your back to the defendant, correct?

20      A.  Correct.

21      Q.  At any point, did you hear her getting closer on

22  see that was getting closer or see her getting closer

23  when you were turning back?

24      A.  At one point, I saw or I heard the voice getting

1    louder and louder, and the profanities seem to be more

2    agitated.  So I turned around, at that point and she

3    walking away from Trooper Walker, and Trooper Walker was

4    telling her you need to stay with me, get back and so

5    forth.

6         Q.  At some point, did Trooper Walker then take her

7    into custody?

8         A.  Yes, he did.  I simply remember him going to reach

9    for her and her making a motion backwards like she was

10   smacking t his arm. Whether contact was made or not, I

11   have no idea.  From my perspective, that's what I saw.

12        And then she walked aggressively in my direction,

13   which is also where the Department of Highways worker

14   was.  At that point, Trooper Walker stated to her she was

15   under arrest.  I went to grab her, she pulled away from

16   him, at which point she placed against one of vehicles to

17   help to be taken into custody.

18        Q.  Do you know why she was placed against the

19   vehicle?

20        A.  Because she kept fighting against him, fighting

21   not to be arrested and wanted to get away from him, just

22   to avoid that whole being taken into custody.

23        Q.  And when you saw all of that happening, did you

24   turn back around or did you watch what was going on?

1      A.  When she got closer to me and was placed her up

2  against the vehicle, that was within two or three feet

3  from where I was standing.

4          So the individual I was speaking with I believe

5  stepped away.  And I, at that point, turned and focused

6  my attention toward Trooper Walker and Ms. Hamstead.

7      Q.  At some point, you said that was smacking back or

8  making some kind of motion to try to get Trooper Walker

9  off of her, correct?

10      A.  Yes.

11      Q.  And then you said she was restrained up against

12  the vehicle, correct?

13      A.  Correct.

14      Q.  Did she begin to comply at that point?

15      A.  No, ma'am, she did not.  While up against the

16  vehicle, she continued to try to shield her arms from

17  Trooper Walker.  And in that close proximity to that

18  vehicle, it was nearly it impossible to try to gain

19  compliance and control her, therefore she was placed on

20  the ground.

21      Q.  Okay.  And you observed all this happening,

22  correct?

23      A.  I did, I was a literally standing over top of it.

24      Q.  At any point, did you assist Trooper Walker in

1   custody?

2       A.  Not at first.  I would say probably 10 or 15

3   seconds went by, Trooper Walker had her left hand in

4   handcuffs, her right arm kind of forced on her.  And she

5   was try like attempting with that one arm to get up off

6   the ground.

7       Q.  Let me back up.  I didn't hear what you said.  You

8   said her left hand was in handcuffs, and what was going

9   on with her right hand?

10      A.  It's like she was trying to use this part of her

11  right arm and the right side of her body to maybe attempt

12  to get up off the ground or shoved up under.

13          The right side of her body was basically flopping

14  up and down on the ground.

15      Q.  So what did you do?

16      A.  At that point, I knelt down and put my knee on the

17  ground.  I took my left hand and put it on the back of

18  her right shoulder and held pressure there to avoid her

19  from bouncing up and down where Trooper Walker could gain

20  compliance of her right arm.

21      Q.  Okay.  At that point, did she began complying?

22      A.  No, there was no compliance, not even after being

23  placed into the police vehicle.

24      Q.  So you observed her in the officer's patrol car?

1    you saw once law enforcement got there?

2        A.  I've seen Ranson because t was initial called into

3    Ranson.  The officer came, he was trying to figure out

4    what was going on.

5            And then, I believe it was the sheriff's

6    department and the state police came.  They were all

7    trying to figure out what was going on, trying to talk to

8    everybody.

9        Q.  What was her demeanor while law enforcement was

10   talking to other individuals?

11       A.  She was very loud.  It wouldn't stop.

12       Q.  When you say she was very loud, do you recall what

13   she was saying?

