In the Matter of:

JULIE ANN HAMSTEAD

vs

FORMER TROOPER D.R. WALKER

SHUTTS, ALLEN

*January 29, 2020*

**Liberty Reporting**
West Virginia, Virginia & Maryland
(304) 260-0670 | (301) 992-5264

**EXHIBIT 7**

ALLEN SHUTTS, 01/29/2020

1    A.    I don't know.

2    Q.    Okay.

3    A.    I'm not sure.

4    Q.    Okay.  There was parking in front of the house
5 that you say is across from McKinney's when you were
6 there; so there was parking in front of that house
7 before the construction, wasn't there?

8    A.    Honestly, I don't recall.

9    Q.    There was parking between the two houses where
10 that opening was before the construction, wasn't there?

11    A.    Before, I don't know.

12    Q.    Okay.

13    A.    I know when we were done there were.

14         MR. JEFFRIES:  Braun, I will stipulate that
15    the project was going to interfere with the
16    parking.  If we can move on to something relevant.

17 BY MR. HAMSTEAD:

18    Q.    There's some indications in what you have
19 provided where you accused Julie Hamstead of cursing or
20 cussing about the sidewalk.  Could you tell us what
21 words you say that she was using?  You mentioned
22 something about someone being fat, an inspector being
23 fat.  Other than that, was there anything that you
24 attribute her as saying?

ALLEN SHUTTS, 01/29/2020

```
 1     A.    She said several curse words and referred to
 2   one of the inspectors as being fat.  And I mean, I don't
 3   recall exactly the words I know she was -- she was very,
 4   very upset.
 5     Q.    Okay.  And you didn't understand why she was
 6   upset?
 7     A.    I did not, no.
 8     Q.    So then in your statement you say that you
 9   turned around and -- at some point you turned around and
10   saw her in the parking lot, coming into the parking lot;
11   correct?
12     A.    I did not see her enter the parking lot.
13     Q.    Okay.
14                       (Whereupon, Deposition Exhibit
15                        No. 1 was marked for
16                        identification.)
17     Q.    Could you take a look at this rough sketch.
18   It's not to scale.  And  wanted to ask you if you would
19   tell us where her car was the first time you saw her
20   car?
21           MR. LEVICOFF:  Objection.
22     Q.    And which way.
23           MR. LEVICOFF:  Objection.  He hasn't confirmed
24      that he knows what that depicts or that it's
```

1   Q.   How did he know that you were the one that
2   called 911?
3        MR. LEVICOFF:   Objection.
4        MR. JEFFRIES:   Objection to form.
5   A.   I'm not sure if he asked me if I was the one
6   that called or not.
7   Q.   So when you started speaking to the officer,
8   which you have indicated was Officer Newlin, Julie
9   Hamstead said she wanted to hear what you were saying?
10  Do you remember that.  Do you remember her saying that?
11  A.   Yes.  She said something to that effect yes.
12  Q.   Okay.  And she said something to the effect
13  of, I have a right to hear what you were telling Officer
14  Newlin; is that right?
15  A.   That's correct.
16  Q.   And then what happened after she said I want
17  to hear -- I have a right to hear what -- it was you,
18  Allen Shutts, were telling Officer Newlin what happened
19  then?
20  A.   Well, when we initially started to speak, she
21  interrupted and Trooper Walker asked her to step back.
22  Then she said, you know, I have a right or something
23  along those lines, I have a right to hear what he's
24  saying and she was becoming more irate.  He asked her to

1   step back again.  And as I proceeded she interrupted
2   again.  And then she got arrested.
3       Q.   Okay.  What did you see happen during her
4   arrest?
5       A.   I believe it was the third time Trooper Walker
6   went to restrain her and she slapped his arm away and
7   then that's when he -- he put her against the car to try
8   to put her hands behind her back and I don't know, I
9   mean, we were in a gravel parking lot.  I don't know if
10  he intentionally took her to the ground to arrest her or
11  if they just lost their footing and went down.  But he
12  finally -- he finally got her down and placed her in
13  handcuffs and arrested her.
14      Q.   What car did he put her against?
15      A.   I don't recall.
16      Q.   How far away from the car were you when he put
17  her against the car?
18      A.   It was close proximity.  It was probably
19  within 10 feet.
20      Q.   But you don't remember what car it was?
21      A.   I don't remember, no.
22      Q.   And what happened then after he put her down?
23      A.   He placed her in handcuffs and put her in his
24  cruiser.

1  MR. LEVICOFF: That's fine.
2          (Recess taken)
3          EXAMINATION (RESUMED)
4  BY MR. HAMSTEAD:
5      Q.   What I would like to do is, I'd like to show
6  you this video that you saw this morning, Mr. Shutts.
7  And so I guess we've got two screens over here.  If
8  you'd come on this side of the table.
9          You indicated, Mr. Shutts, that you had,
10  was it a company dump truck that you had, that you
11  were assigned to?
12     A.   That's correct.
13     Q.   And could you describe that vehicle?
14     A.   It's a white GMC.
15     Q.   Okay.  And was it a crew cab or four-door or
16  what --
17     A.   It's a four-door.
18     Q.   Four-door.
19     A.   Yeah.
20     Q.   Extended cab?
21     A.   Yes.
22     Q.   Okay.  White?
23     A.   Yes.
24     Q.   Do you see in the video that I've put up on

ALLEN SHUTTS, 01/29/2020

```
1    the screen 1617.30 hours.  Do you see your vehicle?
2         A.    Appears to be it, yes.
3         Q.    You watched that this morning?
4         A.    Yes.
5         Q.    And do you see it entering -- would you call
6    that the front of the lot?
7         A.    Yes.
8         Q.    Do you see it stopped?
9         A.    Yes.
10        Q.    Do you know who the worker is standing in
11   front of your truck at that time?
12        A.    I do not.
13        Q.    Were you able to see a time on the video when
14   you got out of your truck?
15        A.    No.
16        Q.    You never could see that?
17        A.    I didn't pay attention to it.
18        Q.    You didn't pay attention to it?
19        A.    No.
20        Q.    I'm going to move the video forward here to
21   1624.  Do you see Dale DeGrave's truck approaching First
22   Avenue and turning left?
23        A.    Yes.
24        Q.    And then turning right into a lot at 1624; is
```

```
1    took Ms. Hamstead into custody that you believed to be
2    improper?
3              MR. HAMSTEAD:  Objection to the form of
4       question.
5         A.   No, sir.
6         Q.   How many times did you call 911 on April 25th?
7         A.   Twice.
8         Q.   Twice.  And that would be once after your
9    discussion with Ms. Hamstead at the sidewalk?
10        A.   That's correct.
11             MR. HAMSTEAD:  Object to the form of the
12      question.
13        Q.   Then once after the accident; correct?
14        A.   That's correct.
15        Q.   You didn't call 911 twice to report an
16   accident, did you?
17        A.   No.
18        Q.   Did you participate in the reenactment of the
19   incident that is at issue in this case?
20        A.   No.
21        Q.   Did you conspire with anyone to falsely charge
22   Ms. Hamstead with criminal offenses?
23        A.   No.
24             MR. JEFFRIES:  I don't have any further
```