**In the Matter of:**

## JULIE ANN HAMSTEAD

vs

## FORMER TROOPER D.R. WALKER

## NEWLIN, JASON

*November 19, 2019*

## Liberty Reporting
West Virginia, Virginia & Maryland
(304) 260-0670 | (301) 992-5264

**EXHIBIT 15**

```
 1   from him?
 2       A.    It's on Charles --
 3             MR. JEFFRIES:  Objection.
 4       Q.    Correct?
 5             MR. JEFFRIES:  Misstates his testimony.
 6       Q.    Isn't that correct?  You don't even remember
 7   that?
 8       A.    If it's on a Charles Town Police Department
 9   statement form, then I obtained it; however, like I
10   explained, I did not read them.
11       Q.    So the individual who assigned the taking of
12   statements, Trooper Walker assigned that to you;
13   correct?
14       A.    No, sir.  I asked him if he wanted me to
15   obtain statements.
16       Q.    And then you took that on?
17       A.    Yes.
18       Q.    You asked him to take charge of the
19   investigation so you wouldn't have to do it?
20             MR. JEFFRIES:  Objection.  Misstates his
21      testimony.
22       Q.    Is that correct?
23       A.    Is that a question or a statement?
24       Q.    It's a question.
```

1   A.   With him making the arrest, it is more
2   beneficial for him to handle the entire thing since the
3   incidence with your client happened with him.
4   Q.   Okay. It was more beneficial for him to
5   conduct the investigation because of the incident of
6   what happened between Julie Hamstead and him; is that --
7   is that what you're saying.
8   A.   Rather than having multiple reports, there
9   would only be one.
10  Q.   It was your jurisdiction?
11  A.   He's a State Trooper; he's got jurisdiction
12  everywhere.
13  Q.   You didn't have primary jurisdiction in
14  Charles Town at that time?
15  A.   State Police has jurisdiction everywhere in
16  the State of West Virginia; so if I wanted to turn over
17  an investigation to him, by all means that's my --
18  that's my right. I can do that.
19  Q.   But are you testifying that you thought he was
20  going to go back and get more statements after you
21  finished?
22  A.   No, I never said that.
23  Q.   You didn't think he was, either, did you?
24  A.   No, I obtained the statements we needed from

1   A.   My position on -- I don't have a position to
2   be made.  I didn't investigate nor charge.
3   Q.   So you didn't weigh in at any time on the
4   issue of whether she would have to do these 12 hours or
5   whatever it was, this jail time, to match up with what
6   time she would have spent in jail if she hadn't
7   exercised her right to arraignment?
8   A.   It's possible.
9   Q.   Okay.
10  A.   Yeah, I'm not going to say no.  I'm not going
11  to say yeah.  I mean, it's highly possible because of
12  the opinion that I had over the whole arraignment
13  process.
14  Q.   You felt that was unfair to give her special
15  treatment just because she got an arraignment that
16  night?
17  A.   Right.  A hundred percent of the other people
18  we arrest don't get that same luxury.
19  Q.   Right.  So therefore, yeah, you thought that
20  would be unfair?
21  A.   Being fair?
22  Q.   Be unfair?
23  A.   Right.  Yeah.  Right, they came out at
24  midnight to do an arrangement when generally they only

```
 1   come out after hours for search warrants and emergency
 2   protective orders or emergency juvenile hearings.
 3        Q.    You don't -- do you not know that an
 4   individual has a constitutional right to an arrangement?
 5        A.    I one hundred percent understand they have the
 6   constitutional right to an arraignment.
 7        Q.    Do you not believe they have the
 8   constitutional right to a speedy arraignment before
 9   they're jailed?
10        A.    Right.  But my 13 years here I've never seen
11   that happen before.
12        Q.    I understand that.  I'm not -- I'm not
13   questioning your knowledge of that procedure.  I'm just
14   asking you.
15        A.    Right.  I'm a 100 percent aware of their right
16   to speedy due process.
17        Q.    Especially, if they've been falsely charged,
18   that would really matter a lot, wouldn't it?
19              MR. JEFFRIES:  Object to the form.
20        A.    No.
21        Q.    Doesn't matter whether they're falsely charged
22   or not, they still should go to jail?
23              MR. JEFFRIES:  Object to the form.
24        A.    They have a right to an arraignment but same
```

