# EXHIBIT B

# In The Matter Of:

*Julie Ann Hamstead v.*
*Former Trooper D. R. Walker*

---

*Charles A. Feldbush, Sr.*
*January 15, 2020*

---

*Sapphire Court Reporting*

Original File Charles A. Feldbush Sr.txt
Min-U-Script® with Word Index

1    be an exhibit.

2        A.    Okay.

3        Q.    If you need to cross-reference to yours, that's fine.

4        A.    I'll let you know.

5        Q.    Just to make sure, on the off chance, that there is

6    something different, let's refer to the one that will be the

7    exhibit.

8        A.    That shouldn't be a problem.

9        Q.    You were asked a number of questions, I believe five

10   questions, and that's kind of how you drafted your report, a

11   question and answer and an explanation.  So we'll take those

12   one at a time.

13           Question 1 is, "Was the charge of destruction of

14   property made against Julie Hamstead on April 25th, 2016, a

15   valid charge?"  Your answer was no.

16           What do you mean by a "valid charge"?

17       A.    Was there probable cause to make the charge.  That

18   would make it valid.  The answer would be no.

19       Q.    Here you talk about that "Dale DeGrave provided

20   Officer Jason Newlin of the Charles Town Police Department

21   with a written statement where he stated that he hit her

22   door."

23           Are you aware that Mr. DeGrave testified at the

24   criminal trial in the magistrate court that she hit his

1   vehicle?

2        MR. HAMSTEAD:  Objection to the form of the question.

3    Q.   You can answer.

4        MR. HAMSTEAD:  Misstates the evidence.

5    A.   I know what he said, yes.

6    Q.   What did he say?

7    A.   That she -- it was a -- she hit him, he hit her.  I

8   wasn't in court that day, so I can't be specific.  But I

9   attribute that to a set of facts outside what he gave

10  Officer Newlin on the day of the incident.

11    Q.   But you are aware that he testified that she hit him?

12    A.   Uh-huh.  Oh, I'm sorry.  Yes, I am.  That's a habit.

13    Q.   Then you go on and you state that based on both his

14  testimony, Mr. DeGrave's, "and Police Officer Jason Newlin's

15  deposition testimony, it was confirmed that the vehicle

16  driven by Mr. DeGrave suffered no damage."

17        On what page of Officer Newlin's deposition

18  transcript did he say that Mr. DeGrave's vehicle suffered no

19  damage?

20    A.   I don't have that down there.

21    Q.   Didn't Officer Newlin actually testify that he

22  considers a scuff mark to be damage?

23    A.   There was a comment made about that, but what he says

24  and what I believe the facts were is a different story.

1    he couldn't even say that Dale DeGrave was the driver of the

2    truck.

3        A.    Actually, no one can testify to that.

4        Q.    Do you recall Officer Newlin testifying that someone,

5    whether it was Dale DeGrave or he didn't know who, but

6    someone told him that there was a scuff mark to the bumper

7    of the truck that Mr. DeGrave was driving?  Do you recall

8    that testimony?

9        A.    I recall reading that, yes.  But I gave it no weight

10   based on the evidence that I've seen on the door.

11       Q.    You go on to state that "Newlin had a duty to report

12   this verbal statement" -- so we're not talking about the

13   written statement.  "Newlin had a duty to report this verbal

14   statement to Walker, and it must be presumed that he did

15   tell Walker."

16            Why must it be presumed that Officer Newlin told

17   Walker that there was no damage to the truck?

18       A.    Because, first of all, he would have seen it.  And,

19   second of all, he took the statement from the person that

20   was in custody and control of the truck.

21       Q.    When you drafted this report you hadn't seen his

22   deposition transcript, so I take it you were not aware that

23   he testified that he didn't read the statements himself, he

24   just took them and gave them to Trooper Walker?

1    A.    That's what he says.

2    Q.    You weren't aware of that though at the time you

3  wrote the report?

4    A.    No.  I believe that Mr. Hamstead and I talked about

5  that.

6    Q.    So if he didn't get a verbal statement why must it be

7  presumed that he told Trooper Walker that there was no

8  damage to the truck?

9    A.    Because he physically saw it.

10    Q.    Did he testify to that, Officer Newlin?

11    A.    I don't believe.  I know where that's at.

12         (The witness looks through the documents.)

13    A.    I can't point to that.

14    Q.    Were you aware at the time you drafted your report

15  that Officer Newlin testified that he did not recall

16  speaking to Trooper Walker after Trooper Walker left the

17  scene?

18    A.    No.

19    Q.    Are you aware now that Officer Newlin testified that

20  he did not recall speaking to Trooper Walker?

21    A.    Well, I know what he says, but...

22    Q.    You just assume he's lying?

23    A.    I believe there's a voracity issue between all three

24  of them.

37

1    Q.   Are you aware that he testified to that?

2    A.   Yes.

3    Q.   So why must it be presumed that he reported a verbal

4    statement that he says he never received --

5    A.   Who never received?

6    Q.   Officer Newlin.  Why must it be presumed, as you

7    state in your report, that he passed on to Trooper Walker a

8    verbal statement that he testified he never received and

9    that he testified he never spoke to Trooper Walker?  Why do

10   you presume then that he did what he said he did not do?

11        MR. HAMSTEAD:  Objection to the form of the question.

12   It's not consistent with the evidence.

13   Q.   Go ahead and answer.

14   A.   Police officers talk.  Everybody talks.  They talk

15   about some of the most insignificant things.  If they worked

16   together, they talked about it.

17   Q.   Did they work together?

18   A.   Absolutely.  They're in the same area.

19   Q.   You're just assuming that because --

20   A.   Pardon me?

21   Q.   You're just assuming they worked together because

22   they were in the same area?

23   A.   Absolutely.  Now you'll hear in the testimony that

24   either -- I believe it was either him or Sigulinsky said

1    except for Ms. Hamstead, we have no direct information that

2    he ever took photographs of Ms. Hamstead's vehicle.  None.

3    We have some where he took some of the truck.  But they are

4    even saying in the documents that there was damage to the

5    bumper and to the fender.  There was no damage to anything.

6          Mr. DeGrave struck Ms. Hamstead's vehicle.  That ends

7    the story.  It's a simple case where they would have got

8    out, exchanged information, and been on their way.  Now, if

9    a police officer responds to that, he can certainly put his

10   information on the top of the exchange forms, but charging

11   people for destruction of property is ludicrous.

12   Q.    What you don't mention in your report -- you mention

13   the DeGrave statement.  You don't mention that Trooper

14   Walker received other statements.

15         He did receive other statements, didn't he?

16   A.    I believe five in total.

17   Q.    And they were part of your file, correct?

18   A.    Well, they're in the documents.  I haven't seen them.

19   Q.    And you didn't cite any of them, did you?

20   A.    No.

21         MR. JEFFRIES:  Let's mark this as Exhibit 3.

22         (Deposition Exhibit No. 3 was marked for

23   identification.)

24   BY MR. JEFFRIES:

43

1    Q.    You had all five of those in your file, correct?

2    A.    These five?

3          MR. HAMSTEAD:  All five of these marked as 3?

4          MR. JEFFRIES:  Yes, collectively Exhibit 3.

5          MR. HAMSTEAD:  Okay.

6          THE WITNESS:  Hold on a second.  Let me just check

7    this.

8          MR. HAMSTEAD:  Can we go off the record just a

9    minute.

10         MR. JEFFRIES:  Sure.

11         (There was a break in the proceedings.)

12   BY MR. JEFFRIES:

13   Q.    Among the statements that you had, you had the one

14   from John Timothy Morris.

15         MR. JEFFRIES:  Do you have a Sharpie?  We need to

16   redact these.

17         MR. HAMSTEAD:  Something to redact with?

18         MR. JEFFRIES:  Donna has come prepared.

19         Let the record reflect, I'm redacting the Social

20   Security number, date of birth, and driver's license number

21   from these statements.

22   BY MR. JEFFRIES:

23   Q.    Okay.  You have the statement of John Timothy Morris.

24   Can you take a look at that one?

44

1          Do you agree that Mr. Morris stated in his statement

2     that the "driver started to pull away and lady ran into side

3     of truck"?  Do you see that?

4          A.    That's what he states.

5          Q.    And you have the statement of Allen Shutts.  You see

6     at the very end of his statement it says, "I turned around

7     to see her," meaning Ms. Hamstead, "at a high rate of speed

8     going through the parking lot striking our vehicle."  Do you

9     see that?

10         A.    I do see that.  That's what he says.

11         Q.    So Trooper Walker had not just Mr. DeGrave's

12     statement, but he had statements by at least two -- written

13     statements by at least two witnesses saying Ms. Hamstead

14     struck the truck not the other way around, correct?

15         A.    That's what he had.

16         Q.    Right.

17         A.    But I didn't -- I didn't take those into

18     consideration over top of the person driving the vehicle.