14       A.  "We welcome the state for lawsuits.  We will get

15   what's owed to us."  She was being loud and rude telling

16   them she didn't have to be quiet.

17       Q.  Okay.  Did you hear anything that Trooper Walker

18   had said to her?

19       A.  He told her numerous times, ma'am, calm down.

20   Ma'am, I'm trying to put everything together.  Like I

21   said, I believe like five or six times her told her to

22   please calm down.

23       Q.  Did she comply with his requests?

24       A.  No.

1    Q.  Okay. · What was her demeanor after he told her to.

2    calm down?

3    A.  He warned her again and said that he would place

4    her under arrest.  She held her hands out and said,

5    "arrest me, arrest me," and starting walking away from

6    him.

7         So I know he grabbed a hold of her, she jerked

8    away.  And that's when he grab ahold of her again and put

9    her up against the truck to try handcuff her.

10    Q.  So you observed the defendant jerk away from the

11    officer?

12    A.  Yes.

13    Q.  And you said the she was placed up against the

14    vehicle, correct?

15    A.  Yes.

16    Q.  Okay.  What happened from there?

17    A.  She wouldn't let him handcuff her. And the next

18    thing I know, I don't know if they slipped or fell on the

19    gravel or he put her down on the gravel.  I don't know,

20    but that's when they both went down and he got her

21    handcuffed.

22    Q.  Okay. Did you have any concerns about the way the

23    officers were treating Ms. Hamstead that day?

24    A.  No.

1    happened to her car?

2        A.   Well, in what way?

3        Q.   Where did it go.

4        A.   She couldn't -- she says, Can I move my car?  And

5    John said, Why?  She said, So I can get out, and she

6    pulled it forward.

7        Q.   Do you know about how far forward she pulled it?

8        A.   Maybe 10 to 15 feet, I guess.

9        Q.   Okay.  Were you there when the law enforcement

10   arrived?

11       A.   Yes.

12       Q.   Did you talk to anyone in law enforcement?

13       A.   Yeah.  I don't know which law enforcement was

14   taking the accident case, but I talked to Ranson and

15   Charles Town and the state trooper.

16       Q.   Okay.  When you were talking to law enforcement or

17   when other individuals was talking to law enforcement,

18   what was the defendant's demeanor like at that point?

19   How was she acting?

20       A.   She kept saying, "you're lying," and "tell the

21   truth," stuff like that.

22       Q.   What was the level of her voice?

23       A.   Louder than normal.

24       Q.   Was she ever told to be quiet?

258

1    A.   Yes.

2    Q.   Who was telling her to be quiet?

3    A.   The state trooper.

4    Q.   About how many times did he tell her to be quiet?

5    A.   At least two that I know of.

6    Q.   Okay.  Was she listening to Trooper Walker?

7    A.   No, I don't think so.

8    Q.   What else was she doing during that period of

9  time?

10   A.   She was walking around them.  And he kept telling

11  her you need to stay over here and let the officers do

12  the case.

13   Q.   And did she listen to him?

14   A.   No.

15   Q.   Where was she going?

16   A.   Down to where we were.  She was in behind us

17  behind my -- we were next to my truck, the cab, and she

18  was heading down behind a truck.

19   Q.   So she was coming towards you all?

20   A.   Uh-huh.

21   Q.   Okay.  At some point, did you see Trooper Walker

22  take her into custody?

23   A.   I didn't see him take her into custody.  But I

24  headed back to my truck.  And she went down there and he,

1    one point, me and Ms. Hamstead were just standing there

2    while Officer Newlin and Sergeant Sigulinsky spoke with

3    the male subjects.

4        Q.  What was her demeanor at that time?

5        A.  Calm, relatively calm.

6        Q.  And then at some point -- so she was relatively

7    calm at that point, correct?