1   Q.   And it does not show any other vehicles along
2   1st Avenue other than that one that we talked about
3   first.  And you see a white truck coming in there.
4   Double cab; right?
5   A.   Right.
6   Q.   That truck comes in at 1617:38.  But according
7   to the 9-1-1 you were not dispatched until 1621:38.
8   What we talked about before.
9   A.   Right.  How accurate is this time compared to
10  the world clock?  This -- these times are set off the
11  world clock and the most accurate.  APU has a tendency
12  of being a little bit off.  So do you know how accurate
13  this time really is?
14  Q.   Okay.  Regarding the statement that it's a
15  little bit off, could you quantify that?
16  A.   I'm just wondering if this is an accurate time
17  as it relates to these here.  I don't know.
18  Q.   Right.
19  A.   I've never seen this video.
20  Q.   Okay.  But why do you indicate that APU is
21  known for being a little bit off?
22  A.   Because when we've reviewed prior crimes there
23  and their time have been a little bit off.
24  Q.   How far?

1    indicate that I ran it.
2       Q.    Doesn't say 112?
3       A.    No.  It says 112 I'm in the unit but it
4    doesn't say that I ran it or if that tag was provided to
5    our dispatcher I had to run them.
6       Q.    So you're suggesting that somebody may have
7    called you before 1627 and given you this information
8    before you ever got there?
9       A.    Well, I can tell you this: the time also
10   indicates that Trooper Walker's there by now marking on
11   scene via dispatch.
12      Q.    Sure does.
13      A.    And we're past that time already.
14      Q.    Yes.  Something's wrong, isn't it?
15      A.    I'll venture to say it's your video times.
16   There's no way that every one of these times from the
17   dispatcher are incorrect.  I'd say one time on a clock
18   or a camera as compared to -- to two, four, six, eight,
19   10, 12, 14, 16, 18, 20 times by dispatcher are
20   incorrect.
21      Q.    Well, dispatcher just puts down when people
22   call?
23      A.    The computer -- as soon as they enter a note,
24   the computer automatically time stamps it.

1  again and we're on the second half and it's 629.
2      A.   Okay.  That's what I was asking, which video
3  we're on.
4      Q.   So we overlapped it a little bit.
5      A.   This is north side APU second half?
6      Q.   Correct.  It is.  Do you see a -- looks like a
7  yellow vested worker coming over and talking on the
8  passenger side of Sig's car?
9      A.   Right.
10     Q.   He appears to be repositioning his car backing
11  up; correct?
12     A.   Right.
13     Q.   1633 he's pulling in.  Is that the location
14  where you recall his vehicle when you arrived?
15     A.   Right. As you see, he's parked.  He's not
16  popped out from the other side of that truck, therefore,
17  the entrance is blocked.
18     Q.   You can see over to the front of his car --
19     A.   Yeah.
20     Q.   The vehicle coming up there now, do you
21  recognize who that is?
22     A.   Trooper Walker.
23     Q.   You believe that to be Trooper Walker; so that
24  car there pulled up around 1631, and you believe that to

```
 1    be your vehicle pulling in behind Trooper Walker?
 2         A.    Yes.
 3         Q.    1631, 17, 18.  Believe that to be you getting
 4    out of your vehicle?
 5         A.    Yes.
 6         Q.    And walked around the back of it?  So you
 7    arrived within less than a minute of Sigulinsky?
 8         A.    Right.
 9         Q.    And you walked where at that point?  Into the
10    parking lot, where did you go?
11         A.    Over to where the vehicles were.
12         Q.    Okay.  You walked directly to the vehicles?
13         A.    Yes.
14         Q.    Sig had only been there for just a couple of
15    -- less than a minute.
16         A.    I thought he'd been there longer than that
17    but, yeah, I guess so.
18         Q.    Well, as a matter of fact, he testified he --
19    as a matter of fact, he had testified he had a long
20    conversation before you got there.  Couldn't have done
21    that, could he, because you were there within less than
22    a minute of he?
23         A.    Unless he's referring to that guy I don't
24    know.
```