19         Q.    At the bottom of page 1 of your report you go on at

20     the very end, "DeGrave's verbal statement, which he gave to

21     Newlin, is corroborated by a recent statement I took from

22     DeGrave's coworker Guy Greenfield."

23          Is the Guy Greenfield statement in your file?

24         A.    Is it what?

47

1    A.   I have no idea.  I'm not privy, I don't think, that I

2   know that conversation.

3    Q.   I mean, Trooper Walker based his criminal charge on

4   the information he had, correct?

5    A.   Well, I would certainly hope so.

6    Q.   And he had statements from two witness, at least two

7   witnesses, written statements, that she struck the Jefferson

8   Asphalt truck.  And then he had one statement from DeGrave

9   saying that he struck her.  He did not have Mr. Greenfield's

10   statement, did he?

11    A.   Not that I'm aware of, no.

12    Q.   He has to base his criminal complaint on what he

13   knows, correct?

14    A.   That's true.

15    Q.   And what he knew --

16    A.   But in this case here, if this was me -- let's use

17   that.  If this was me, these other two people get no weight,

18   no weight.  Mr. DeGrave is the one driving the truck.  He is

19   the one that says yea or nay on what happened, not witnesses

20   that I wouldn't have faith in.

21    Q.   But you're not being asked did Trooper Walker follow

22   good police procedures.  You're being asked was there

23   probable cause.

24    A.   Right.

1   wasn't.  I can't tell you why he didn't do it.  I can't tell

2   you why he was concerned about Mr. Hamstead out there

3   pressuring him to leave the scene.  That, to me, is

4   ridiculous.  You do the investigation first.

5        If Ms. Hamstead is hurt, as she portrayed herself to

6   be, as she said she was, he should have called an ambulance

7   to the scene and had her taken immediately to the hospital.

8   You have two other officers there that could have followed

9   the ambulance to the hospital if she was under arrest at

10  that point, and they could have stayed with her until he

11  finished his investigation on scene, 'cause once the

12  vehicles are officially removed out of the parking lot, it's

13  very difficult to go back and reconstruct it.

14  Q.   Okay.  And, again, I understand that you take issue

15  with Trooper Walker's investigation of this incident, but

16  you've still not told me anything in your 28 years of

17  training and experience and education that would qualify you

18  to determine what was in his mind and what his intent was.

19  Let me ask --

20  A.   Hold on since you're going there.  Of course, I can't

21  tell you what was in his mind.

22  Q.   But you just did in your report.

23  A.   All I can tell you is what his actions showed.  His

24  actions show that there was nothing up in here because he

1   never occurred.

2       Q.   Okay.  You would agree that it's not uncommon for

3   police officers to charge someone and the person ultimately

4   gets acquitted?

5       A.   Go back.  I can't hear you.

6       Q.   Would you agree that it's not uncommon for a police

7   officer to charge someone with a crime but the person in the

8   end gets acquitted?

9       A.   That does happen, but I've never -- I've never done

10  that.  If I can't prove it, I don't charge them.  I've never

11  charged somebody I couldn't prove.

12      Q.   So in 28 years you had a 100 percent conviction rate?

13      A.   Very close, very close.

14      Q.   Did you have 100 percent?

15      A.   I wouldn't say it's 100 percent.  There's some days

16  your get off the wrong side of the bed.

17      Q.   So you have had occasion where you charged someone

18  and they got acquitted?

19      A.   Sure.

20      Q.   Did that mean that you were intentionally falsely

21  charging them?

22      A.   No.  No.  No.  But, unlike in this case, I did my job

23  to the letter every single time because it's a reflection

24  upon me if you don't and the department I work for.

1  reviewing them at the time that was done.  I may have.  I
2  can't recall.
3      Q.   Did you read in the trial testimony of all of these
4  witnesses, Mr. Morris, Mr. Koppenhaver, Mr. Hedrick -- I'm
5  sorry.  Mr. Koppenhaver did not testify at trial --
6  Mr. Morris, Mr. Hedrick, Mr. Shutts, Officer Newlin,
7  Sergeant Sigulinsky, did you read all their trial testimony?
8      A.   Not at the time I wrote this, no.
9      Q.   Did you read the trial testimony of Trooper Walker
10  where he stated reasons why he believed Ms. Hamstead struck
11  the Jefferson Asphalt truck?
12      A.   Why she struck it?
13      Q.   Yes.
14      A.   No.  I mean, I may have -- I may have looked over it,
15  but I didn't take that into account.
16      Q.   So none of these other witness statements, none of
17  their trial testimony played any role in you forming your
18  opinions?
19      A.   Absolutely not.  Let me repeat that.  Absolutely not.
20      Q.   So is it your opinion that the statements of nearly
21  every eyewitness on the scene combined with the damage to
22  the vehicles and the skid marks in the gravel did not
23  provide Trooper Walker with probable cause to charge
24  Ms. Hamstead?

1     A.    Absolutely not.

2     Q.    Did you read in the magistrate court trial transcript

3  where Magistrate Senseney stated why he acquitted

4  Ms. Hamstead of destruction of property?

5     A.    I don't recall what that was, but I do recall seeing

6  it.  I don't recall what he said though.

7     Q.    And that didn't play any role in you forming your

8  opinion as to whether there was probable cause?

9     A.    Well he, like me, was not on the scene, and what they

10  -- they're all self-serving.  You have to understand all

11  this is self-serving, I saw this and I saw that.  Dale

12  DeGrave is the entire case here.  The man says, I struck

13  her.  That ends the story.  There is no Chapter 2.

14     Q.    He testified at trial that she struck him.

15     A.    Of course he did, but he's got a job at Jefferson

16  Contracting.  He wants to keep that job.  He would tell you

17  that -- he would tell you whatever you wanted to hear.

18     Q.    Is that in the record?

19     A.    Of course not.  Of course not.  We -- I talked to

20  several people, to include Guy Greenfield, and he pretty

21  much verified my suspicions when it comes to Jefferson

22  Contracting.

23     Q.    Did you talk to Trooper Walker?

24     A.    No.  I wouldn't expect to get anything from Trooper

73

1    am I reading too much into it?

2        A.   No.  That's...

3        Q.   Okay.  I didn't get a good answer.  Did I understand

4    you correctly?

5        A.   Yeah, but there's a little more to it.  I don't know

6    if the court reporter can pick that up.  There are more

7    factors involved in that to include these.  Apparently

8    there's a tremendous amount of weight going into this stuff

9    here when people's jobs hang in the balance like

10   Mr. DeGrave's job.  So that's what bothers me.

11          They haven't refuted that by any means anywhere in

12   here that it never happened that way, other than they added

13   the fact that she came racing into the parking lot and

14   struck him.  That just didn't happen.

15       Q.   I'm just wanting the big picture.

16       A.   Right.

17       Q.   No probable cause, correct?

18       A.   Absolutely.

19       Q.   And because no probable cause, it was an intentional

20   falsification of a charge?

21       A.   Right.

22       Q.   Okay.  Let's move on to Question 2 then.  Question 2,

23   "Was the charge of disorderly conduct made against Julie

24   Hamstead on April 25th, 2016, a valid charge and" --

74

1    A.    At the top of page 3?

2    Q.    Yes, sir.  Your opinion is no, correct?

3    A.    That's correct.

4    Q.    And, again, by a "valid charge" what do you mean?

5    A.    A valid charge you have to have probable cause.

6  There again, you can't facilitate the cause and the reason

7  and then charge somebody with the violation.

8    Q.    Are you aware that Ms. Hamstead was convicted of

9  disorderly conduct?

10   A.    Well, sure.

11   Q.    Does that affect your opinion?

12   A.    No.

13   Q.    What are the elements of disorderly conduct under

14  West Virginia law?

15   A.    Bear with me a second.  I know I have that.  Any

16  person who in a public place, any office or office building

17  of the State of West Virginia or in the State Capitol

18  complex or on any property owned, leased, or occupied or

19  controlled by the State of West Virginia, mobile home parks,

20  a public parking area, a common area, an apartment building

21  or dormitory or common area or privately owned commercial

22  shopping center, mall or other group or commercial retail

23  establishment disturbs the peace of others by violent,

24  profane, indecent, or boisterous conduct or language or by

1    making of unreasonably loud noise that is intended to cause

2    annoyance or alarm to another person and who persists in

3    such conduct after being requested to desist a law

4    enforcement officer acting in his or her own lawful capacity

5    is guilty of disorderly conduct.

6        Q.    You state in your report that it is "apparent from

7    the video that the subject private parking lot was not open

8    for public parking on April 25th, 2016."

9             What is the significance of that statement?

10       A.    Well, let's get down to that.  If you come down to

11   Number 3 under disorderly conduct, a public parking area

12   means an area where publicly or privately owned or

13   maintained open to the use of the public for motor vehicle

14   -- for the parking of motor vehicles.  In this case here, it

15   was only open to the construction or the Department of

16   Highways or Jefferson Contracting.  It wasn't open to the

17   general public.