8        A.  Yes, ma'am.

9        Q.  At some point, did her demeanor change?

10       A.  Yes.  Once the, I don't know exactly which guy

11   that were talking to, once he started talking about what

12   had happened at the incident there, she began coming

13   irate saying, hey, they're lying this, that, and the

14   other as far as they're not telling truth.

15           I told her, listen, we will get your side of the

16   story.  Let them tell there's, we will come over and talk

17   to you.  She calmed down.  She didn't say anything there.

18   And as soon as the guy started talking again, she started

19   yelling about he was lying.  I was like, ma'am, listen,

20   you need to shut your mouth and stay back here.

21   At that time, she said to me, just put the cuffs on me,

22   and she put her hands out like this.

23       Q.  How far away were you and the defendant from the

24   other officers?

1      A.  10 to 12 feet.

2      Q.  And which direction were the officers facing in

3  relation to the defendant?

4      A.  As we've seen earlier in all the other people's

5  testimony, the way the parking lot was set up, we were

6  facing the trees and white trick.  And the tree were in

7  the background, what we call the back of the parking lot.

8         Me and Ms. Hamstead were facing the truck, and the

9  other officers and guy, they were standing at the front

10  of the truck.  I don't know where officer or Sergeant

11  Sigulinsky's truck was.  I don't recall that.  But me and

12  Ms. Hamstead were standing 10 to 12 feet away toward the

13  rear of the truck but up the hill a little bit toward

14  George Street.

15      Q.  And you said at some point she made some comment

16  about put the cuffs on me or arrest me or something?

17      A.  Yes.  After I told her to shut her mouth and stay

18  back where I was because she had become irate, yelling

19  and not allowing the other guys to talk about their

20  story.

21      Q.  Did she make any gestures at that point?

22      A.  Just putting her hands out.  I told her that was

23  not necessary, to stay back here with me, shut your mouth

24  and let them take care of what they need to take care of,

1    and you will get your side of the story out.

2          And as soon as I said that, she turned around and

3    started advancing on them again.  At that point, I made

4    the decision to place her under arrest for disorderly

5    conduct and on obstructing.

6          Q.  I want talk about how you took her into custody.

7    Can you tell us a little bit about how that happened?

8          A.  Yes, ma'am.  As she started walking away from me

9    towards the other officers, I went to grabbed her arm.  I

10   can't remember if it was right or left, she slapped my

11   hand away.  I went up to grab her again I believe I got

12   one arm behind her at that point.  She would not give her

13   other arm after I told her to put her arms behind her

14   back she's under arrest.

15         At that point, I walked her over three or four

16   steps and put her up against the truck to get a better

17   leverage on her.  At that point I still had the one arm

18   behind her.  She wasn't given up the other arm and we

19   struggled for a couple of seconds.  I decided d to put

20   her on the ground.

21         When I put her on the ground, I was try get her on

22   her stomach, she would not get on her stomach.  She had

23   her legs up underneath her kind of in a Indian-style

24   position.  We struggled there for a couple seconds there.

1    I kept telling her to put her hands behind her back,

2    she's under arrest.  That went on for a couple seconds,

3    and then she calmed down for a second and tried to barter

4    with me -- if let my arm go and let me stand up, we will

5    do whatever.  I said, no that's not an option.  You need

6    put your hands behind your back.

7         She put her arm behind her back.  I put her in

8    handcuffs.  She said, get me off the ground.  I said,

9    Yes, ma'am, I'm double-locking the cuffs so they don't

10   get tighter on you when you sit down.  I double-locked

11   the cuffs and --

12        Q.  Can you tell me what that means, double-lock the

13   cuffs?

14        A.  Double-locking the cuffs is when you place

15   somebody's wrist in the handcuff, you click it down to

16   where the proper adjustment is, and then you stick the

17   end of the handcuff key into the handcuff, it locks it in

18   place so it doesn't collapse anymore onto their wrists.