18       Q.    How do you know that?

19       A.    That's what I picked up from Mr. Hamstead.

20       Q.    You were told from Mr. Hamstead that it was only open

21   to the DOH --

22       A.    At that time.  That's not normally how it would be,

23   but at that time because of the construction vehicles that

24   were parked in there.  There was quite a few of them.

81

1    presence and you had gotten her over to your vehicle -- over

2    to a vehicle, preferably a police car, not standing on top

3    of three or four or five guys.

4        Q.   So to answer my question, the inappropriate actions

5    of former Trooper Walker that you refer to in your report

6    were telling her to shut up and not taking her over to his

7    police cruiser?

8        A.   Yes, that's a start.  I mean, you don't -- there's

9    absolutely no need to tell a female to shut up.

10       Q.   Are you aware of his testimony that at first he told

11   her to please be quiet and then moved on to please be quiet,

12   shut your mouth?

13       A.   You still don't tell them to shut up.

14       Q.   Are you --

15       A.   You still don't do it.

16       Q.   Are you aware of his testimony that he said he never

17   told her to shut up?

18       A.   Yes, but I --

19       Q.   You don't --

20       A.   I don't believe it, no.

21       Q.   Are you aware of the testimony of other witnesses who

22   said they didn't hear him tell her to shut up?

23       A.   I think that's contrary.  I think there is testimony

24   -- I think there is statements where that was said.  I don't

1    have -- I can't bring it to you right this second.

2        Q.    You didn't mention it in your report.

3        A.    What's that?

4        Q.    You didn't mention it in your report that any other

5    witnesses said that Trooper Walker --

6        A.    I've seen some depositions since I wrote that report

7    that may or may not change my mind in that.  That's why I

8    put that statement in the back of the report that I reserve

9    the right to change that should that new information come

10   up.

11       Q.    What evidence did you have at the time you drafted

12   this report that he told her to shut up?

13       A.    Well, I talked to Ms. Hamstead.  I talked to her.

14   The rest of them you couldn't talk to.

15       Q.    But you have their statements, correct?

16       A.    Well, you have -- you have self-serving statements is

17   what you've got.  These are all self-serving.

18       Q.    You had their testimony at the trial?

19       A.    Self-serving.

20       Q.    Under oath.

21       A.    I understand what it is.

22       Q.    On down about two-thirds of the way through this

23   first paragraph, "It is my understanding that in his

24   deposition Officer Newlin testified that a third part, John

1   I say something bad about them they're going to find out

2   about it and I don't have a job, or if I'm working over here

3   and they find out about it, I suddenly lose my job.  But

4   it's not for that reason.

5        Q.    Did Mr. Greenfield tell you that?

6        A.    No.  I mean, I've been around doing this stuff all my

7   life.

8        Q.    You're making an assumption?

9        A.    Based on his -- what he told me.

10       Q.    What did Mr. Greenfield mean when he said, quote,

11   "They worked on her until she dropped it"?

12       A.    They harassed her apparently, and I don't know who

13   this woman is.  They harassed her until she dropped her suit

14   against the company.

15       Q.    Did Mr. Greenfield say that Jefferson Asphalt or any

16   of its employees falsely charged this person?

17       A.    No.  They apparently hit her vehicle.  They damaged

18   her car.  And then, when she went to pursue it, they just

19   harassed her to the point where she just gave up on it.

20       Q.    Let's move on to Question 3.  "Did Julie Hamstead

21   commit the offense of obstruction," and your opinion is no.

22            Now, this one is worded a little bit differently than

23   the previous two questions.  The previous two questions were

24   whether it was a valid charge.  Here it was asked did she

88

1    commit the offense.  Is there a reason why it was worded
2    differently?
3       A.   You have the same thing.  You have the fact that
4    there's no probable cause to show -- I mean, just because
5    she's walking up on somebody and you think she's going to do
6    something or you think she may not do something, that's not
7    probable cause to charge them, especially since that
8    particular officer, Sigulinsky, didn't have jurisdiction and
9    wasn't primary on the case and wasn't working the accident.
10      Q.   Okay.  We'll get to that in a second.  But my
11   question was just is there any significance to the change in
12   wording of the question?  Questions 1 and 2 --
13      A.   I understand that.  I see it now.  There's no real
14   significance, no.
15      Q.   Okay.  Are you aware that Ms. Hamstead was convicted
16   in magistrate court of obstructing?
17      A.   Absolutely.
18      Q.   Did that fact play any role in forming your opinion?
19      A.   Not based on the information that I had at the time I
20   wrote this.
21      Q.   Do you understand that she was never acquitted of
22   obstruction but got the charge dismissed as part of a plea
23   deal?
24      A.   Correct.

1      Q.    Did that fact play any role in forming your opinion?

2      A.    No.

3      Q.    What are the elements of obstruction under West

4    Virginia law?

5      A.    It's Code Section 61-5-17.  Obstructing an officer,

6    fleeing from an officer, making false statements to the

7    officer, interfering with emergency communications, any

8    person who by threats, menaces, acts, or otherwise forcibly

9    or illegally hinders or obstructs or attempts to obstruct to

10   hinder or obstruct a law enforcement officer, probation

11   officer, or parole officer acting in his or her official

12   capacity is guilty of a misdemeanor.

13     Q.    You state in your report that "In your experience,

14   obstruction is often a charge levied against a citizen who

15   has been improperly arrested, especially in cases where use

16   of force has been involved."

17           Is it your opinion that obstruction can never be a

18   valid charge?

19     A.    It can be a valid charge, but it can't be fabricated

20   and based on information that doesn't exist.

21     Q.    In your 28 years of law enforcement experience, did

22   you ever charge a citizen with obstructing an officer?

23     A.    Oh, yes.

24     Q.    I want you to step back from this case.  I'm going to

1   clear than that.  But when you obstruct, what kind of

2   obstruct?  Are you hitting him with a baseball bat?  Are you

3   verbally doing something?  Are you swinging your arms at

4   somebody or are you trying to get your side of the story

5   out?  There's a big difference.  There's a very fine line

6   between obstruction and trying to tell your side of the

7   story.

8       Q.   Are you aware of West Virginia cases that made that

9   distinction?

10      A.   I don't know anything about West Virginia cases, no.

11      Q.   So you don't really know if, under any given set of

12  facts, whether an officer has probable cause to charge

13  someone with obstruction under West Virginia law, do you?

14      A.   Not under West Virginia law, but you can contrive any

15  factors in making that charge based on this right here to

16  suit your needs.

17      Q.   Okay.  Another hypothetical.  If a person refuses an

18  officers commands to stay in a certain place, can that be

19  obstruction under West Virginia law?

20      A.   I don't know case law, but I'm just -- strictly based

21  on how you presented that, I would assume yes, based on how

22  you presented it and seeing what happened in this case.

23  Yes.

24      Q.   When you formed your opinion that -- now I'm going

1   back to this particular case.

2       A.   Okay.

3       Q.   When you formed your opinion that Ms. Hamstead did

4   not commit the offense of obstruction did you consider the

5   opinions and testimony of, I believe, every single witness

6   on the scene except Ms. Hamstead who all said she was being

7   loud and disorderly, using profanity, and attempting to

8   interrupt the city officers' investigation?

9       A.   Let's break that down.  Using profanity, not once do

10  I see in any of this paperwork what profanity she was using.

11  I just don't see that.  I haven't -- it may be there, but I

12  don't see it.  I mean, just because you say those simple

13  words means nothing to me.

14          Like I say, I gave no weight to any of these

15  statements.  All I see in the depositions are I don't know,

16  I don't remember, I don't recall.  And these are from

17  trained police officers.  So based on all of that I

18  formulated another opinion based on what the factors are.

19      Q.   That's not true, is it, because when you formulated

20  this opinion you didn't have the deposition testimony of the

21  officers?

22      A.   I had what I was told and a lot of that is absolutely

23  word in mouth.

24      Q.   In fact, Sergeant Sigulinsky hadn't even been deposed

1   when you wrote this report --

2       A.   That's true.

3       Q.   I know that when we were talking about the

4   destruction of property charge you said you discounted the

5   statements of everyone but Mr. DeGrave because he was the

6   driver, correct?

7       A.   Correct.

8       Q.   Why did you discount the statements of everyone else

9   when it came to Ms. Hamstead's action and what these other

10  witnesses saw her doing?

11      A.   Because there's no underlying information other than

12  them just saying it.  If she used profanity, okay, even if

13  you do in the -- what do you call it -- the warrant before

14  the magistrate, I'd put in there that she said this and she

15  said this and I told her to stop and she continued using

16  this language to me for the profane part.  Okay.

17          Nowhere in any of these things did it say

18  specifically what she did.  She could -- they could have

19  said she was jumping up and down like a wild fool, but

20  there's no indication of that.  It just says she was jumping

21  up and down.  I'm using that as an example.  You don't see

22  any of that on there, any of this stuff.

23      Q.   Although it doesn't say specific words, you do agree

24  that at least some of the witnesses said she was using

1  profanity?

2     A.   Well, of course, but I'm going by -- you have to take

3  that with a grain of salt that they are written on.