19        Q.  Okay.

20        A.  It's very useful when you sit down because when

21   you sit down, obviously your hands are behind your back.

22   You're almost sitting on your hands, so it can collapse

23   those hands if you don't do so and cut off circulation to

24   a person's hands.

1    Q.  So you told her you were double-locking the cuffs

2    and then what happened?

3    A.  I stood her up off the ground.  We walked over to

4    my cruiser.  She asked for her husband to be there, and

5    that I broke her arm.  I told her that I did not break

6    her arm.  I walked her over to the cruiser and put her in

7    the cruiser.

8         At that point, I going to take the accident there

9    I was involved.  I was taking care of the rest of the

10   incident.  And then shortly after that is when Mr.

11   Hamstead showed up.  I don't know if somebody else

12   introduced me as, to him as Ms. Hamstead's husband, or if

13   he introduced himself or however it was.

14        But shortly after, I put her in the cruiser, I was

15   walking back, made contact with him.  And he's kind of

16   like what's going on.  I was like well, as we're talking

17   there, you know, this happened, this happened, I hear a

18   thumping come from my cruiser.  Is see Ms. Hamstead

19   hitting her head against the window.

20        I walk over to the cruiser like, what are you

21   doing, stop doing that.  She said, I need to go to the

22   hospital.  I said, okay.  I need to take care of a couple

23   things first, take some pictures of this accident and

24   we'll go on up there.

1    I close the door.  I went around to the other side

2    and got my camera out of my bag sitting on the same seat

3    as her or maybe in my trunk.  I can't remember, but

4    that's usually where I had it.

5    I went back and I stopped to Mr. Hamstead and

6    said, you know, she really wouldn't under arrest if she

7    wasn't acting like that.  And then I continued to go on

8    over there and take picture of the accident scene.

9    As I was doing that, Mr. Hamstead approached my

10   vehicle.  I don't know what he said.  I instructed him to

11   get away from my vehicle because.  We don't allow people

12   to talk to our prisoners once we have arrested them.  He

13   abided by that.  He start walking over to my area while

14   was standing taking the pictures.  I starting taking

15   pictures, he said, hey, we really need to get to the

16   hospital.  I said, yes, sir.  Once I get done with my

17   investigation, we will go to the hospital.

18   I was moving around, taking some more pictures.

19   He brought it up again, she needs to go to the hospital.

20   Yes, sir, I will take her to the hospital.  Let me finish

21   what I'm doing.

22   At that point, I directed Officer Newlin to start

23   getting statements.  I asked Sergeant Sigulinsky to help

24   him get statements from other people that was witness to

1    the arrest and I everything like that.  You know, what

2    had happened before the crash and witness to the arrest.

3              At that point, I was in the middle of taking

4    pictures.  Mr. Hamstead, again said can we take her to

5    hospital.  Yes, we are going to the hospital right now.

6    I stopped taking pictures at that point.  The last

7    picture that you see is the tire track going up to the

8    vehicle in the rear of her vehicle.

9         At that point, I stopped taking pictures.  I went

10   got in my cruiser and took her up to the hospital.

11      Q.  Let me stop you there.  I want talk a little bit

12   about what her demeanor was while law enforcement was

13   trying to talk to the other workers.

14         Do you know, approximately, how many times you

15   asked her to calm down or step back or whatever?

16      A.  Several times.  It got progressively more

17   demanding each time because she was getting the hint to

18   the point where she said go ahead and cuff me.  That's

19   not necessary.  You just need to shut your mouth stand

20   back with me, that's all that need to happen.

21      Q.  Was she staying in one spot during this?

22      A.  No.  She was walking around back and forth.  She

23   will go toward the officers, I would tell her to get back

24   a couple steps.  And then the guy would start talking

1   opinion as to how this accident occurred?