4     Q.   Why?

5     A.   Because I don't believe a word they had to say.  I

6  believe it was all contrived information because they didn't

7  like Ms. Hamstead so they're going to say whatever needs to

8  be said to get rid of the problem.

9     Q.   So going into this, your starting, beginning

10  presumption was that everyone but Ms. Hamstead was lying?

11     A.   Say that again.

12     Q.   Going into forming your opinion, your initial

13  presumption was that everyone but Ms. Hamstead was lying?

14     A.   Not going into it, no.  That wasn't done til right

15  before I wrote the report.  Everything up to that particular

16  time -- because there -- you have nothing.  You have no

17  evidence on here that she was using -- what did she say?

18  What did she say?

19     Q.   Why does it matter?

20     A.   Because it verifies what you said.  Profane language,

21  I mean somebody could be talking -- there's slang talk over

22  here in West Virginia that we don't have back over in

23  Virginia that some people would take as being derogatory,

24  you know, just for an example.  Profane language is cursing.

104

1    chance of a conviction on that than the rest of them.

2         The resisting part, he didn't charge her with that

3    either.  That leads me to believe some off-the-wall things.

4    Those two were supposedly solid charges, but he didn't

5    charge them.  Just because she doesn't put her hands out,

6    no, I don't know where we get that from.

7    Q.   You go on in the second paragraph of Number 4 saying

8    that Trooper Walker failed to follow the continuum use of

9    force procedure of the West Virginia state police.

10        Now, in this letter from Mr. Hamstead that was

11   Exhibit 1, I don't see where you were provided any state

12   police training materials on use of force and going through

13   your file before the deposition I don't recall seeing any --

14   A.   From West Virginia State Police?

15   Q.   That's correct.

16   A.   I'm going by one thing that I used to make that

17   comment.

18   Q.   What was that?

19   A.   That's command presence.  He wouldn't have had that

20   problem if he had command presence.

21   Q.   So you did not have the state police's use of force

22   training materials?

23   A.   Not in my hand, no.

24   Q.   Did you have them at all?

1    A.    Pardon me?

2    Q.    Did you have them at all?

3    A.    No.

4    Q.    So what specifically did you use to determine that

5  Trooper Walker failed to follow the use of force procedure

6  of the West Virginia State Police?

7    A.    I'm sure that would have been to be -- you always --

8  the use of force continuum, you always start with the least

9  -- the least and then progress.  That would have been

10  verbal, verbal commands.

11        We don't have much of that here whatsoever, at least

12  it's not documented at that point.  I'm sure that the term

13  "shut up" is not in the use of force by West Virginia State

14  Police.  They have it as another phrase, but they don't have

15  the words shut up.

16    Q.    Who does?

17    A.    Through the investigation through the state police.

18    Q.    But, again, to be clear, you did not have the West

19  Virginia State Police's use of force procedures when you

20  made this statement?

21    A.    No.

22    Q.    You go on and say that "then Trooper Walker went from

23  verbal commands telling Ms. Hamstead to shut up to the use

24  of, quote, hard hands, which is next to the use of deadly

106

 1   force on the continuum.

 2         What are hard hands?

 3   A.    Hands on.

 4   Q.    Any hands on?

 5   A.    Uh-huh.  Any form of hands on.

 6   Q.    Is there such a thing as soft hands?

 7   A.    No, not that I'm aware of.

 8         (Deposition Exhibit No. 4 was marked for

 9   identification.)

10   BY MR. JEFFRIES:

11   Q.    All right.  Mr. Feldbush, now you have the West

12   Virginia State Police's use of force training.  I'll

13   represent to you that this is a PowerPoint presentation that

14   is given to officers, as I understand it, in the West

15   Virginia State Police Academy.

16         I'd like to go to -- you see in the lower right-hand

17   corner, the numbers Walker -- it starts on the first page,

18   Walker 159.

19   A.    Okay.

20         MR. HAMSTEAD:  Exhibit number?

21         MR. JEFFRIES:  4.

22         MR. HAMSTEAD:  Thank you.

23   BY MR. JEFFRIES:

24   Q.    Can you go to page 161?

1   do that.

2        Q.   Well, tell me if I'm wrong, but I would imagine that

3   where it fits in here is what it's designed to do, right?

4        A.   Compliance.

5        Q.   A bullet from a gun is designed to --

6        A.   Compliance.

7        Q.   A beanbag from a shotgun, although under the right

8   circumstances might end up killing somebody, is designed to

9   be nonlethal, correct?

10       A.   Right.  But, again, there have been people -- a

11  couple of occasions that I've heard about, where people were

12  shot in the head and killed.

13       Q.   Is it your --

14       A.   I mean, it wasn't intended, I don't think.

15       Q.   Is it your opinion that putting somebody's arm behind

16  their back and taking them to the ground is more forceful

17  than using a taser or pepper spray?

18       A.   Yes.

19       Q.   Let's go to page 164.  Again, this is the state

20  police's training.  They say that if a subject refuses to

21  move, uses the weight of his or her body to defeat the

22  control of the officer, or if the subject is pulling away

23  from the officer, the officer may use pressure points, joint

24  manipulations, may strike muscle groups, and may engage in

1  takedowns.

2      A.    Okay.

3      Q.    The subject pulling away from the officer, isn't that

4  what Trooper Walker alleges happened?

5      A.    That's what he says happened.

6      Q.    Isn't that also what every witness at the scene

7  except Ms. Hamstead said happened?

8      A.    To my knowledge --

9            MR. HAMSTEAD:  Objection to the form of the question.

10     A.    To my knowledge.

11     Q.    Let me ask you another hypothetical.

12     A.    Okay.

13     Q.    If a suspect pulls away from the officer, would that

14  officer be in compliance with the state police's use of

15  force policy that you've just seen if that officer used

16  joint manipulations and a takedown?

17           MR. HAMSTEAD:  Objection to the form of the question.

18     A.    It could very well be, yeah, based on what you're

19  talking about here.  That's correct.  That would be

20  considered part of their training, but that doesn't

21  necessarily mean that you have to use that particular

22  training in that form or fashion.

23     Q.    Are you aware --

24     A.    Dependant on the person.

111

1    Q.   Are you aware that the state police investigated

2  Trooper Walker's use of force and found it to be in

3  compliance with their policy?

4        MR. HAMSTEAD:  Objection to the form of the question.

5    A.   I heard that.

6    Q.   Did you read the report?

7    A.   I believe that may be what I have.  I'm not sure.

8    Q.   It's called a Report of Response to Resistance or

9  Aggression.

10    A.   I'm not sure.  I have the Report of Criminal

11  Investigation.

12    Q.   Do you recall if you reviewed the Report of Response

13  to Resistance or Aggression that was prepared by the state

14  police?

15    A.   I do not.

16    Q.   Do you see in Exhibit 1, the list of materials that

17  were provided to you by Mr. Hamstead, do you see where you

18  were provided with the Report of Response to Resistance or

19  Aggression?

20    A.   I do not.

21    Q.   I'm representing to you now that the state police

22  investigated Trooper Walker's use of force and found it to

23  be within policy.  Based upon that representation, does that

24  change your opinion whether he used excessive force?

112

1      A.    No.

2      Q.    Why not?

3      A.    Well, just because they've investigated it doesn't

4    mean -- who do you have tell them that?  You have these

5    people tell them that and Trooper Walker or Newlin or

6    Sigulinsky?  I think that's all there is here.

7          When there's question to believe those on the scene,

8    there's question to believe the entire investigation.  When

9    you have doubt -- I have doubt.  I have severe doubt about

10   this entire case.  I think I may have told you this case

11   ended when Dale DeGrave says, I struck her.  That ends the

12   story right there.  Everything else is fabricated and

13   brought about based on what we wanted to do at the time.

14     Q.    When did Dale DeGrave say that he struck her?

15     A.    In his statement.

16     Q.    When was that statement taken?

17     A.    It was taken on the scene.

18     Q.    When on the scene?  Before or after Ms. Hamstead's

19   arrest?

20     A.    I don't know the exact time.  It's not timed.  But

21   therein lies the problem.  If the person who assumed

22   responsibility for this investigation had done an

23   investigation, all of these questions would have been

24   answered long ago and we very well may not have been here

1   today.

2         But the fact remains is there was nobody in charge.

3   This was a "throw the stuff in the air and see where it

4   lands" type thing.  Nobody assumed -- I'll take -- the only

5   person that actually had -- really had primary was Newlin.

6         See, Newlin had put in leave to go home early that

7   day and was en route out when this call came out.  So I'm

8   assuming, based on what I know from police officers, hey, I

9   put in leave, I'm going home early, can you handle it.  And

10  Walker has the authority to do that because it's West

11  Virginia.  Sigulinsky didn't have any authority.  Why he was

12  there -- 'cause there's no indication that mutual aid was

13  called.  Why he's there is anybody's guess.