2      A.   My opinion in how this accident occurred was the

3   Honda Pilot was coming into the parking lot at a speed

4   that I can't say was well above what should be there or

5   well below at a speed that was able to create skid marks

6   in an uncontrolled manner and struck the front of the

7   truck.

8      Q.   Okay.  And I anticipate there will be some

9   testimony that will indicate that the truck hit the Honda

10  Pilot.  Would you dispute that testimony?

11     A.   I would dispute that.  I don't believe that the

12  truck would have -- I believe that the Honda Pilot is the

13  sole purpose for the accident.

14         I don't believe the truck had any bearing on

15  whether the accident happened or didn't or wouldn't have

16  happened.

17     Q.   What is that based on?

18     A.   Due to the statements of other people around,

19  evidence I saw on the truck.

20     Q.   Specifically, what evidence?

21     A.   The evidence I saw on the truck as far as damage

22  to the truck and the skid marks on the ground were pretty

23  tall-tale signs to me.

24     Q.   Okay.  So you said once she was placed in the

1    correct?

2        A.  That is correct.

3        Q.  And did you give her instruction on the way to the

4    hospital?

5        A.  I told her to not act like an ass.

6        Q.  Why did you tell her that?

7        A.  Because she asking act like an ass before.

8        Q.  You didn't want her to act like that in the

9    hospital?

10       A.  That's correct.

11       Q.  So when you got into the hospital, what was her

12   demeanor like walking in the hospital?

13       A.  I was leading her by her arm into the hospital,

14   not pinching her or grabbing her or anything like that.

15   She was my prisoner.

16       I was leading her into the hospital, went up to

17   the kiosk.  The lady at the kiosk was on the phone at

18   that time, which is where we usually walk up to get a

19   room for the person we have under arrest.  She had to

20   close the window because Ms. Hamstead was speaking loudly

21   saying that I had broke her arm, that I am pulling her

22   arm and doing this and that and I'm hurting her.

23       And it wasn't until I let go off her arm because

24   we had been standing there for 30 seconds or so, we were

1    think you said 2254, correct?

2       A.   Yes.

3       Q.   When does CAD show you en route to the magistrate

4    court?

5       A.   2334.

6       Q.   And how long were you at the magistrate court

7    courthouse then?

8       A.   I arrived at the courthouse at 2331.  And I was

9    advised I was available at 0001, that meant the following

10   day.

11      Q.   Do you recall how you obtained the defendant's

12   license?

13      A.   Somebody gave it to me at the scene.  I don't

14   remember who.  I don't remember when.  Whether it was

15   before or after I arrested her.  But I had taken it at

16   scene but I don't know by who.

17      Q.   You did the not enter her vehicle?

18      A.   No, I did not.

19      Q.   Did you see anyone enter her vehicle while you

20   were there?

21      A.   I did not.

22      Q.   And you said were on scene total about 26 minutes,

23   correct?

24      A.   Yes, ma'am.

342

1    BY MR. HAMSTEAD:

2        Q.  Did Ms. Hamstead put you in fear where you feared

3    for your safety?

4        A.  No.

5        Q.  Where is the driver's license?

6        A.  I do not know it.  It was on my desk so long.  I

7    believe I picked up to come to court.  I do not have it.

8        Q.  How long ago id you pick it to come to court?

9        A.  I don't recall the exact date.  I know we were

10   coming to court one time to bring it here.  I don't where

11   it went after that.  I don't see it on my desk anymore.

12   I looked several times.  I know that was an issue that

13   you had brought up and I don't know what happened to it.

14       Q.  Do you not get the information off her driver's

15   license that night?

16       A.  What do you mean?

17       Q.  You didn't get information off of her driver's

18   license on the 25th, that date?

19       A.  That's correct, I did.

20       Q.  Why did you need it after that?

21       A.  No, it wasn't intentional.  I believe I left it on

22   my desk.  When I came back.  I saw hit.

23       Q.  How many times did you get asked to produce that

24   driver's license over the course of this case in April of

1   anything.  But over the weekend, I'm thinking this is not

2   true, they are not going to give us any parking spaces.