14      Q.   It's not in the record?

15      A.   Well, I mean, forget what's in the record.  They'll

16  tell you anything they want to tell you, Counselor.  I've

17  been around this bush for a long time.  I know what these --

18  I know what these officers say because --

19      Q.   These particular officers?

20      A.   I'm not talking about these in particular.  I'm

21  talking about what they say.

22         When I look at Sigulinsky's deposition and I read I

23  don't remember, I don't recall, I can't remember on almost

24  every question he's asked, that provides me with great

114

1    pause.

2        Q.    But, again, you did not have Sergeant Sigulinsky's

3    deposition transcript when you wrote this report?

4        A.    That's true.

5        Q.    But you were already discounting it, not based on his

6    deposition testimony because you didn't have it.

7        A.    Because at the time he was supposed to have been --

8    he should have been there as a -- I wasn't quite sure at the

9    time because of that -- the county/town line, where exactly

10   it was.  I didn't realize it was right there.  I wasn't 100

11   percent on that until later on, but it would have made no

12   difference because Walker took the investigation.  And, yet,

13   there was no investigation.  There's nothing.  There's zero.

14       Q.    Do you understand how Trooper Walker came to become

15   the primary officer on the investigation?

16       A.    Well, not that I'm -- I'm sure you'll tell me, but

17   not that I can recall.  I mean, I know Sigulinsky didn't

18   have authority in that situation.  Like I say, I knew Newlin

19   was going home.  Since he made the arrest of Ms. Hamstead

20   for the charges that he did, they pretty much dumped it on

21   him.

22       Q.    Am I correct that when forming your opinion that

23   Trooper Walker used excessive force you discounted the

24   written statements and the trial testimony under oath of

115

1   numerous witnesses on the scene who all stated that

2   Ms. Hamstead was actively resisting arrest?

3       A.   They all say what?

4       Q.   That Ms. Hamstead was actively resisting arrest when

5   Trooper Walker applied force?

6            MR. HAMSTEAD:  Objection to the form of the question.

7       A.   Well if it's not a lawful arrest, you have the right

8   to resist if it's unlawful.

9       Q.   Did you discount their testimony and their

10  statements?

11      A.   Well, like I told you, the statements -- I know what

12  you're trying to do here.  These -- these mean nothing.

13  Down the road, they don't exist 'cause they mean nothing in

14  this case, except for Dale DeGrave's.

15      Q.   The one that helps Ms. Hamstead.

16      A.   Pardon me?

17      Q.   The one that helps Ms. Hamstead is the one that

18  matters?

19      A.   I don't know that he helped her or not.  I know he

20  told -- I know this is going to be -- going to be a

21  brainstorm here.  He told the truth.

22      Q.   How do you know that?

23      A.   Because he has nothing to gain by it until such time

24  as I'm sure his company may have told him, hey, what are you

1    doing to us.  And I'm sure that occurred on the scene after

2    the rest of the boys say, hey, you gave a statement to the

3    cops.

4        Q.    Is that in the record?

5        A.    Of course not.  Of course not.

6        Q.    You're just --

7        A.    I have been to the mountaintop.  I know it's cold,

8    breezy, and lonely.  I know what these people say.

9             You can't believe it, but Dale DeGrave had no bone,

10   no axe to grind, no bone to hide.  He told her -- it was

11   very calm, very cool, everybody was fine when these two were

12   together before everybody else law enforcement-wise showed

13   up.  All they would have had to have done would be exchange

14   forms.

15       Q.    What was Sergeant Sigulinsky's axe to grind?

16       A.    I didn't know that he had one.

17       Q.    Well you discounted the credibility of his statement

18   and you said they all --

19       A.    Because he didn't do anything.  He's there helping

20   for an hour.  I have my own opinion about that, but he's

21   there helping for an hour and what did he do?  Nothing.

22       Q.    So why would he lie?

23       A.    Why would he lie?  Why would he tell the truth?  He

24   didn't do anything.  He didn't investigate it.  He didn't

120

1  garbage.

2  Q.  So it took her a long time to go from the parking lot

3  to the hospital.  Did I just hear you say that?

4  A.  That's what I understand.

5  Q.  Where do you understand that she went during that

6  time?

7  A.  We don't have a clue.

8  Q.  Do you understand that Mr. Hamstead followed her to

9  the hospital?

10  A.  I understand that may have happened.

11  Q.  Are you familiar with the case of Graham v Conner?

12  A.  Grant B. Conner?

13  Q.  Graham v Conner.

14  A.  I know I know it.  I can't tell you what it is.  Not

15  off the cuff.  What is that case?

16  Q.  You're the expert on police procedures.

17  A.  I don't know it by the name.

18  Q.  Can you tell me what factors must be considered when

19  deciding whether a particular use of force is reasonable?

20  A.  Well the degree of what the problem is.  Locking up a

21  murder suspect would be a whole lot different than locking

22  up an individual involved in an accident in a parking lot.

23  Q.  Okay.  Anything else?

24  A.  Like I say, not like the use of force continuum work

121

1   with the police.  It would be the same way with the

2   citizens, not in the same verbiage, but it would be the same

3   way.  You use the force necessary to effect the arrest.  You

4   don't go from zero to 10 just because of a -- she's a

5   female, she's small.

6       Q.   That's my question to you.  How do you determine what

7   is the force necessary?  What factors play into that

8   determination?

9       A.   Well, it depends on the surrounding -- the

10  surrounding things at the time.  What's going on, how is it

11  going on, what is she saying, the fact that you didn't bring

12  her aside, the fact that you didn't belay any fears that she

13  had and tell her that, hey, there'll be a thorough

14  investigation of this, I'm going to listen to all sides and

15  make a decision at that point.  This is before he put

16  handcuffs on her.  Nobody did that.  Nobody told her

17  anything of that nature.

18           It was just shut up and then you've got handcuffs

19  going on you.  Sure she was upset.  My question would be

20  what happened if it was the other way around.  I think about

21  that, if one of the guys were that way.  Well, you had John

22  Morris was that way.  He didn't get locked up for disorderly

23  conduct pursuant to the code.

24           So you have to understand -- you have to think.  Why

122

1    didn't that happen?  I can't answer that.

2        Q.   Do you have any other factors that go into the

3    determination of whether use of force is excessive?

4        A.   Well, I mean, what happens to the individual.  I

5    mean, there's no reason to bend a person's arm behind their

6    back.  In this case here, like I told you, her being a

7    female, I would have put the cuffs on in front of her

8    because I had no reason to believe she was a desperado.  All

9    those factors come into consideration at the time, who,

10   what, when, where, how, and why.

11           MR. JEFFRIES:  All right.  This would be a good time

12   for a quick break.

13           (There was a break in the proceedings.)

14   BY MR. JEFFRIES:

15       Q.   Let's move on to Question 5.  "Does the video

16   produced by American Public University depict the actual

17   event in which Julie Hamstead drove her Honda Pilot vehicle

18   into the university's private parking lot and the accident

19   that followed?"  Your opinion is no.

20           First off, what in your training or experience in

21   police procedures qualifies you to come to this opinion that

22   the video does not depict the actual event?

23       A.   Because of the things that occurred on the video.

24   I've had cases before where I've had to have the FBI at

123

1    Quantico enhance video and/or images on the video so I could

2    continue the investigation.

3            I knew when I did this that Mr. Hamstead requested a

4    certain timeframe of the video, but that was not -- even

5    after they knew about it.  It was changed.  That, to me, is

6    a maker problem.

7    Q.    We'll get into that, but you're going into the facts

8    that underlie your opinion, and I'm wanting to know about

9    your training and experience that makes you qualified to be

10   an expert on video interpretation.

11   A.    Well, I've -- through the use of the FBI on a number

12   of cases at the laboratory in Quantico I've had to have

13   videos enhanced at my direction.  They would help whatever

14   it may be.  They would enhance it or change -- not alter it

15   but they would change it to where you could see things --

16   you got bank robbery photos, armed robbery photos, 7-11s and

17   such.  They would be directly capable of enhancing or doing

18   whatever you needed to that particular -- at your direction.

19   Q.    Was this video enhanced?

20   A.    Well, I can't get into that right this -- I mean, I

21   can't -- was it enhanced when I saw it?

22   Q.    Yes.

23   A.    It looks like it may have been altered.

24   Q.    Okay.  We'll get to that later.  In these cases that

1    you're talking about were you having the FBI at Quantico

2    enhance them or look at things because you thought that they

3    depicted the fabricated event or were you just trying to

4    figure out who the suspect was that was shown in the video?

5        A.   The suspect, who they were.

6        Q.   Have you ever had a case where you determined that a

7    video was a reenactment of an event?

8        A.   No.

9        Q.   All right.  In Paragraphs A, B, and C, generally

10   speaking, you discuss discrepancies between the 911 call

11   logs and the timestamp of the APU video, it looks like, just

12   over a minute.  In Paragraph C you discuss a discrepancy of

13   one minute and 11 seconds.

14           Do you know if the clock that puts those timestamps

15   on the video is synched to the clock that records the times

16   on the 911 call logs?

17       A.   Not from APUS, no, but from the videographer that

18   advised that that was -- that those are correct.