3       So Monday came, no word came from them, from the

4   Department of Highways from the engineer from whom you

5   had spoken to.  And the men were still out there digging

6   away and getting ready to pour concrete.

7       You could tell because they were setting up molds

8   for the concrete to pour.  And I have been around

9   construction enough to know when concrete is going to be

10  poured.  So they were setting it up for pouring concrete.

11  And so --

12      Q.  Did you use curse words at individuals that were

13  out there?

14      A.  No, no.  So what happened was, I picked up my son

15  from school.  I dropped him off at the office.  I had to

16  go, it's a long story, but I had to go vacuum my car.  I

17  had given a guy a ride and he said he had bed bugs.

18          MS. MATSCHAT:  Objection.  Relevance.

19      A.  So I vacuumed my car.  And I was going back to my

20  office, and I'm thinking I'm going back to my office, you

21  know, maybe I should park in front of our property there

22  because I know they are not giving us back our parking

23  spaces.  I know it's not safe to park there, but maybe I

24  should just park there.  And I just should maybe just get

1    a parking ticket and, you know, prove a point that it's

2    not safe to park there.

3        Q.  So that parking space where you picked, is that

4    one of the areas that was contemplated to be given back

5    to us?

6        A.  Yes.  We were promised to have three parking spots

7    back there.

8        Q.  And what did you do after that after you parked

9    there?

10       A.  Well, I parked there.  I put my flashers on.  And

11   I thought, you know, I need to call the police.  But I

12   thought, well, they can give me a ticket.  I have to tell

13   them it's not emergency right away, so I called the

14   police.

15       Q.  You called 911?

16       A.  I did call 911.  But then I said it's not an

17   emergency right away because, you know, I realized I

18   called 911 and probably should not have done that.

19           But anyway I said, it's not an emergency.  But,

20   you know, I need to talk to someone, you know.  I'm

21   thinking in the back of my head maybe I will get a

22   parking ticket.

23       Q.  Did you hear the 911 call that was played here

24   today?

1    A.   Yes.

2    Q.   That was the call?

3    A.   That was the call.

4    Q.   What did you do after that?

5    A.   And then, well, I had stood there for little bit,

6    and so I see a police officer drive by, and he just

7    passed by, and it was a white vehicle.  And so I thought,

8    well, you know, obviously he doesn't care that I'm

9    illegally parked here, so this not going to work, you

10   know.

11           So about that time, I was getting ready to get in

12   my vehicle and take off.  About that time, the guy from

13   the corner --  it wasn't Shutts, it was s some other

14   worker -- came up to me and said --

15           MS. MATSCHAT:  Objection.  Hearsay.

16   A.   -- what are you --

17           MS. MATSCHAT:  Objection.

18           MR. HAMSTEAD:  What are you objecting for?

19           MAGISTRATE SENSENEY:  Wait.  Wait.

20           MS. MATSCHAT:  My objection is hearsay.  Now

21   she's telling something of some person she can't

22   identify, that's clearly hearsay.

23           MAGISTRATE SENSENEY:  You can't do that.

24           MR. HAMSTEAD:  Your Honor, the police, if I

1    that, that's admissible hearsay.  I'm allowed for people

2    to talk to what the defendant said.  That's a party

3    opponent admission.  It's a hearsay exception.  That

4    doesn't mean she can talk about any random person that

5    come through and what they said.

6           MAGISTRATE SENSENEY:  Your objection will be

7    sustained.

8           MS. MATSCHAT:  Thank you.

9    BY MR. HAMSTEAD:

10       Q.  You had interaction with somebody there out there

11   at the sidewalk, correct?  You can't tell me what they

12   said, the Court ruled on that.

13       A.  Correct.

14       Q.  What did you do as a result?  What did you do

15   after that?