19       Q.   Mr. McCourt?

20       A.   Yeah.

21       Q.   He provided that the times on the APU videos were

22   synched to the same clock as the 911 center?

23       A.   I believe that's what he did, yes, but there were

24   issues.

1    Q.   Well, on Paragraph B you talk about the time of --

2    according to the trial testimony of Allen Shutts,

3    Ms. Hamstead's vehicle arrived at the lot on or before 16:08

4    hours and you cite to Exhibit 19 and several pages of trial

5    testimony of Allen Shutts.

6         Can you show me in there Exhibit 19 where he says

7    that her car arrived there no later on 16:08?

8    A.   16:08 is not mentioned in these five pages.

9    Q.   Isn't it true that Mr. Shutts only provided estimates

10   of how long he spoke to Ms. Hamstead before she arrived at

11   the parking lot?

12   A.   Yes.  That, I do know.

13   Q.   In Paragraph D you say that --

14   A.   Which paragraph?

15   Q.   D.

16   A.   Okay.

17   Q.   You say "Ms. Hamstead's cell phone logs provide an

18   accurate timeline of the events of the day."

19        How do Ms. Hamstead's cell phone logs provide an

20   accurate timeline of events that occurred there in the

21   parking lot after she pulled into the parking lot?

22   A.   Well, we know what time she called 911 from the front

23   of her business, and this is directly after that, after she

24   left because she never got to talk to the officer, which

1    A.    No.  I don't have it on here, no.  After 4:06 she was

2    involved -- is when the incident in the parking lot started.

3    Q.    So explain to me your statement in your report that

4    Ms. Hamstead's cell phone logs provide an accurate timeline

5    of the events from that day.

6    A.    Well up to and including what she has.  After 4:06,

7    she never made any other calls that I'm aware of that

8    afternoon.

9    Q.    Does that allow you to draw any other conclusion

10   other than she was arrested sometime after 4:06?

11   A.    That's correct.

12   Q.    Do you know if the clock that's used to record these

13   times on her cell phone bill are synched to the clock that's

14   used to record the times of the 911?

15   A.    No, I do not know that.  In my mind, I'll step out

16   and say that I'm not really much concerned about her clock

17   at that point.  It would be the 911 call, which is what I

18   would use.

19   Q.    Well, you're saying that her cell phone logs provide

20   an accurate timeline of the events of that day, but that's

21   not true, is it?

22   A.    On her side.  I didn't say they would match against

23   911.

24   Q.    They don't even provide an accurate timeline past

1   4:06, do they?

2       A.   That's because we have the encounter and then the

3   phone wasn't used after that time.  Now, if I went back to a

4   ping log, you might be able to get that.  But I don't have

5   that.

6       Q.   I understand, and I understand there's a reason.  But

7   nevertheless, it's true that they do not provide an accurate

8   timeline of the events of the day, do they?

9       A.   I wouldn't say so much accurate as I would say a

10  thorough -- a more advanced timeline.

11      Q.   How are they more thorough when they end at 4:06?

12      A.   Well, because at 3:58 -- everything starts at 3:58

13  where 911 is called for a particular reason in front of the

14  business.  And by 4:06 we have the incident that's the

15  encounter over at the gravel lot.

16      Q.   Well, it's after 4:06, right, because she made a call

17  at 4:06?

18      A.   Right.  I'm talking about after that.  Right.

19      Q.   But we don't know how long after that?

20      A.   No.

21      Q.   Okay.  Later on in Paragraph D you state, "All

22  evidence, logs, and testimonies demonstrate that the

23  accident occurred no later than 16:09 hours."

24           What were you referring to by "all evidence, logs,

1  and testimonies"?

2      A.   That I have seen so far.

3      Q.   Well, what evidence were you considering?

4      A.   Well, you have the evidence that says it occurred at

5  16:08.  I don't know if I have that with me or not.

6           Well, we know Allen Shutts called in at 16:08.

7      Q.   How do we know that Allen Shutts called at 16:08?

8      A.   He had trail -- the trial testimony of Mr. Shutts.

9      Q.   Did he call in and say the accident occurred at

10  16:08?

11      A.   Not that I'm aware of, no.  He didn't call that in

12  until roughly 16:23, and that was about a minute and 20

13  seconds shy of when the incident occurred.  So he would be

14  reporting something that hadn't happened yet.

15      Q.   Let's go back to my question.

16      A.   Okay.

17      Q.   In Paragraph D you say, "All evidence, logs, and

18  testimonies demonstrate that the accident occurred no later

19  than 16:09 hours."  My question to you was what evidence?

20      A.   That I would have had to review at the time.  I mean,

21  stuff has changed a little bit since then, and talking to

22  Mr. and Mrs. Hamstead at the time when it occurred.

23      Q.   So your interviews with Mr. and Mrs. Hamstead?

24      A.   Uh-huh.

1    Q.   The 911 call logs reflect that the incident occurred

2    at around 4:24 p.m., don't they?

3    A.   That's what it allegedly says, correct.

4    Q.   But you state here, your words, all logs.  The 911

5    call logs don't establish that the accident occurred no

6    later than 16:09, do they?

7    A.   Well, hold on.  The one at 4:24 that you're talking

8    about is the one where Allen Shutts calls into 911 and

9    reports an accident that has yet to occur per the video.

10   Have you seen the video?

11   Q.   I've watched the video.

12   A.   Then you would know that.

13   Q.   But you told me that -- strike that.

14        You said that it's your understanding that the APU

15   video is synched to the same clock as the 911 center,

16   correct?

17   A.   That's what I'm told.  I'm not an expert on that by

18   any means.

19   Q.   Okay.  Well, whose testimony did you consider?  You

20   said all testimonies establish that --

21   A.   That I have been told about and referred to.

22   Q.   So not actual testimony, what you were told by

23   Mr. Hamstead --

24   A.   Well, don't forget --

1           MR. HAMSTEAD:  Object to the form of the question.

2       A.    -- I didn't have access to every single thing at the

3   time.  I had to go by what I was told by the defendant -- in

4   this case, the plaintiff herself and by Mr. Hamstead as far

5   as when they got over there and when things started

6   happening.  But as things progressed, we come to find out

7   different stuff.

8       Q.    Well, you had the sworn trial testimony of every

9   witness, didn't you?

10      A.    Yes.

11      Q.    You discounted that?

12      A.    You have to discount that, except for Mr. DeGrave.

13      Q.    Did anyone besides Ms. Hamstead testify that the

14  accident occurred no later than 16:09?

15      A.    No, not that I'm aware of.

16      Q.    So it's not true what you put in your report that all

17  evidence, logs, and testimonies demonstrate that the

18  accident occurred no later than 16:09, is it?

19      A.    I think it would be, yes.

20      Q.    Would a more accurate statement be that all evidence,

21  logs, and testimonies that you considered demonstrate that

22  the accident occurred no later than 16:09?

23      A.    That is a conceivable possibility, yes.

24      Q.    I mean, there's conflicting evidence?

132

1    A.   Yes, there is, but it's factual.  You have to go to

2   see these things to retrieve them and pull them out.

3    Q.   Is it typical police procedure to disregard all

4   testimony and evidence that doesn't fit the conclusion

5   you're wanting to reach?

6    A.   No.

7    Q.   Go to Paragraph E.  You say that "The times at which

8   the officers claimed they arrived on the scene does not

9   match with the American Public University video."

10        What time did Trooper Walker state that he -- strike

11   that.

12        You go on and say, "However, the times when officers

13   claim to have departed do match the video times."

14        What time did Trooper Walker state that he left the

15   scene?

16    A.   Left the scene?

17    Q.   Yes.

18    A.   16:44 is what time he says.

19    Q.   Where did you come up with that time?

20    A.   It's on the -- it's in his report.  Hold on a second

21   here.  The Report of the Criminal Investigation by the West

22   Virginia State Police.

23    Q.   Okay.  And --

24    A.   Do you have a copy of that?

1    A.    Right.

2    Q.    -- in Paragraph F.

3    A.    I had been told about it, but I hadn't seen it.

4    Q.    So you're putting things in your report that you've

5    not actually seen, just based upon what the Hamsteads are

6    telling you?

7    A.    Right.  I was shocked to hear both of them.  I had

8    not seen that part of the video initially.

9    Q.    You testified at the beginning of this deposition

10   that you weren't told to make any assumptions by the

11   Hamsteads, but it sounds like you were told to make quite a

12   few.

13   A.    No.  That's what I did on my own.  They don't tell

14   you anything.  You don't ever make an assumption of what

15   somebody tells you.  It's your decision to make it or not.

16   Q.    Well, you assumed that Officer Newlin testified to

17   numerous things in his deposition without having read the

18   transcript.  You assumed everything in Paragraph F based

19   upon what they told you --

20   A.    I believed what they had to tell me based on what we

21   went over.  Assuming is a different story.  There are

22   statements for assuming.