16       A.  Well, if I can make a comment on that.  I want to

17   say one the profanity that I did use.  I wanted to tell

18   you that.

19       Q.  You can testify to what you said, that was not

20   objection.  The objection was with regard what the other

21   individual said.  It was not your testimony.

22       A.  In response to one of his questions --

23       Q.  Okay.

24       A.  -- I said, the two fat asses at the Ranson, you

1   know, head office.  And that was in response to a

2   question that he asked me.  And that was the only

3   profanity that I used on April 25, 2016.

4       Q.  As a result of that conversation, did you

5   formulate an opinion as to whether any parking spaces at

6   all were going to be provided?

7       A.  I was absolutely assured that no parking space

8   would be private provided ever.

9       Q.  All right.  What did do you then?

10      A.  Then, I got back in my car and made one more call

11  to The Journal.  And I left a message at The Journal at

12  about 4:04, it's on my cell phone log.

13      Q.  What was the purpose of that?

14      A.  That was to tell them that if they were

15  interested, that tomorrow morning there was an illegal

16  Department of Highways project going on in Charles Town.

17  And that tomorrow morning there would probably be a few

18  people there with signs to say "stop work.

19      Q.  Was the concrete project that included paving

20  sidewalk, what was the problem with the paving of that

21  sidewalk with respect to the office and the house next

22  door?

23          MS. MATSCHAT:  I will object to relevance.

24      Q.  What was the problem with it?

1  enforcement's attention.  She testified she had tried

2  to get a ticket.  So you know she was certainly wanting

3  there to be some interacton with law enforcement, and she

4  took it too far.

5           I don't think sIgnulinsky's testimony was any

6  different.  Ithinhk he testified about during trhe scuffle

7  she bumped into him.  But I don't think we asked Officer

8  Newlin or Trooper Walker specifically aabout whether or

9  not that did or did not happen.

10          It was not a main point that either party

11 brought up. I don't think it was different.  Ithink it was

12 not a point that we focused on.

13          So again, Ithink the State has proved beyond

14 a reasonable doubt that she is guilty of all these

15 charges, and we will ask for a finding.

16          MAGISTRATE SENSENEY:  Okay.  As to the count

17 of destruction of property, I'm goiong to find

18 Ms. Hamstead not guilty. As far as the injury to a vehicle

19 is concerned, the injury must be such as to repair the

20 utility or diminish value of the property.  From what I

21 see, neither the utility nor the value of the truck was

22 diminished from the acciedent.

23          To the counts of disorderly conduct and

24 obstrucitng an officer, I'm going to find Ms. Hamstead

25 guilty to the charges.  Shall we begin with the

483

1          MAGISTRATE SENSENEY:  Okay.

2          MS. MATSCHAT:  And frankly, you know, it's no

3    surprise that she's driving in a brand new 2016 Honda

4    Accord.  I don't know that causing or fining her doing

5    court costs are really going to get her attention, so

6    that what why I'm asking for jail time as well.

7          MAGISTRATE SENSENEY:  Well, let me back up a

8    little bit.  It is that Ms. Hamstead and Mr. Hamstead did

9    get special treatment that night.  And I can't speak for

10   Magistrate Rissler, but ordinarily some one who is

11   arrested would have to spend a night in jail and be

12   arraigned the next morning rather than midnight.

13          But I'm going to, in order to stay consistent

14   pending my other judgments on cases with similar charges,

15   I'm going to fine Ms. Hamstead of total fines and court

16   costs of $200 on each one of these charges for a total of

17   $400.  And you don't have to pay that today.  Or, because

18   it's late and everything is locked up downstairs, you

19   have to decide whether you're going to appeal the case to

20   the circuit judge.  You have to decide, you have 20 days

21   to decide whether or not to appeal the case.  And if you

22   don't decide to appeal it, then, I will give you 20 days

23   to the pay $400 also.

24          MR. HAMSTEAD:  A total of within the 20-day