23         As far as F goes, this -- when I physically saw it

24   that day, I was taken aback by it, especially when I saw a

140

1    white male get out of the car.  That's not possible because

2    at that time Ms. Hamstead is in handcuffs in the back of

3    Trooper Walker's car on the scene.

4         Q.    Okay.  So at the bottom of page 5 you state, "From

5    the evidence obtained, an investigation already completed as

6    well as what is stated below, I conclude that this video is

7    a fabricated reenactment of the event.  It is my opinion

8    that former Trooper Walker did not act alone fabricating

9    this evidence but enlisted nearby workers at the APUS

10   parking lot to create false tire track evidence which was

11   later used in Walker's false narrative and subsequent

12   prosecution of Ms. Hamstead for destruction of property and

13   the related false charges of disorderly conduct and

14   obstruction.

15        A.    That would be correct.

16        Q.    So when you say evidence obtained, you're referring

17   to statements that were given to you by Mr. Hamstead and

18   Ms. Hamstead as to what happened, or what they believe

19   happened?

20        A.    An overview.  I went to the location.  I also saw

21   some of the photographs that were taken.  As far as this

22   wild driving ability in the parking lot, I didn't see

23   anything from those photographs that would lead me to

24   believe that we had a NASCAR driver involved in this event.

1    From the damage that I've seen on both the photographs of

2    Mr. DeGrave's truck or Jefferson Contracting's truck and

3    Ms. Hamstead's vehicle, they didn't match in my opinion.

4        Q.   You go on in this bottom paragraph, "It is my opinion

5    that former Trooper Walker did not act alone fabricating

6    this evidence but enlisted nearby workers at the APUS

7    parking lot to create false tire track evidence."

8             What facts and evidence do you base this opinion on?

9        A.   Well the fact that it happened.  I mean, he -- if you

10   have Ms. Hamstead in handcuffs in the back of his cruiser

11   and this event takes place, what does that tell you?  That

12   tells you he's standing right there when it occurred.

13       Q.   How do you know she's handcuffed in the back of his

14   cruiser?

15       A.   She told me.

16       Q.   Do you have any other evidence --

17       A.   You can't see it.  They cut the video.  You can't see

18   it.  She was in the video roughly 35 to 45 minutes, but you

19   can't see it because the video has been stopped, cut.

20       Q.   Any other evidence besides Ms. Hamstead's statement

21   that leads you to believe Trooper Walker fabricated this and

22   enlisted nearby workers to create false tire track evidence?

23       A.    Well if he's there on the scene, who all of a sudden

24   enlisted their own set of morals and got in her car and

1  and basically at this time she's under arrest.  Then, out of

2  nowhere, you see Dale DeGrave's truck come back out of

3  nowhere and you see Ms. Hamstead's vehicle being driven.

4  That's not possible.  If he is standing there orchestrating

5  this, doing his investigation as he said he was, you would

6  have seen this.  He would know this.  It's not physically

7  believable or even comprehensible that they don't know what

8  occurred.  Obviously, if you didn't have the boy getting out

9  of the vehicle, it would all be a moot issue.

10      Q.   So you're just making a determination on credibility?

11      A.   Absolutely.

12      Q.   You go on to state, "Walker testified at magistrate

13  court that he could not tell what was in the video but then

14  he testified later in the Circuit Court of Appeals that the

15  APUS video depicts the real event," and you cite to

16  Exhibit 8 of your report.

17           Now, Exhibit 8 is the hearing in circuit court on

18  November 9th, 2019, correct?

19      A.   Correct.

20      Q.   Why didn't you attach magistrate court testimony

21  where he said what you said he said?

22      A.   I did not have that at the time.

23      Q.   I thought you had the magistrate -- yes, you did

24  because you attached excerpts of it as exhibits, other

148

1       A.   Not again.  This is the second event.  What we're

2    trying to do is show that, based on that, Mr. Morris

3    wouldn't have had time to talk to Ms. Hamstead because you

4    don't have the time.  There's no time in between those two,

5    so it didn't occur.  This is the second event.

6       Q.   Would there have been time after 16:24:53?

7       A.   Pardon me?

8       Q.   Would there have been time after 16:24:53 for

9    Mr. Morris to talk to Ms. Hamstead?

10      A.   No because this is the second event.  The accident

11   happened a time ago.  This is the second time the car had

12   been moved.

13      Q.   You're being circular.  You're saying that --

14      A.   Exactly.

15      Q.   -- this is evidence that this is a second event

16   because there's not time for Mr. Morris to have talked to

17   Ms. Hamstead, but what if this isn't the second event?

18   Could he have spoken to her after 16:24:53?

19      A.   How do you put in what if?  You have to go by what

20   you see and what you know and what you hear and what you

21   investigate.  There is no what if.

22      Q.   You're operating from the presumption that this is a

23   staged reenactment and you're ignoring every bit of evidence

24   that shows that it isn't.

149

1    A.   I have not seen where there's every bit of evidence

2  to say it's not.  My information that I've got, the accident

3  happened earlier.

4    Q.   Okay.

5    A.   And this would be a second time.  And the reason this

6  is done is to throw the entire narrative off into left

7  field.

8    Q.   Let's go on to Paragraph I.  In the second sentence

9  you say, "None of the workers at the scene react to any sort

10  of accident or incident at the time DeGrave's truck moves

11  forward, abruptly stops, and then backs up."

12    A.   Right.

13    Q.   So, under your theory, why would the DeGrave truck

14  move forward, abruptly stop, and then back up between

15  16:24:53 and 16:25:01?

16    A.   That would be probably one of the mysterious

17  questions we don't know, we can't answer.  But you can see

18  that nobody seems to be concerned about it, about any

19  accident, about a truck being hit.  There's nobody running

20  over there en masse to see what's going on.  It's like it

21  never occurred.

22    Q.   How can you tell the reaction of the workers from the

23  video?

24    A.   'Cause you can see them.

153

1    doubt.  It wasn't Ms. Hamstead.

2        Q.   Okay.  Are you aware that Officer Newlin watched the

3    video and testified that he thought that was Ms. Hamstead

4    getting out of the car?

5        A.   I know what he said, but it goes back to credibility,

6    Counselor.  It goes back to credibility.

7        Q.   So they found somebody to drive Ms. Hamstead's

8    vehicle, somebody to drive the Jefferson Asphalt truck.

9    You're aware that the video shows three police cars coming

10   in, correct?

11       A.   Right.

12       Q.   But you testified that Trooper Walker's is already

13   there, right?

14       A.   It's up -- it's up front, I believe.

15       Q.   So they found another state police cruiser to show

16   up?

17       A.   Not 100 percent sure, but I believe it's a

18   possibility.  I believe it's a possibility.

19       Q.   Do you believe it's a state police vehicle that pulls

20   in?

21       A.   I'm not sure about that.

22       Q.   Coincidentally, it pulls in right at the same time as

23   --

24       A.   Sure.

164

1  party damages and she took the vehicle to Superior Auto and

2  then came to the agent's office with her husband, 4/26 --

3  4/27, I mean.

4     Q.   Okay.  What date did the Hamsteads obtain the APU

5  video?

6     A.   Do you have a cite as far as a...

7     Q.   Exhibit 18 are the videos with APU.

8     A.   Bear with me.  It was after May of 2016.

9     Q.   I'll agree with you that her statement to the

10 insurance company is consistent with what she's saying in

11 this civil action, but isn't her statement to the insurance

12 company contradicted by the statement of every other

13 witness?

14    A.   Sure it would be.  That's kind of silly to ask that

15 question.  Sure it would be.

16    Q.   When you were arriving at your conclusions and

17 drafting your report did you ever consider the possibility

18 that it might be Ms. Hamstead who is lying instead of the

19 other five or ten people that are involved in this?

20    A.   Sure I would.  Sure I did, but there are mitigating

21 factors to that.

22    Q.   What are the mitigating factors?

23    A.   Dale DeGrave specifically testified or specifically

24 provided a statement stating that he struck her vehicle.

165

1    Like I told you before countless times, that ends -- that

2    ends everything here.  Nothing else would have transpired

3    had they done their job, exchanged information, and moved

4    on.

5           This was all contrived on the part of people that

6    were there.  I mean, I don't care if she's yelling or

7    screaming at all.  It doesn't make a difference because it

8    all stops at the exchange of information which never

9    occurred.

10   Q.    And you ignored Mr. DeGrave's trial testimony under

11   oath that she struck him?

12   A.    I didn't ignore it.  I just don't believe it to be

13   true.

14   Q.    You believe Mr. DeGrave perjured himself?

15   A.    I believe there's a good chance of that, yes.  Let me

16   further that real quick here.

17          MR. HAMSTEAD:  Object to the -- a belated objection

18   to the characterization of Dale DeGrave's testimony at

19   trial.

20   Q.    Sure.

21   A.    Let me explain something to you.  At the time the

22   accident occurred Mr. DeGrave gets nothing for being

23   truthful.  There is no positive or negative effects at that

24   particular time he wrote the statement until he gets around

180

1      A.    Because I've seen officers charge people when they

2  didn't have probable cause just to get the charges in, we'll

3  make the case later on.  I've seen that happen.  It's one of

4  my pet peeves.

5      Q.    Let's go to the next page, Paragraph T.  The second

6  sentence, "He illicitly and falsely charged her with

7  destruction of property knowing that the charge was false."

8          What in your training and experience in police

9  procedures qualifies you to form the opinion that you

10  express there in Paragraph T as to Trooper Walker's beliefs

11  and intent?

12      A.    'Cause he didn't have probable cause to make the

13  charge.

14      Q.    Is it your training and experience that if an officer

15  arrests someone without probable cause that means that they

16  deliberately and falsely charged the person?

17      A.    Rephrase that.  I think I have the answer to that,

18  but go ahead.

19      Q.    Is it your opinion that any time an officer arrests

20  someone without probable cause that that means that they

21  have intentionally and knowingly fabricated charges against

22  them?

23      A.    Absolutely.

24      Q.    And you don't believe in the concept of arguable

1    probable cause?

2        A.    No.  I told you before.  You've either got it or you

3    don't have it.  If you want to fabricate charges, like in

4    this case right here, you can throw in that arguable status.

5    I don't -- I don't subscribe to arguable probable cause.

6    You either have probable cause or you do not.

7        Q.    Am I correct that in forming your opinions, as

8    discussed here in your report, you started with the

9    presumption that everyone but Ms. Hamstead was lying?

10       A.    No.  Actually, I did not.

11       Q.    How did you determine that Sergeant Sigulinsky was

12   lying?

13       A.    Well, based on what I was told by -- by the

14   Hamsteads, number 1.  Number 2, he was there on the scene

15   for a prolonged period of time.  I didn't know it was an --

16   almost an hour at the time -- and nothing -- nothing came

17   out of it.  There was no substantial response on his part.

18   And at the time I got that I did not have his -- his

19   statement, but all that did was just verify what I believed.

20       Q.    I just want to know, as of December 2nd, 2019, what

21   you used to form your opinion.

22            Anything else that led you to conclude that Sergeant

23   Sigulinsky was lying?

24       A.    Lying?

1   happened.  That should never have happened.  She was walked

2   into that because they refused to listen to her, especially

3   to the point where you tell somebody to shut up.

4       Q.   You're not answering my question.  What substantiates

5   Ms. Hamstead's testimony and statements that she was not

6   resisting arrest?

7       A.   She has more believability.  I don't think she was --

8   she has more believability than the rest of them do.

9       Q.   Anything else?

10      A.   What else besides believability?

11      Q.   I'm asking you.

12      A.   I mean, after I read some of these statements here --

13  I mean, I'm just surprised it went this far.

14          MR. JEFFRIES:  Let's take a real quick five-minute

15  break.

16          (There was a break in the proceedings.)

17  BY MR. JEFFRIES:

18      Q.   Mr. Feldbush, we've discussed your report pretty

19  extensively.  Do you have any opinions that are not

20  disclosed in your report?

21      A.   I think one of the things we need to look at and I've

22  not heard it today -- you just hit on it a second ago about

23  how can everybody else be lying and not Ms. Hamstead.  Well,

24  let's reverse that role.

216

1     Q.    So have you --

2     A.    It's only been a couple of times.

3     Q.    Have you or have you not --

4     A.    Yes.

5     Q.    -- served as an expert witness?

6     A.    Yes, but not in the fashion that we have in this

7   case.  This is a lot different case than the state courts.

8   That was done through private investigatory work not to this

9   extent.

10    Q.    In your civil cases, what percent have you been for

11  the plaintiff's side roughly?

12    A.    For the plaintiff?

13    Q.    Yes.

14    A.    Actually, they have all been for the defendant's

15  side, I mean, the person that was charged.

16    Q.    On what kind of cases have you served as an expert

17  witness?

18    A.    In those cases it would be domestic related or -- I'm

19  trying to think what the other one was.  Well, that case

20  didn't go to trial.  There's one other, and I can't recall

21  what it was.  It's not -- like I say, it's just been a

22  couple.

23    Q.    When you say domestic related, what -- like a divorce

24  or a child custody or --

217

1    A.    Well, a combination of both.

2    Q.    So what was your role there?

3    A.    Well, what they wanted to find out who was doing what

4  on both sides.  You know, we had -- we had one person,

5  husband and/or wife -- I don't recall which one it was.  I

6  think it was the wife -- what was going on.  I was asked

7  very plainly on the stand what was my opinion with regards

8  to what was going on behind the scenes with her and her

9  other person that she was with.  I had to give my opinion on

10 that because I didn't have it on video that particular time.

11   Q.    Have you ever served as an expert on police

12 procedures in a civil case before?

13   A.    Not yet, no.

14   Q.    Have you ever served as a witness in a case in West

15 Virginia other than this one?

16   A.    Let me think.  As any kind of witness?

17   Q.    Fact witness or expert witness?

18   A.    No.

19   Q.    Any experience with West Virginia law other than this

20 case?

21   A.    Other than Martinsburg, that's about it.

22   Q.    What was your role in the Martinsburg case?

23   A.    I started out as a consult in that case to see what

24 we thought.

235

1    her down.  That's standard training procedure.  You pin them

2    right down to the ground.  And then they have no -- no

3    ability to cause any more issues other than maybe kicking.

4            You handcuff them, you sit them back up.  You

5    actually roll them to the right or roll them to the left

6    depending on where your point of center is.  They sit down

7    and then you pick them back up, straight back up.

8        Q.   And I understand what you said there, but my question

9    was what evidence in this case -- you were asked if these

10   two paragraphs were consistent with the evidence you've

11   seen.  What evidence did you consider to determine what

12   happened there?

13       A.   Well I believe and there's a lot here to go over --

14   to point to, but I believe I've seen where they took her

15   down to the ground and then sat her on her rear end.

16       Q.   Testimony from?

17       A.   I believe it was Walker, I believe.  But that was

18   just a glance at it.  I have not read his entire deposition

19   or transcript.

20       Q.   You read his entire magistrate court testimony,

21   didn't you, from the criminal trial?

22       A.   I didn't -- I've not been over the entire thing.  No.

23   I have read portions of it, yes.  Bear with me a second.

24           It says on page 1 of this document.

236

1    Q.    His criminal complaint report?

2    A.    It refers to where she was -- "Walker advised subject

3    that was not an option."  She couldn't call her husband.

4    "Suspect placed her hands behind her back."  I'm going

5    further than I should have.

6          "The subject then placed her right hand behind her

7    back and stated she could not get it up.  Walker placed her

8    in custody for disorderly conduct and obstruction.  He

9    double locked the handcuffs and assisted the suspect to a

10   seated position."

11   Q.    You said just now that you haven't read the entire

12   magistrate court transcript but you've read portions of it.

13   Have you read the entire portion of Trooper Walker's

14   testimony?

15   A.    No.  Let me go back to that previous question.  It

16   tells you right here.

17         "Walker advised subject he was trying to get her off

18   the ground."  So that verifies she was prone on the ground

19   and then he sits her back up to a sitting position.  It

20   tells you right here.

21   Q.    How does that verify that she was prone as opposed to

22   sitting --

23   A.    She was placed on the ground.

24   Q.    Right, but you could be placed on the ground



# Use of Force Continuums

- Its NOT a policy, it's a FORCE/Control tool.
- Use it to plot incidents/injuries/training  needs
- Avoid "stair steps" or linear  type continuums.
- Avoid excessive detail.
- NO IMPLEMENTS or
  TECHNIQUES ON YOUR
  CONTINUUM!!!

USE OF FORCE CONTINUUM

| | | |
|---|---|---|
| LEVEL FIVE | DEADLY FORCE | FIREARMS AND STRIKE TO VITAL AREAS |
| LEVEL FOUR | HARD TECHNIQUES | STRIKES AND TAKEDOWNS |
| LEVEL THREE | SOFT TECHNIQUES | OC: COME ALONGS AND WRIST LOCKS |
| LEVEL TWO | VERBAL COMMANDS | CLEAR AND DELIBERATE |
| LEVEL ONE | OFFICER PRESENCE | PHYSICAL APPEARANCE PROFESSIONAL BEARING |

Walker 00159

EXHIBIT
4
PENGAD 800-631-6989

Walker 00160

# Use of Force Continuums

Continuum as a management tool

- Research and information collection
- Policy development
- Planning
- Assists in decisions ref: resource allocation.



Walker 00161

# Use of Force Continuums

Continuum as a training tool

- Provides structure for training.
- Creates "People pictures"
- Reinforces proper use of force/control



Walker 00162

# Use of Force Continuums

Continuum as a defense tool



- Evidences management of force

- Demonstrates direction and supervision.

- A "picture" for the Jury of the relationship between escalation and de-escalation.



Subject Refuses to Move, use the Weight of his/her Body to Defeat the Control of Officer, or if the Subject is Pulling Away from the Officer.

- Officer may use pressure points
- Joint manipulations
- Officer may strike muscle groups
- Take downs

Walker 00164