**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**JULIE ANN HAMSTEAD**,

        Plaintiff,

**v.**                                        **CIVIL ACTION NO. 3:18-CV-79
(BAILEY)**

**D.R. WALKER**, individually,

        Defendant.

## <u>ORDER GRANTING DEFENDANT TROOPER D.R. WALKER'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Currently pending before this Court is Defendant Trooper D.R. Walker's Motion for Summary Judgment [Doc. 260] and Plaintiff's Motion for Partial Summary Judgment [Doc. 262], both filed on February 10, 2020.  Having been fully briefed, these matters are now ripe for decision.  For the reasons set forth below, this Court will **GRANT** Defendant Trooper D.R. Walker's Motion for Summary Judgment **[Doc. 260]** and **DENY** Plaintiff's Motion for Partial Summary Judgment **[Doc. 262]**.

## <u>BACKGROUND</u>

The events giving rise to this lawsuit occurred on the afternoon of April 25, 2016. Plaintiff was opposed to a sidewalk and highway project in Ranson and Charles Town, West Virginia, referred to throughout this lawsuit as the Fairfax Boulevard Project, which she believed would affect parking access to one of her properties.  On that day, plaintiff observed forms being installed in front of her property and, believing the concrete pour to which she was opposed to be imminent, decided to take action.

Plaintiff parked her car in front of her property, allegedly to demonstrate that no one

would be able to park there, and called 911 "want[ing to speak with] an officer [in] reference [to the] city pouring concrete in front of her house." [Doc. 261-4 at 1]; *see also* [Doc. 261-1 at 2–3]. Sergeant Keith Sigulinsky ("Sigulinsky") of the Ranson Police Department took the call and responded to the area where plaintiff was. *See* [Id. at 1–2]. However, Sigulinsky states that because he was dispatched to a "disturbance" and did not see a disturbance, he did not stop at plaintiff's location. *See* [Docs. 261-4 at 1–2; 261-5 at 2–3; 261-6 at 8; 261-2 at 40]. Plaintiff, having seen Sigulinsky drive by her, concluded "this [is] not going to work." [Doc. 261-2 at 40].

Thereafter, plaintiff had a confrontation with Jefferson Asphalt supervisor Allen Shutts ("Shutts") about the project. *See* [Docs. 261-7 at 2–3; 261-2 at 6–7]. Shutts described the plaintiff as being "very, very upset," and that plaintiff was "cussing and being irate." [Docs. 261-7 at 3; 261-2 at 7]. Eventually, around 4:18 p.m., Shutts called 911 "to see if they could send an officer out to talk with [plaintiff]," because Shutts "didn't want any issues the next day" when the concrete was going to be poured. [Docs. 261-2 at 7; 261-8 at 1–2; 261-9 at 1].

Officer Jason Newlin ("Newlin") of the Charles Town Police Department was dispatched to the call. *See* [Doc. 261-8 at 1–2]. Sigulinsky also heard the call come across his radio and, thinking it might relate to the call he responded to a little while earlier, also responded. *See* [Doc. 261-6 at 2]. Defendant was also in the area and responded when he heard the call come across his radio because "[t]here was a disturbance called out . . . [so defendant] went by to make sure everything was okay." [Doc. 261-10 at 2].

After Shutts placed his initial 911 call, but before any of the police officers arrived, there was a collision between plaintiff's vehicle and a Jefferson Asphalt pickup truck, driven

2

by Jefferson Asphalt employee Dale DeGrave, in a gravel parking lot across from American Public University ("APU") where Jefferson Asphalt was storing vehicles and equipment. *See, e.g.*, [Docs. 261-14 at 2; 261-2 at 8–9]. Shutts witnessed the collision and, around 4:23 p.m., made a second call to 911 to report it, stating that plaintiff struck the Jefferson Asphalt truck. *See* [Docs. 261-2 at 8–9; 261-8 at 2; 261-9 at 1]. Approximately five minutes later, Sigulinsky arrived at the scene, followed closely thereafter by Newlin and the defendant. *See* [Docs. 261-12; 261-5 at 6; 261-8 at 1–2; 261-10 at 4; 261-15 at 8–9].

Sigulinsky and Newlin began interviewing the Jefferson Asphalt employees present at the scene and asked plaintiff to remain with defendant while they did so. *See* [Doc. 261-1 at 6]. As Sigulinsky and Newlin attempted to conduct these interviews, plaintiff kept interrupting their efforts. *See* [Docs. 261-2 at 10; 261-2 at 19; 261-2 at 23; 261-7 at 4–5; 261-16 at 2]. The witnesses and police officers at the scene described plaintiff as being "irate," "upset," "yelling and screaming," "very loud," "rude," and "hysterical," and said that plaintiff kept attempting to go over to where Sigulinsky and Newlin were conducting their interviews. *See* [Docs. 261-2 at 11, 14–15, 19, 23, 27, 28; 261-6 at 4; 261-7 at 4–5; 261-14 at 4; 261-17 at 2]. Plaintiff has described her actions as "exercis[ing] her right to defend herself against false charges." [Doc. 110 at 9]. The witnesses and police officers at the scene state that defendant told plaintiff several times to be quiet, calm down, stay away from the officers conducting their interviews, and that she would have the opportunity to tell her side of the story after the interviews with the Jefferson Asphalt employees were completed. *See* [Docs. 261-2 at 11, 14, 23, 26, 28, 33; 261-17 at 2]. Plaintiff alleges that defendant kept telling her to "shut up," and that defendant showed no interest in hearing her side of the story. *See* [Doc. 110 at 8–9].

3

The witnesses state that after plaintiff repeatedly refused to obey defendant's instructions, plaintiff once again began walking towards Sigulinsky and Newlin, who had their backs to plaintiff continuing to talk to the Jefferson Asphalt employees. *See* [Docs. 261-2 at 15, 19–20, 26, 29; 261-6 at 4].  Defendant states that "[a]t that point, [he] made the decision to place [plaintiff] under arrest for disorderly conduct and on obstructing." [Doc. 261-2 at 29].  As plaintiff started walking away from defendant towards the other officers, defendant went to grab plaintiff's arm, at which point witnesses state that plaintiff swatted defendant's hand away from her. *See* [Docs. 261-2 at 11, 16, 20, 29; 261-6 at 5; 261-7 at 5].  When defendant went to grab plaintiff again in an attempt to take plaintiff into custody, all of the witnesses state that plaintiff actively resisted arrest, refusing to give plaintiff her other arm so that she could not be handcuffed and attempting to pull away from defendant. *See* [Docs. 261-2 at 12, 20, 24, 29; 261-6 at 6; 261-14 at 5; 261-16 at 4, 6; 261-17 at 4].  At that point, defendant placed plaintiff up against a work truck in order to gain better control over her to effect the arrest. *See, e.g.*, [Doc. 261-2 at 29].  The witnesses state that plaintiff continued to resist and shield her arms from defendant when she was placed up against the vehicle. *See* [Docs. 261-2 at 12, 16–17, 21, 24, 29; 261-6 at 6; 261-14 at 5; 261-16 at 4, 6; 261-17 at 4].  Thus, defendant "decided to put [plaintiff] on the ground," where after "struggl[ing] there for a couple seconds," defendant was eventually able to place plaintiff in handcuffs and put her in the back of his police cruiser.  [Doc. 261-2 at 29–30]; *see also* [Docs. 261-1 at 7; 261-2 at 12, 14; 261-6 at 4; 261-16 at 6].  Plaintiff alleges that she did not resist arrest and describes the force used in effecting her arrest as defendant "smash[ing] the right side of her face into [the] work truck[,] breaking her eyeglasses" and "slamm[ing] plaintiff face down into the ground, bloodying her knees."

4

[Doc. 110 at 9–10].

Following plaintiff's arrest, it was decided that defendant should take the lead on the overall investigation, including the vehicle accident. *See* [Doc. 261-15 at 2–3]. Thus, defendant turned to investigating the accident, taking photographs of the accident scene, while Newlin offered to take statements from the witnesses. *See* [Docs. 261-2 at 31–33; 261-15 at 2–3]. While defendant was investigating the accident, plaintiff's husband, Mr. Hamstead, arrived on the scene and stopped briefly to speak with plaintiff while she was in the back of defendant's cruiser. *See* [Docs. 261-1 at 8; 261-2 at 31–33]. Mr. Hamstead urged defendant to take plaintiff to the hospital to have her shoulder examined and, after being prodded several times, defendant ceased investigating the accident and took plaintiff to the hospital, leaving Newlin to continue collecting witness statements. *See* [Docs. 261-2 at 31–33]. Mr. Hamstead followed defendant to the hospital. *See* [Doc. 261-1 at 16–17].[1] Plaintiff alleges that on the drive to the hospital, defendant drove recklessly while plaintiff was unbuckled in the back seat, and that defendant told her "don't show your ass" at the hospital. *See* [Doc. 110 at 15, 18]. Defendant admits that plaintiff was unbuckled and that he made a remark to this effect because of plaintiff's earlier behavior. *See* [Doc. 261-2 at 35].

Defendant arrived at the hospital with plaintiff at 4:54 p.m. [Docs. 261-8 at 1; 259-2 at 1, 13]. While ambulating into the hospital, plaintiff was observed having no trouble moving her head and neck. *See* [Doc. 259-2 at 7]. Upon examination, plaintiff was

---

[1] While plaintiff acknowledges Mr. Hamstead followed a state police cruiser to the hospital, she claims it was a "decoy" cruiser and not defendant's. This contention is part of her conspiracy theory, which will be discussed *infra*.

diagnosed with left shoulder pain and a cervical spine sprain.  *See* [Id. at 2].  Plaintiff also

had a visible scratch on her left knee.  *See* [Id. at 9].  Despite plaintiff's claims that

defendant broke her arm, imaging revealed no fractures or dislocations.  *See* [Id. at 29].

Plaintiff was discharged from the hospital at 10:45 p.m.  *See* [Id. at 18].

Defendant then transported plaintiff to the State Police detachment for processing,

arriving at 10:54 p.m.  *See* [Doc. 259-8 at 1].  While completing his report, defendant ate

and listened to country music, which plaintiff describes as "sex songs."  *See* [Docs. 110 at

118; 261-1 at 25–26].  Defendant charged plaintiff with three misdemeanor counts: (1)

obstructing an officer, (2) disorderly conduct, and (3) destruction of property.  *See* [Doc.

259-20 at 1].  Defendant left the detachment at 11:34 p.m. and took plaintiff to magistrate

court for her arraignment,[2] arriving at 11:41 p.m.  *See* [Doc. 261-8 at 1].  Plaintiff was

arraigned and released on personal recognizance at 11:53 p.m., with the magistrate finding

probable cause for all three counts.  *See* [Docs. 261-21 at 1; 261-22 at 1].

Plaintiff was convicted of the obstruction and disorderly conduct charges following

a bench trial in the Jefferson County Magistrate Court.  *See* [Doc. 261-24 at 1–2].  Plaintiff

was acquitted of the destruction of property charge because the magistrate found that the

damage to the Jefferson Asphalt truck did not diminish the utility or value of the vehicle.

*See* [Docs. 261-24 at 3; 261-2 at 43].  Plaintiff appealed her convictions to the Jefferson

County Circuit Court, and ultimately entered a plea of *nolo contendere* to the disorderly

---

[2] Mr. Hamstead contacted a magistrate to arrange for plaintiff to be arraigned that night.  *See* [Docs. 261-1 at 24; 261-10 at 3].  Newlin noted in his deposition that it was not normal procedure for an arrestee to be arraigned after normal business hours.  *See* [Doc. 259-15 at 3–4].  Even the magistrate who presided over plaintiff's bench trial noted on the record that plaintiff received "special treatment" by being arraigned that evening rather than spending the night in jail and being arraigned the next day.  *See* [Doc. 259-2 at 44].

conduct charge in exchange for the State dismissing the charge of obstructing an officer. *See* [Doc. 146-2].

This lawsuit eventually followed.  Plaintiff's Second Amended Complaint essentially named as defendants every individual plaintiff interacted with on the day in question and the organizations or municipalities that those individuals worked for.  Specially, the Second Amended Complaint named the following defendants: (1) the instant defendant, D.R. Walker; (2) the City of Ranson, West Virginia; (3) Sigulinsky; (4) the City of Charles Town, West Virginia; (5) Newlin; (6) West Virginia Department of Highway employees Rodney Hedrick and Kyle Reed Koppenhaver; (7) Jefferson Contracting, Inc.; (8) Jefferson Asphalt Products Company; (9) Jefferson Asphalt employees Dale DeGrave, Allen Shutts, and John Timothy Morris; (10) Charles Town General Hospital; and (11) Kelly Halbert, a registered nurse who attended to plaintiff in the hospital.  *See* [Doc. 110 at 1].  Plaintiff's Second Amended Complaint asserted a myriad of claims against all of these individuals and organizations based on plaintiff's assertion that they all conspired together to fabricate false criminal charges against plaintiff "in retaliation for plaintiff's protest over the unvetted and unlawful State Project" and to aid in defendant's "malicious scheme to overcharge plaintiff . . . in an attempt to shield [defendant] from responsibility for his excessive use of force . . . and to justify plaintiff's arrest."  *See* [Doc. 110 at 11–12, 22–25].  This alleged conspiracy and cover up included, but was not limited to, the manufacturing of evidence to implicate plaintiff was at fault for the motor vehicle accident and providing false statements.  *See generally* [Doc. 110].  In fact, plaintiff claims the videos taken from APU's security cameras [Doc. 261-12] do not reflect the actual events, but are a reenactment staged to cover up the conspiracy to falsely charge her.  *See* [Docs. 110 at 11–15; 261-13

7

at 6–7].

Following the motion to dismiss stage of this litigation, only one defendant remains—defendant Walker—and only three causes of action remain against the defendant: (1) a Fourth Amendment excessive force claim, (2) a Fourth Amendment unreasonable search and seizure claim, and (3) a tort of outrage claim. Defendant now moves for summary judgment on all of these claims. Defendant asserts that because defendant's "use of force to effect [plaintiff's] arrest was objectively reasonable, he is entitled to qualified immunity from [plaintiff's] Fourth Amendment excessive force claim." [Doc. 260 at 1]. Further, defendant argues that plaintiff "does not have evidence by which a reasonable jury could find that she has established the essential elements of her Fourth Amendment search and seizure and intentional infliction of emotional distress counts." [Id.]. Defendant argues that "[i]n particular, [plaintiff's] conspiracy theory is blatantly contradicted by the record as a whole and supported only by her uncorroborated, self-serving testimony and speculation." [Id.].

In response, plaintiff asserts that a "genuine issue exists in this case because 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" [Doc. 281 at 1] (citation omitted). Plaintiff argues that defendant "seeks to have the Court supplant the providence [sic] of the jury." [Id.] Plaintiff also makes her own motion for partial summary judgment as to her Fourth Amendment unreasonable search and seizure claim. *See* [Doc. 262].

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *See* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322–23 (1986).  If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  **Id.**  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  **Id.** at 250.

In reviewing the supported underlying facts, all reasonable inferences must be viewed in the light most favorable to the party opposing the motion. *See* **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 587 (1986).  Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  **Id.** at 586.  That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); **Celotex Corp.**, 477 U.S. at 323–25; **Anderson**, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  **Anderson**, 477 U.S. at 249 (citations

9

omitted).  Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  ***Beale v. Hardy***, 769 F.2d 213, 214 (4th Cir. 1985).  "Permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."  ***Sylvia Dev. Corp. v. Calvert Cty., Md.***, 48 F.3d 810, 818 (4th Cir. 1995).  Further, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  ***Celotex Corp.***, 477 U.S. at 322.

When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other; rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.  **Wright, Miller, & Kane**, *Federal Practice and Procedure*: Civil 2d § 2720.

## <u>DISCUSSION</u>

This Court will address each of the three remaining claims against defendant in turn.

## A.  Excessive Force Claim

Defendant asserts that because defendant's "use of force to effect [plaintiff's] arrest was objectively reasonable, he is entitled to qualified immunity from [plaintiff's] Fourth Amendment excessive force claim."  [Doc. 260 at 1].  "The doctrine of qualified immunity

protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Stated differently, "[q]ualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

It is clearly established that the Fourth Amendment confers upon individuals a constitutional right to be free from excessive force during the course of an arrest.  *Graham v. Connor*, 490 U.S. 386 (1989), *accord* *Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("The Fourth Amendment's right to be free from unreasonable seizures includes the right to be free from seizures carried out with excessive force.").  However, "[w]hen evaluating whether a right was clearly established at the time of a violation, courts do not ask whether the right allegedly violated was established as a broad general proposition but whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted."  *Pegg v. Herrnberger*, 845 F.3d 112, 117 (4th Cir. 2017) (internal citations and quotation marks omitted).  Thus, ultimately, whether or not qualified immunity shields defendant from liability depends upon whether or not the force employed during plaintiff's arrest was excessive.

To determine whether a police officer applied excessive force in violation of the Fourth Amendment, courts examine officers' actions "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490

U.S. at 397.   Thus, "[s]ubjective factors involving the officer's motives, intent, or propensities are not relevant," *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994), but instead "whether an officer has used excessive force is analyzed under a standard of objective reasonableness." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Specifically, courts examine "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 397.  "The extent of the plaintiff's injuries is also a relevant consideration." *Turmon*, 405 F.3d at 207. Moreover, the Supreme Court has explained that:

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97 (internal citations and quotation marks omitted).

Here, though the severity of the crimes with which plaintiff was charged are relatively minor, every single witness to the event except plaintiff testified under oath—some on multiple occasions—that plaintiff actively resisted arrest.  *See* [Docs. 261-2 at 11–12, 16–17, 20–21, 24, 29; 261-6 at 5–6; 261-7 at 5, 261-14 at 5; 261-16 at 4; 261-17 at 4]. Though plaintiff *alleges* that she did not resist arrest, [Doc. 110 at 10], plaintiff offers absolutely no *evidence* to refute the testimony of every other witness on the scene.  This Court would agree with defendant that plaintiff "confuses 'allegations' with 'evidence.'"

[Doc. 306 at 4].

In response to defendant's Motion, plaintiff does not cite to a shred of evidence to support her version of the events. Instead, plaintiff merely relies upon her own allegations and sets forth further speculation. Plaintiff does not even provide any of *her own testimony*— by deposition, affidavit, or otherwise—to support her allegation that her arrest was "carried out without resistance." [Doc. 110 at 10]. There is a total of four pages from plaintiff's deposition included with her response brief; none of which contradict the testimony of all of the other witnesses at the scene that plaintiff actively resisted arrest. *See* [Docs. 281-7 at 3; 281-9 at 3; 281-10 at 3; 281-14 at 3].

Furthermore, while defendant testified that he did not fear for his own safety, multiple witnesses testified that plaintiff approached Newlin and Sigulinsky from the rear, which potentially could have endangered those two officers. *See* [Docs. 261-2 at 15, 19, 37; 261-6 at 4]. This is particularly true considering that witnesses stated plaintiff was "irate," acting "hysterical," and "walking aggressively" towards them. *See* [Docs. 261-2 at 7, 11, 14, 19–20, 23, 26, 27; 261-6 at 4; 261-7 at 3–5; 261-17 at 2]. Once again, plaintiff puts forth no evidence of her own to contradict these witnesses' testimony, apart from her unsupported allegations.

Upon consideration of the evidence, this Court concludes that defendant applied no more force than necessary to overcome plaintiff's resistance and protect the other officers at the scene. Plaintiff presents no evidence to support her allegation that defendant "smashed the right side of her face into [the] work truck" and "slammed plaintiff face down

13

into the ground."[3]  [Doc. 110 at 9–10].  To the contrary, all of the witness testimony stated that defendant "placed" or "put" plaintiff up against the truck in order to help defendant control plaintiff—who was actively resisting defendant's attempts to handcuff her—and that when plaintiff continued to resist being handcuffed, defendant performed a simple and common takedown maneuver to ensure plaintiff's compliance.  *See* [Docs. 261-2 at 12, 16–17, 22, 24, 29–30; 261-16 at 6; 261-17 at 4].  There is no evidence defendant ever struck or kicked plaintiff, and plaintiff remained on the ground no longer than the time defendant needed to handcuff her.  Once plaintiff was handcuffed, defendant assisted plaintiff back to her feet and refrained from any further physical contact.  As a result of the encounter, plaintiff suffered minor injuries, receiving only diagnostic treatment at the hospital before being released a few hours after her arrival.  *See* [Doc. 259-2].  "An efficient, lawful arrest[4] of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force."  ***Pegg***, 845 F.3d at 120.  Therefore,

---

[3] The only evidence plaintiff has presented to support this claim is a picture of broken eyeglasses.  *See* [Doc. 281-38 at 2].  Assuming these eyeglasses are plaintiff's and that they were, in fact, broken during her arrest, such would be evidence that force was used to effect plaintiff's arrest, but it does little to prove that the amount of force utilized was excessive.  This is particularly true where plaintiff offers no testimony of her own to support her allegations.

[4] To the extent plaintiff continues to argue that "there was no objectively reasonable cause for [plaintiff's] arrest," [Doc. 281 at 10], and that a jury "could determine that [defendant] had no valid basis for arresting [plaintiff] in the first place," [id. at 1], plaintiff is again attempting to relitigate an issue that has already been decided.  While plaintiff continues to assert that defendant lacked probable cause to arrest her at all, this Court has already ruled plaintiff's conviction for disorderly conduct bars her from challenging probable cause for her arrest.  *See* [Doc. 150 at 13].  Plaintiff clearly disagrees with this Court's decision, and she is free to present such disagreement on appeal, but such is no longer an issue in this case.

this Court finds that defendant's actions were objectively reasonable[5] and that defendant is entitled to qualified immunity as a result.

Plaintiff argues defendant asks this Court to invade the province of the jury, by "weigh[ing] the evidence and mak[ing] credibility determinations." [Doc. 281 at 1].  Plaintiff argues that the "veracity of Plaintiff's allegations should not be measured by the number of witnesses testifying for each side," [id. at 2], and that the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  [Id. at 1] (citation and quotation marks omitted).  This Court disagrees.

This case is not a "he-said/she-said," but rather a he-said, he-said, he-said, he-said, he-said, he-said, he-said, he-said, he-said, he-said, he-said, he-said/she-said.  However, it is not the shear number of witnesses supporting defendant's version of the events that is important, nor is this Court making credibility determinations with regard to conflicting testimony.  Instead, it is the fact that defendant presents a significant amount of evidence supporting his version of the events without plaintiff presenting contradictory evidence of her own that leaves this Court with no option other than to find in favor of defendant.  While what "he-said" is supported by all of the witnesses' testimony and the documentary evidence in the record, what "she-said" can only be gleaned from plaintiff's allegations and argument, but is not supported by evidence in the record.  As previously noted, plaintiff

---

[5] This Court notes that after an investigation into defendant's "response to resistance or aggression," the West Virginia State Police determined that defendant's actions were "reasonable," "appropriate," and "policy compliant."  [Doc. 261-23 at 5, 10].  The use of a takedown is also exactly what the police training submitted by plaintiff states is an appropriate response to a subject pulling away from an officer.  *See* [Doc. 281-24 at 50].  Finally, the Court notes that not one witness had any problem with defendant's actions that day, describing defendant as "very patient in the situation" and acting "in a professional manner."  *See* [Docs. 261-2 at 12, 17; 261-6 at 7; 261-16 at 6].

does not even present this Court with her *own* sworn testimony to contradict defendant's version of the events, instead simply relying on unsupported allegations and speculation. Despite plaintiff's arguments to the contrary, this Court is, in fact, required to remove such a case from the jury when presented with such a situation.  *See **Anderson v. Liberty Lobby, Inc.**,* 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); ***Everson v. Leis***, 556 F.3d 484, 496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion."); ***Ford Motor Co. v. McDavid***, 259 F.2d 261, 266 (4th Cir. 1958) ("Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture."); ***Sylvia Dev. Corp. v. Calvert Cty, Md.***, 48 F.3d 810, 818 (4th Cir. 1995) ("[T]he non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not 'genuine' within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor.") (internal citations and quotation marks omitted); ***Scott v. Harris***, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); ***Felty v. Graves-Humphreys Co.***, 818 F.2d 1126,

1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion."); *Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010) (a non-movant "cannot create a material fact by reliance on conclusory allegations or bare denials"); *Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) ("[A] party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence."); *Choe v. Smith*, 1995 WL 541675, at *2 (4th Cir. 1995) ("In response to the Defendants' affidavits rebutting [plaintiff's] claims, [plaintiff] merely alleged that the Defendants were lying. She submitted no affidavits or evidence in support of this allegation. To survive summary judgment, however, [plaintiff] was required to produce more than a mere allegation of the existence of a material fact.").

In sum, summary judgment is the time to show your cards; the time to show the Court exactly what admissible evidence you have from which a reasonable jury could rule in your favor. Here, plaintiff simply fails to do so. This Court would agree with defendant that plaintiff "fails to recognize that we are no longer at the Rule 12(b)(6) stage but at the Rule 56 stage, where she must identify record evidence to support her claims so as to show that there is a genuine dispute of material fact." [Doc. 306 at 5].

Defendant has put forth evidence demonstrating his actions were objectively reasonable and that he reasonably could have believed his conduct was lawful, thus demonstrating that he is entitled to qualified immunity from plaintiff's excessive force claim. On the contrary, plaintiff has not put forth evidence to contradict defendant's version of the events or support a different conclusion. It is plaintiff's own lack of support for her allegations that creates no genuine dispute of material fact; not any determination by this

Court regarding the veracity of any witness's claims.  Accordingly, this Court will grant summary judgment in favor of defendant with regard to plaintiff's excessive force claim.

## B. Unreasonable Search and Seizure Claim

Before addressing plaintiff's Fourth Amendment unreasonable search and seizure claim, this Court must first address Defendant Trooper D.R. Walker's Motion to Strike Plaintiff's Affidavit in Support of her Motion for Partial Summary Judgment [Doc. 279], which seeks to strike certain provisions of plaintiff's affidavit supporting her Motion for Partial Summary Judgment as to liability for her unreasonable search and seizure claim. Defendant argues the provisions he is seeking to strike "consist of [plaintiff's] conclusions and speculation, . . . are not based upon Plaintiff's personal knowledge, or . . . are otherwise inadmissible."  [Id. at 1].  In response, plaintiff argues what defendant classifies as "speculation" is instead plaintiff's "lay witness opinion testimony which is admissible." [Doc. 304 at 1].

### 1. Defendant's Motion to Strike

Federal Rule of Civil Procedure 56 provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   Fed. R. Civ. P. 56(c)(4); *see also **Evans v. Techs. Applications & Serv. Co**, 80 F.3d 954, 962 (4th Cir. 1996) (stating that affidavits submitted to support or oppose a motion for summary judgment must "contain admissible evidence and be based on personal knowledge").  A court may strike from an affidavit any statement that is inadmissible hearsay, speculation, or unsupported argument.  See **Pfeil v. Rogers**,

757 F.2d 850, 861–63 (7th Cir. 1985); *see also* **Haynes v. Twin Cedars Youth & Family Servs.**, 2012 WL 895699, at *7 (M.D. Ga. Mar. 15, 2012) (Royal, C.J.) ("[A] court may strike or disregard the improper portions of an affidavit submitted in connection with a motion for summary judgment, and consider the remainder of the testimony or statement.") (citing **Lee v. Nat'l Life Assurance Co. of Canada**, 632 F.2d 524, 529 (5th Cir. 1980)); **Pritchard v. Southern Co. Servs.**, 92 F.3d 1130, 1135 (11th Cir. 1996) ("[I]nadmissable hearsay . . . [cannot] defeat summary judgment when that hearsay will not be reducible to admissible form at trial. " ) (citing **McMillian v. Johnson**, 88 F.3d 1573 (11th Cir. 1996)).

For a matter to be considered within a witness's personal knowledge, it must be "derived from the exercise of his own senses, not from the reports of others—in other words, [it] must be founded on personal observation." **United States v. Evans**, 484 F.2d 1178, 1181 (2nd Cir. 1973). A party's mere "belief" and/or speculation is not based on personal knowledge and is not competent summary judgment evidence. *See* **Gen. Longshore Workers, Int'l Longshoremen Ass'n, Local 1988 v. Pate Stevedore Co.**, 1993 WL 603297, at *8 (N.D. Fla. Dec. 30, 1993) (Vinson, J.), *aff'd sub nom.* **Gen. Longshore v. Pate Stevedore**, 41 F.3d 668 (11th Cir. 1994) (holding that a party's belief does not satisfy the personal knowledge requirement because "[b]elief, no matter how sincere, is not equivalent to knowledge") (citing **Jameson v. Jameson**, 176 F.2d 58, 60 (D.C. Cir. 1949)). "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." **Drake v. Minnesota Min. & Mfg. Co.**, 134 F.3d 878, 887 (7th Cir. 1998) (citing **Davis v. City of Chicago**, 841 F.2d 186, 189 (7th Cir. 1998)). Further, a lay witness may only offer an opinion if it is "rationally

based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue."  Fed. R. Evid. 701.

With these rules in mind, this Court turns to considering the provisions defendant seeks to strike.  Defendant moves this Court to strike paragraphs 4, 5, 7, 9, 12, 13, and 14 from plaintiff's affidavit in their entirety.  This Court will discuss each of these paragraphs in turn.

### PARAGRAPH 4

4.  That, based on my careful review of video footage captured and provided by American Public University, and upon information and belief, I conclude that, following my arrest, former Trooper D.R. Walker commissioned a young tall male to enter my vehicle from the passenger's side to remove my wallet from my purse and deliver it to Walker.  After confiscating my driver's license, Walker then commissioned Sgt. Sigulinsky of Ranson to return my wallet to my purse absent my driver's license.

[Doc. 262-1 at 6].

The portion of this paragraph asserting that defendant "commissioned" individuals to enter plaintiff's vehicle is speculation and is not based on personal knowledge.  Even if plaintiff could determine from watching the video who entered her vehicle, which itself is seemingly impossible to this Court from its own review of the video, there is no way plaintiff could determine that it was defendant who "commissioned" them to do so.  Thus, this portion of paragraph 4 is purely speculative, and as such will be **STRICKEN** and not considered by this Court.

As for the portion of this paragraph identifying a "young tall male" and "Sgt. Sigulinsky" as the people who entered her vehicle, plaintiff offers some rational basis in her response brief for how plaintiff reached this determination—albeit, she did not do so in the

affidavit itself.  Again, from this Court's own review of the video, it is seemingly impossible to determine who actually enters the vehicle, but plaintiff offers this as her "opinion" of who is depicted in the video.  However, plaintiff offers no explanation on how this opinion would be helpful for the jury in determining a fact in issue, as there is no explanation for why plaintiff is in a better position to determine who appears in the video than the members of the jury.  *See United States v. Fulton*, 837 F.3d 281, 292 (3d Cir. 2016) ("[W]here a witness is not in a better position than the jurors to form an opinion or make an inference, the witness's opinion is inadmissible under Rule 701(b).").  Regardless, as will be seen below, plaintiff's opinion of who entered her vehicle has no effect on this Court's determination of whether summary judgment is appropriate.  Furthermore, this opinion appears at other places throughout the record.  *See* [Doc. 261-1 at 28].  Thus, while it may be improper, this Court sees no need to strike this opinion.

### PARAGRAPH 5

5.  Although it is now known that Sigulinsky entered the passenger side of my vehicle following my arrest, both Walker and Sigulinsky continue to participate in "code of silence" activity, each falsely claiming that they do not know how Walker came to be in possession of my driver's license, which was taken from my purse located in my vehicle after my arrest.

[Doc. 262-1 at 6].

This Court concludes that this paragraph should be **STRICKEN** in its entirety.  First, it is not "known that Sigulinsky" entered plaintiff's vehicle.  This is again simply plaintiff's speculative opinion.  As defendant accurately points out:

During his deposition, Sgt. Sigulinsky testified that he could not determine from watching American Public University ("APU") security camera videos from across the street whether he entered the passenger side of Plaintiff's vehicle, but he did not recall doing so. (Sigulinsky Dep. 166:22-167:2,

168:20-169:3, attached as "Exhibit 3").  Similarly, Officer Newlin could not identify from the APU video who entered the passenger side of Plaintiff's vehicle.  Officer Newlin could only determine that the person shown on the video was "a male in dark clothing" who was neither him nor Trooper Walker.  (Newlin Dep. 213:4-214:11, attached as "Exhibit 4").  Contrary to Plaintiff's position, Officer Newlin did not testify that he believed the person shown on the video was Sgt. Sigulinsky; he testified that the person could be Sgt. Sigulinsky "or somebody else."  Id. at 214:11.  While Plaintiff may believe the person shown on the video is Sgt. Sigulinsky, that is merely her opinion after watching the APU video—not her personal knowledge—and it certainly is not "known that Sigulinsky entered the passenger side" of Plaintiff's vehicle.

[Doc. 279 at 4].

Second, plaintiff's assertion that defendant and Sigulinsky are participating in "code of silence" activity is also purely speculation without any purported basis of personal knowledge within the affidavit.   Accordingly, the entirety of this paragraph is hereby **STRICKEN**.

### PARAGRAPH 7

7.   That although Walker acknowledges the confiscation of my driver's license, he fails and refuses to state a reason for confiscating it and for not promptly returning it to either me or my husband, who was present following my arrest.

[Doc. 262-1 at 6].

This Court concludes that the entirety of this paragraph should be **STRICKEN**, as it is blatantly contradicted by the record.  Defendant testified at plaintiff's criminal trial that he got information from the license at the time of plaintiff's arrest and testified that the reason he did not return the license is because he lost it.  [Doc. 279-6 at 8].  While plaintiff may choose not to believe these explanations, she cannot truthfully contend that defendant did not provide them.

22

**PARAGRAPH 9**

9.  That during the time my attorney was trying to get my driver's license returned, I consistently worried each time I drove that Walker, who had taken my license for no valid reason, could have another officer stop me and charge me with a crime for having no driver's license in my possession at the time.

[Doc. 262-1 at 7].

The portion of this paragraph that states defendant "had taken my license for no valid reason" shall be **STRICKEN** and not considered by this Court for the same reasons described above with regard to paragraph 7.  As the rest of the paragraph is plaintiff simply stating how she personally felt, this Court sees no reason to strike the remainder of the paragraph.

**PARAGRAPH 12**

12.  Based on my personal subjection to Walker's abuse of his power, based on his abusive dominance and sexually abusive behavior toward me for personal gratification and based upon the fact that Walker did not use my driver's license for any real purpose, I conclude that Walker's confiscation of my driver's license was a component of his rogue pattern of abusive use of police power for his personal gratification and that he simply stole my driver's license.

[Doc. 262-1 at 7].

This Court finds that plaintiff's conclusion that defendant's "confiscation of my driver's license was a component of his rogue pattern of abusive use of police power for his personal gratification and that he simply stole my driver's license" is not *rationally* based on the plaintiff's perception.  Plaintiff is "going beyond recounting facts within [her] personal knowledge, and is merely telling the finder of fact what conclusion to reach."  ***Riley v. Univ. of Ala. Health Servs. Found., P.C.***, 990 F.Supp.2d 1177, 1190 (N.D. Ala. 2014).  "As

such, it is a 'meaningless assertion[] which amount[s] to little more than choosing up sides.'" ***Id.*** (quoting Fed. R. Evid. 701 (advisory committee notes)).   Therefore, this conclusion is hereby **STRICKEN**, as is plaintiff's contention that defendant "did not use my driver's license for any real purpose" for the reasons already discussed above.

### PARAGRAPH 13

> 13.   That, upon information and belief, and based upon Walker's reputation for confiscating and not returning other women's driver's licenses, I conclude that Walker's confiscation of my driver's license constituted his repeated pattern behavior involving the collection and theft of women's driver's licenses.

[Doc. 262-1 at 7].

This Court concludes that this entire paragraph is nothing more than mere speculation.   Plaintiff provides no factual basis from which she has personal knowledge of defendant's "reputation for confiscating and not returning other women's driver's licenses." In fact, plaintiff testified at her deposition that "[n]obody told [her] directly" of defendant purportedly keeping women's driver's licenses.   *See* [Doc. 279-5 at 3–4].   Instead, plaintiff claimed that others had told her attorney of such conduct.   However, defendant points out that "discovery revealed no such allegations—either through documentary evidence or by interrogatory answers identifying the witness and the purported knowledge of the witness." [Doc. 279 at 5].   Also, as previously noted, for a matter to be considered within a witness's personal knowledge, it must be "derived from the exercise of his own senses, not from the reports of others—in other words, [it] must be founded on personal observation."   ***Evans***, 484 F.2d at 1181.

Furthermore, even if someone told plaintiff directly of such conduct, plaintiff's

statement to that effect in her affidavit would be inadmissible hearsay.  Plaintiff claims in

her response that she could "call the witness from whom the information was obtained" at

trial.  [Doc. 304 at 7–8].  However, not only does it appear that if such person exists that

fact was withheld in discovery, but also it is that witness's testimony that should have been

produced here—not plaintiff's.  In fact, plaintiff's statement that she could produce such a

witness at trial seemingly acknowledges that the proper person to present such evidence

would be the person who provided the information—not plaintiff.  Plaintiff has failed to show

how *her* statement as to the contents of what *someone else* told her is admissible.

Accordingly, this entire paragraph is hereby **STRICKEN** and shall not be considered by this

Court.

### PARAGRAPH 14

14.  Further based on Walker's pattern behavior and based on the way that
he treated me in his car (and at the barracks), I believe that Walker collected
driver's licenses to further sexually harass women and that he kept them as
trophies.  My driver's license provided him with a particularly impressive
trophy.  He knew he had arrested the City Prosecutor/Attorney's wife but that
did not deter him in the slightest from further abusing and sexually harassing
me after my brutal arrest.  Nor did it deter him from tossing me violently
around in the backseat of his cruiser, unbelted, over hills and around sharp
curves, knowing that my husband was following his cruiser.

[Doc. 262-1 at 8].

The portion of paragraph 14 that states plaintiff "believe[s] that [defendant] collected

driver's licenses to further sexually harass women and that he kept them as trophies," shall

be **STRICKEN** for the same reasons described above with regard to paragraph 13.  This

statement is speculation without any factual basis from which plaintiff could have personal

knowledge of such a practice by defendant.  Furthermore, it is based on inadmissible

hearsay.

As for the remainder of the paragraph, this Court sees no reason to strike those portions fo the paragraph that recount actions plaintiff alleges defendant took towards her, such as "tossing [her] violently around in the backseat of his cruiser."  However, plaintiff's assertion for why defendant supposedly took those actions, because defendant "knew he had arrested the City Prosecutor/Attorney's wife," and that plaintiff was "a particularly impressive trophy," shall be **STRICKEN**.  These statements are pure speculation regarding defendant's state of mind.  Once again, plaintiff is "going beyond recounting facts within [her] personal knowledge, and is merely telling the finder of fact what conclusion to reach." *Riley*, 990 F.Supp.2d at 1190.  "As such, it is a 'meaningless assertion[] which amount[s] to little more than choosing up sides.'" *Id.* (quoting Fed. R. Evid. 701 (advisory committee notes)).

Accordingly, for the reasons stated above, Defendant Trooper D.R. Walker's Motion to Strike Plaintiff's Affidavit in Support of her Motion for Partial Summary Judgment **[Doc. 279]** is hereby **GRANTED IN PART**.  The stricken provisions identified above shall not be considered by this Court in ruling on plaintiff's Motion for Partial Summary Judgment. Having now considered and ruled upon defendant's Motion to Strike, this Court turns to considering the parties' cross-motions for summary judgment with regard to plaintiff's unreasonable search and seizure claim.

## 2.  Cross-motions for Summary Judgment on Unreasonable Search and Seizure Claim

Plaintiff's Second Amended Complaint alleges that "Walker, Newlin and Sigulinsky acted in concert and/or individually to violate Plaintiff's Fourth Amendment right by

unlawfully entering, searching and seizing her property from her vehicle without probable cause." [Doc. 110 at 40]. The property that was allegedly seized was plaintiff's driver's license. [Id. at 15].

Upon consideration of the record, however, there is no evidence that defendant did anything other than lose plaintiff's driver's license after it was given to him by someone else. While it seems impossible to this Court to tell who is seen on the APU videos entering plaintiff's car after it is parked in the back of the APU parking lot, the parties do not dispute that it is not defendant. Plaintiff now does not contend that defendant entered her car to get the license; she believes that it was either an unknown contractor or Sigulinsky.[6] [Doc. 261-1 at 28]. Defendant testified that someone at the scene gave him the driver's license, but that he could not remember who. [Doc. 261-2 at 36]. Thus, it is undisputed that defendant did not enter plaintiff's vehicle and did not remove plaintiff's license.

There is also no evidence to support plaintiff's allegation and argument that defendant directed someone else to take the license from her vehicle. As was discussed above in striking plaintiff's statement that defendant "commissioned" these individuals to enter her vehicle, this contention is simply plaintiff's unsupported speculation. Furthermore, none of the witnesses testified to this effect, and defendant denied asking anyone to get plaintiff's license from her car. [Doc. 278-4 at 3–4]. Even if someone was directed or "commissioned" to take plaintiff's license from her vehicle, there is no evidence that such direction came from defendant as opposed to one of the other police officers at the scene.

Nonetheless, plaintiff argues that defendant can be liable for a Fourth Amendment

---

[6] For his part, Sigulinsky does not recall entering plaintiff's vehicle. [Doc. 261-5 at 4–5].

violation even if a civilian removed plaintiff's license from her vehicle because a jury "may well find that [defendant] acted as an 'encourager of private actions.'" In making this argument, plaintiff relies on *Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006), which held as follows:

> Although private actions generally do not implicate the Fourth Amendment, when a private person acts "as an agent of the Government or with the participation *or knowledge of any governmental official*," then the private person's acts are attributed to the government. *The government need not compel nor even involve itself directly in the private person's actions*.

[Doc. 281 at 16] (quoting *id.* at 487) (internal citations omitted) (emphasis supplied by plaintiff). In quoting this language, plaintiff seemingly argues that defendant can be liable for the actions of a private party who entered plaintiff's vehicle, even if defendant did not direct the private party to do so. Plaintiff seems to argue that defendant's knowledge of the private party's actions is alone sufficient to hold defendant liable.

This Court disagrees. Initially, this Court notes there is no evidence that defendant had knowledge that someone went into plaintiff's vehicle and retrieved her license.[7] The evidence shows that defendant had knowledge he came into possession of plaintiff's license, but nothing establishes that he knew where the license came from. In fact, as previously discussed, defendant testified he did not know where the license came from, [Doc. 261-2 at 36], and plaintiff puts forth no evidence otherwise.

Furthermore, even if defendant did have knowledge that a private party removed plaintiff's license from her car, that knowledge would not be sufficient to attribute the actions of the private party to defendant. The court in *Presley* distinguished the unique fact

---

[7] Even this fact, that plaintiff's license was obtained from her vehicle, is not conclusively established.

pattern before it, where the government "actively encourages, facilitates, or otherwise participates in the private search or seizure," from the "more usual situation" plaintiff alleges here, "in which the government merely knows of or acquiesces in a private person's search or seizure, whose fruits . . . are then appropriated by the government for its own purposes." *Presley*, 464 F.3d at 488 n.7.  In the latter situation, which is presented here, "[i]n order to run afoul of the Fourth Amendment . . . the Government must do more than passively accept or acquiesce in a private party's search efforts." *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003).  "[S]imple acquiescence by the Government does not suffice to transform a private search into a Government search." *Id.* at 345–46.  "Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional.  Passive acceptance by the Government is not enough." *Id.* at 346; *see also* *United States v. Smythe*, 84 F.3d 1240, 1242–43 (10th Cir. 1996) ("[K]nowledge and acquiescence . . . encompass the requirement that the government must also affirmatively encourage, initiate or instigate the private action.") (citation omitted); *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir. 1988) ("It is only be exercise of some form of control that the actions of one may be attributed to another.  Mere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control.") (citations omitted).

In sum, it is undisputed the defendant did not enter plaintiff's vehicle, it is undisputed the defendant did not remove plaintiff's license, and plaintiff puts forth no evidence that defendant directed or affirmatively encouraged anyone else to do so.  Accordingly, this

Court finds that no reasonable jury could conclude that defendant "violate[d] Plaintiff's Fourth Amendment right by unlawfully entering, searching and seizing her property from her vehicle without probable cause." [Doc. 110 at 40]. Thus, this Court will grant summary judgment in favor of defendant with regard to plaintiff's Fourth Amendment unreasonable search and seizure claim.

This Court notes that plaintiff also seems to argue that defendant's alleged retention of her driver's license is also a basis for a Fourth Amendment unlawful seizure claim. This Court does not believe plaintiff actually asserted this claim in her Second Amended Complaint. As previously noted, plaintiff's Second Amended Complaint alleges a Fourth Amendment violation for defendant "unlawfully entering, searching and seizing her property from her vehicle without probable cause." [Doc. 110 at 40]. While plaintiff briefly mentions that defendant "has not returned" her license, [id. at 15], it is clear her Fourth Amendment claim is focused on the alleged entering of her vehicle and seizure of her license therefrom. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). However, since this Court, after defendant raised the issue, previously acknowledged the possibility that plaintiff may be attempting to assert a Fourth Amendment violation based on defendant's alleged retention of her license, [Doc. 150 at 29], it will briefly discuss this assertion, which it finds does not present a Fourth Amendment claim.

Plaintiff now alleges that defendant "converted and stole" her license, and that defendant's retention of her license is "tantamount to brazen theft." [Doc. 262-1 at 3].

30

However, plaintiff presents no evidence to support this speculation. While plaintiff generally claims that she requested the return of her license, plaintiff does not offer any specifics as to when such occurred, to whom she made the request, or by what means she made the request. On the contrary, defendant testified that he noticed plaintiff's license on his desk when he returned to the State Police Detachment after taking plaintiff to magistrate court on the night of April 25–26, 2016. [Id. at 37]. Later, defendant intended to bring the license to court to return it to plaintiff, but he could not find it. [Id.]. Thus, the evidence in the record merely implies that defendant lost her license, not that it was intentionally retained or "stolen" as plaintiff suggests. *See Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995) ("[N]egligent deprivations of life, liberty, or property are not actionable under 42 U.S.C. § 1983.").

Plaintiff essentially claims that defendant did not return her license when she requested it. Courts have found in similar situations that such does not present a Fourth Amendment claim, as they have been hesitant to expand the definition of "seizure" to situations beyond the initial taking of property.[8] *See, e.g.*, *Fox v. Van Oosterum*, 176 F.3d

---

[8] This Court notes that it finds plaintiff's reliance on *United States v. Place*, 462 U.S. 696 (1983), to be misplaced. "*Place* held that an officer who can articulate a reasonable suspicion that property may be involved in a crime may act to detain that property in order to conduct further investigation. After the expiration of a reasonable amount of time for the police to conclude whether their suspicions were justified, however, that detention begins to impede significantly upon the individual's possessory interest and, as such, becomes a full-blown seizure. If at that moment, the police have not established probable cause, then they cannot justify the property's seizure." *Lee v. City of Chicago*, 330 F.3d 456, 464 (7th Cir. 2003). Such is not the situation presented here, where plaintiff's license itself was not suspected of being involved in any crime. Though plaintiff seemingly argues that *Place* "broadly proposes that upon changed circumstances over time, a seizure of property that began as reasonable can become unreasonable[,] . . . such an extension of *Place* betrays the narrow confines of its holding, which is limited to brief investigative detentions of property on less than probable cause." *Id.*

342, 351 (6th Cir. 1999) ("[T]he Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property."); *Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003) ("Once an individual has been meaningfully dispossessed, the seizure of the property is complete[.] . . . The [Fourth] [A]mendment then cannot be invoked by the dispossessed owner to regain his property."). In fact, where the evidence here suggests defendant simply lost plaintiff's license, such presents far less egregious conduct than the previously cited cases where no Fourth Amendment violations were found even though the defendants knowingly refused to return the property on demand.

Finally, even if defendant did knowingly retain or "steal" plaintiff's license as plaintiff contends, "whether that conduct violates the Fourth Amendment's prohibition on unreasonable searches and seizures . . . would not "be 'clear to a reasonable officer.'" *Jessop v. City of Fresno*, 936 F.3d 937, 942 (9th Cir. 2019) (citing *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam))). Thus, even if plaintiff had evidence to support her claim of theft, which she does not, qualified immunity would seem to protect defendant from liability for a Fourth Amendment violation. *See Tinsley v. Wight*, 2012 WL 5305980, at *12 (D.S.C. Mar. 28, 2012) (Blatt, J.) ("[O]ther Circuits who have addressed similar (albeit distinguishable) facts have found no Fourth Amendment violation in the context of an individual's claim for the return of seized property. Accordingly, the Court agrees with the Defendants that they are entitled to qualified immunity under the particular circumstances of this case."); *Mom's Inc. v. Willman*, 109 F. App'x 629, 636–37 (4th Cir. 2004)

(unpublished per curiam opinion) ("The remaining question is whether Colaprete's Fourth Amendment right against having his property converted following a search was clearly established when the alleged conversion occurred. . . . If either Appellant stole Colaprete's watch, he or she should have recognized that this was a tort, a crime, and even a sin, but he had no clear notice that this action violated the United States Constitution.  Accordingly, the district court erred in denying summary judgment on the ground of qualified immunity."); *Jessop*, 936 F.3d at 941 ("Although the City Officers ought to have recognized that the alleged theft of Appellants' money and rare coins was morally wrong, they did not have clear notice that it violated the Fourth Amendment—which, as noted, is a different question. The Fourth Circuit's unpublished decision in *Mom's*—the only case law at the time of the incident holding that the theft of property seized pursuant to a warrant violates the Fourth Amendment—did not put the 'constitutional question beyond debate.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Springer v. Albin*, 398 F. App'x 427, 436 (10th Cir. 2010) ("Given the disparity in the law, we conclude that it was not clearly established at the time of the search that the agents' alleged conduct of stealing money after it was lawfully seized . . . violated the Fourth Amendment.  Accordingly, we must also conclude that the agents were entitled to qualified immunity.").

Accordingly, for the reasons stated above, this Court will grant defendant summary judgment on plaintiff's Fourth Amendment unreasonable search and seizure claim and will deny plaintiff's cross-motion for summary judgment on this same claim.

## C.  Tort of Outrage Claim

At the motion to dismiss stage, this Court identified fourteen (14) alleged actions of

33

defendant which, in totality and all taken as true for the purposes of that motion, stated

enough facts to state an outrage claim that was plausible on its face.  Those fourteen (14)

actions were as follows:

(1) screamed at plaintiff "I don't care" and "shut up" when plaintiff attempted to explain what happened with regard to the vehicle collision [Doc. 110 at 8]; (2) "smashed the right side of [plaintiff's] face into [defendant] DeGrave's work truck[,] breaking her eyeglasses" [Id. at 10]; (3) "slammed Plaintiff face down onto the ground, bloodying her knees" [Id.]; (4) "placed Plaintiff into the back seat of his police cruiser and turned up the already blaring hard rock music that was playing with the windows closed in the vehicle in order to place Plaintiff in further distress and anxiety and in order to distract her form the unlawful and counterfeit events that he conspired to conduct in the parking lot" [Id.]; (5) "deliberately and meanly delayed transporting Plaintiff to the hospital for treatment for an extended period of time" [Id.]; (6) "conspired with the remaining defendants to induce one of the defendants . . . to drive Plaintiff's Honda Pilot in order to produce skid marks in the gravel" to support the destruction of property charge [Id. at 11]; (7) provided "false written statements so as to procure false charges against" plaintiff [Id. at 13]; (8) "transmitted Plaintiff in the back seat of his cruiser, with her arms handcuffed behind her back and unlawfully unbuckled, to the Jefferson Medical Center and chided Plaintiff with words to the effect of 'don't show your ass' at the hospital" [Id. at 15]; (9) "[u]pon arriving at the emergency entrance, Trooper Walker pushed Plaintiff into the emergency room by her injured left arm, causing her to cry out in pain" [Id. at 16]; (10) "conspired with Defendant Kelly Halbert, RN, to violate Plaintiff's privacy rights . . . and obtained from Kelly (Newlin) Halbert a false statement to the effect that Plaintiff had suffered no injuries and that she was abusive to Trooper Walker and created a disturbance, falsely crying out in pain when entering the Hospital" [Id.]; (11) "spitefully and meanly and maliciously insisted that an arraignment 'was not an option' and that Plaintiff was going to jail" [Id. at 18]; (12) "prior to arraignment, with malevolent intent to sexually harass and further physically and emotionally injure plaintiff . . . [s]ubjected Plaintiff to seriously unlawful rough car rides running stop signs and driving recklessly at speeds approximately twice the posted speed . . . tossing Plaintiff around in the back seat of his cruiser while unbuckled in a neck brace and arm sling" [Id.]; (13) "[d]uring said car rides he played loud sexually oriented music from a device in his cruiser, and, at one point touched her knee while she struggled to move away from his hand, keeping his hand fixed behind the passenger's seat by Plaintiff's knee for the duration of the ride" [Id.]; and (14) "[f]orced Plaintiff to sit for an extended period of time, while in pain, knowing that she was in pain, shaking violently on a cold metal chair in the hallway just in front of his cubicle wall at the police barracks while he sang sex songs,

ate food and made strange noises behind his desk, until he decided it was time to 'call the Magistrate'" [Id.].

[Doc. 150 at 32–34]. Now, at the summary judgment stage, plaintiff faces the "high burden of proof required to sustain a tort claim of intentional infliction of emotional distress/outrage." *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir. 2017).

Under West Virginia law, to establish the tort of outrage, more commonly known as intentional infliction of emotional distress, the plaintiff must establish four elements:

(1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency;

(2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct;

(3) that the actions of the defendant caused the plaintiff to suffer emotional distress and;

(4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Pegg*, 845 F.3d at 121–22 (citing *Loudin v. Nat'l Liab. & Fire Ins.*, 228 W.Va. 34, 43, 716 S.E.2d 696, 705 (2011)). "It is difficult to overstate the high burden of proof required to sustain a tort claim for intentional infliction of emotional distress/outrage." *Id.* at 122. "West Virginia courts only find liability for outrage where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. This is a high standard indeed." *Id.* (quoting *Keyes v. Keyes*, 182 W.Va. 802, 805, 392 S.E.2d 693, 696 (1990) (quoting *Harless v. First Nat'l Bank*, 169 W.Va. 673, 693–94, 289 S.E.2d 692, 703–04, n.20 (1982))) (internal quotation marks omitted).

A court must consider whether a defendant's actions might reasonably be interpreted as outrageous.  As the Supreme Court of Appeals of West Virginia has explained:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress.  Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

*Hatfield v. Health Mgmt. Assocs. of W. Va.*, 223 W.Va. 259, 268, 672 S.E.2d 395, 404 (2008) (citing *Travis v. Alcon Labs., Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998)).

Here, upon consideration of the record, this Court finds that plaintiff has failed to meet this high legal threshold.  Once again, plaintiff relies on her allegations about defendant's conduct, but does not identify admissible evidence to support most of those allegations, and the few allegations plaintiff does have evidence of could not reasonably be considered "outrageous."

Of the fourteen (14) actions described above, the evidence supports only the following: (1) defendant admits he told plaintiff in the APU parking lot to "shut her mouth" [Doc. 281-34 at 3–4]; (2) defendant admits he placed plaintiff against a truck and took her to the ground in order to effect her arrest [Docs. 261-2 at 29–34; 281-40 at 4]; (3) defendant admits he transported plaintiff in the back of his cruiser without a seatbelt on[9] [Doc. 261 at 23]; (4) defendant admits he told plaintiff not to "show her ass" at the hospital [Doc. 261-2

---

[9] While plaintiff states she was "unlawfully unbuckled" in the back of defendant's cruiser, this Court notes that it is not unlawful for an adult to ride in the back seat of a vehicle without a seat belt on in West Virginia.  *See* W.Va. Code § 17C-15-49(a).

at 35]; and (5) defendant admits he ate food and listed to music while completing his report at the State Police Barracks [Doc. 281-49 at 3].   These actions, even taken together, cannot be considered sufficiently outrageous to support an outrage claim as a matter of law.

With regard to plaintiff's arrest, this Court has already determined defendant did not use excessive force.  A lawful arrest without excessive force does not constitute outrageous conduct.  *See Pegg*, 845 F.3d at 122 (citing *Courtney v. Courtney*, 186 W.Va. 597, 602, 413 S.E.2d 418, 423 (1991)).  The remainder of these actions is, at worst, conduct that is "merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent." *Courtney*, 186 W.Va. at 602, 413 S.E. 2d at 423.  These actions are "markedly milder than the kind of conduct courts applying West Virginia law have found necessary to support an intentional infliction of emotional distress claim." *Pegg*, 845 F.3d at 122 (citing *Heldreth v. Marrs*, 188 W.Va. 481, 425 S.E.2d 157, 161–62 (1992) (allowing an outrage claim to proceed when a husband suffered a heart attack after witnessing his wife get struck by a car and die); *Hutchinson v. West Virginia State Police*, 731 F.Supp.2d 521, 531 (S.D. W.Va. 2010) (Chambers, J.) (finding a legally cognizable claim for outrage for a female suspect who was pulled from the shower by her hair during the execution of a search warrant and forced to lie down naked for at least 45 minutes in the presence of eleven male law enforcement officers, one of whom slapped her behind), *aff'd sub. nom. Hutchinson v. Lemmon*, 436 F. App'x 210 (4th Cir. 2011); *Keyes v. Keyes*, 182 W.Va. 802, 803, 392 S.E.2d 693, 694 (1990) (disallowing an outrage claim when a family excluded a son from his father's obituary, burial plans, and the car ride to the funeral); *Lee*

*v. City of S. Charleston*, 668 F.Supp.2d 763, 779 (S.D. W.Va. 2009) (Copenhaver, J.) (disallowing outrage claim based on a roadside public strip search that exposed arrestee's genitals to the arresting officer); *Lowe v. Spears*, 2009 WL 1393860, at *6 (S.D. W.Va. May 15, 2009) (Chambers, J.) (disallowing outrage claim when an officer arrested an individual for a minor offense, possibly in response to arrestee's use of profanity toward the officer)).

Other than the four actions described above, plaintiff has either put forth no evidence supporting the other alleged actions of defendant or the record evidence flatly contradicts plaintiff's allegations. Chief among plaintiff's allegations supporting her outrage claim is her assertion that defendant conspired with others to procure a false charge of destruction of property against her by creating skid marks in the gravel to make it look like plaintiff was at fault for the accident. Plaintiff claims that the videos from APU's security cameras do not show the actual accident and the aftermath that followed, but rather it shows this "reenactment" staged by the defendant and his conspirators. [Doc. 261-13 at 6–7].

Not only does every witness deny the existence of a conspiracy to reenact the accident and falsely charge plaintiff with destruction of property, but the video evidence, 911 records, and call records, not to mention common sense, all contradict plaintiff's account such that no reasonable jury could believe it. *See* [Docs. 261-5 at 8; 261-7 at 8; 261-14 at 6; 261-16 at 7; 261-17 at 5; 261-31 at 2]; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

38

Defendant fairly describes these contradictions:

As an initial matter, Mrs. Hamstead claims that she was in the back of Trooper Walker's cruiser by approximately 4:11 p.m. (Ex. 1 at 192:15-18). The APU videos begin at 4:17 p.m. Thus, the conspirators would have had to come up with this elaborate plan, reach agreement, find someone to drive Mrs. Hamstead's vehicle, move their own vehicles, and arrange for a "decoy" State Police cruiser to come by—all within about six minutes.

In addition, Mrs. Hamstead must claim that there were actually two 911 calls—the initial call, which resulted in the officers coming to the "actual" event; and a second call, which Mr. Shutts allegedly made too early, to stage the event. Yet, 911 records only reflect the calls Mr. Shutts made around 4:18 p.m., as do Mr. Shutts's phone records. (Exs. 8 and 9).

Furthermore, a neighbor provided an affidavit to Mrs. Hamstead, stating that she saw the police arrive around 4:30 p.m., the same time shown in the 911 records and the APU videos. (Weller Aff., attached as "Exhibit 28"). While that timeframe could be consistent with a reenactment, this witness also testified that she did not hear anyone scream about her arm being hurt until *after* the police arrived. *Id.*

Also, Mrs. Hamstead testified that her husband came by and spoke to her while she was in the back of Trooper Walker's cruiser. (Ex. 1 at 77:18-22). Mrs. Hamstead also claims, however, that rather than following Trooper Walker to the hospital, her husband followed a "decoy" cruiser. *Id.* at 112:21-113:3. It is inconceivable that Mr. Hamstead spoke to his wife when she was in one cruiser but was then duped into following a different cruiser a few minutes later when, by Mrs. Hamstead's own testimony, the cruiser she was in never moved the entire time.

Most significantly, the APU videos "blatantly contradict[]" Mrs. Hamstead's account "so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. Mrs. Hamstead claims that she could not see the reenactment because the conspirators moved a large, red dump truck beside Trooper Walker's cruiser to block her view. (2d Am. Compl. ¶¶ 52-53). She identified the car that she claims is Trooper Walker's cruiser in the "North Side" video. (Ex. 1 at 106:3-14; Ex. 25). She testified that the dump truck was parked approximately five feet away from the passenger side of the cruiser. (Ex. 1 at 80:4-9). Yet, no dump truck is shown in the "North Side" video beside the car Mrs. Hamstead claims is Trooper Walker's.

Mrs. Hamstead attempted to explain this discrepancy by testifying that the dump truck is not visible because a red tow truck in the parking lot obscures it. *Id.* at 106:22-107:17. Mrs. Hamstead identified the tow truck by drawing

a square around it. (Ex. 25). Yet, when that tow truck leaves the scene in the video, there still is no dump truck visible. (Ex. 12, "North Side APU Parking Lot 2nd Half" Video at 1650:55). While there is another truck visible after the red tow truck leaves, it is a dark tow truck, not a red dump truck, and when *that* truck leaves, it is clear that there is no dump truck beside the vehicle Mrs. Hamstead identified as Trooper Walker's cruiser. *Id.* at 1700:10. Furthermore, at no point in the video is a red dump truck seen leaving the scene.

The most glaring hole in Mrs. Hamstead's conspiracy theory is the fact that she claims the APU video shows her still in Trooper Walker's cruiser ten minutes after she arrived at the hospital. Mrs. Hamstead testified that the APU video does not depict her leaving to go to the hospital, and she is still in the "North Side" field of view when the video ends at 1703:50. (Ex. 1 at 112:16-20). The 911 records, however, reflect that Trooper Walker arrived at Jefferson Medical Center at 1654:39. (Ex. 8). Coincidentally, the hospital's own records show that Mrs. Hamstead arrived at 4:54 p.m. (Ex. 19 at "Walker 00600").

. . .

The time stamps between the APU videos and the 911 records differ by approximately one and one-half minutes. This is not evidence of a conspiracy, but merely evidence that the clocks used to record the respective times are different. *See* Ex. 15 at 143:6-13, 152:15-17; Ex. 5 at 196:11-197:7; Ex. 30 at 47:19-21, 48:14-19. Even Mrs. Hamstead's videography expert could only offer an opinion that the two cameras' time stamps are synched to each other and display accurate elapsed time; he could not say that the times themselves are accurate. (McCourt Rept. 3, attached as "Exhibit 32" ["The accuracy of the times is not verified. . . ."]).

The entire record here, and especially the APU videos, clearly and "blatantly contradict[s]" Mrs. Hamstead's version of events and compels rejection of her version of the facts. *See **Witt v. W. Va. State Police, Troop 2**,* 633 F.3d 272, 277 (4th Cir. 2011). While the APU videos are of minimal value in showing details, unlike in ***Witt***, they depict the "true sequence of events" as reflected in the 911 records, Mr. Shutts's phone records, and the testimony of every witness except Mrs. Hamstead. *See id.* Also, unlike in ***Witt***, this is not a case where there are no neutral witnesses, pitting the "self-interested testimony" of Trooper Walker against the "self-interested testimony" of Mrs. Hamstead. *See id.* at 276. Here, the neutral witnesses, including the witnesses identified by Mrs. Hamstead—Lois Weller and Guy Greenfield—all dispute her version of events.

Mrs. Hamstead's bizarre conspiracy theory runs counter to the "principle of parsimony"— "that the most acceptable explanation of an . . . event is the

> simplest, involving the fewest entities, assumptions, or changes." Once Mrs.
> Hamstead's conspiracy theory is discounted—as the evidence requires—one
> is left with the inescapable conclusion that the APU videos depict events as
> they unfolded. Mrs. Hamstead is the person driving her vehicle when it is
> shown entering the APU lot. It is Mrs. Hamstead who exits the vehicle once
> it comes to a stop. And there was no conspiracy to manufacture evidence
> and falsely charge her.

[Doc. 261 at 19–23].

As for the remaining allegations identified by this Court that could potentially support an outrage claim, either plaintiff has presented no evidence to substantiate them or they are demonstrably untrue. Specifically, the evidence does not support plaintiff's claim that defendant "deliberately and meanly" delayed transporting her to the hospital. [Doc. 110 at 10]. The 911 records show that defendant arrived on the scene at 4:28 p.m. and arrived at the hospital at 4:54 p.m. [Doc. 261-8 at 1]. Plaintiff presents no evidence otherwise. This total span of 26 minutes hardly seems like inordinate delay considering this time frame encompasses everything that took place at the scene, including plaintiff's arrest and defendant's investigation of the collision, as well as transport time to the hospital. Furthermore, even if plaintiff did present evidence to support this claim, this Court finds that such conduct could not reasonably be considered "outrageous."

Nor is there evidence that defendant "[f]orced Plaintiff to sit for an extended period of time . . . shaking violently on a cold metal chair in the hallway just in front of his cubicle wall at the police barracks." [Doc. 110 at 16]. The 911 records show plaintiff was at the State Police Detachment a total of 40 minutes while defendant completed his report. [Doc. 261-8 at 1]. This also is not an inordinate amount of time. Further, plaintiff has put forth no evidence, not even her own testimony, supporting this claim, nor could such reasonably be considered "outrageous" if she did.

With regard to plaintiff's claim that defendant "spitefully and meanly and maliciously insisted that an arraignment 'was not an option' and that Plaintiff was going to jail," [Doc. 110 at 18], it is clear that normal procedure in Jefferson County Magistrate Court is that if a suspect is arrested and processed after normal business hours, as plaintiff was, that normally that person would spend the night in jail and be arraigned the next day. [Docs. 261-15 at 3–4; 259-2 at 44]. In fact, plaintiff received "special treatment" by being arraigned the night of her arrest. [Doc. 259-2 at 44].

As for the remainder of plaintiff's allegations with regard to this claim—that defendant pushed her into the hospital by her injured arm, that defendant conspired with Nurse Halbert to obtain a false statement about her visit to the hospital, that defendant subjected plaintiff to reckless driving, and that defendant sexually harassed her—once again plaintiff has presented no admissible evidence,[10] not even her own testimony, to support these allegations.

In sum, plaintiff presents no evidence to support the majority of her allegations in support her outrage claim. In fact, many of plaintiff's allegations are patently contradicted by the actual evidence in the record. Of the allegations that plaintiff can support, mainly through defendant's own admissions, this Court has found that they cannot be considered sufficiently outrageous to support an outrage claim as a matter of law, as explained above.

---

[10] In support of her outrage claim, plaintiff relies heavily upon an affidavit and related voice recording regarding an unrelated incident, which plaintiff argues shows "pattern conduct" of defendant. *See* [Doc. 281 at 20–23]. This is clearly improper character evidence prohibited by the Federal Rules of Evidence that would be inadmissible at trial and, therefore, cannot be used to oppose defendant's Motion for Summary Judgment. *See* Fed. R. Evid. 404; **Doe v. Meron**, 929 F.3d 153, 165 (4th Cir. 2019) ("[A] party opposing summary judgment must offer evidence that could be presented in a form that would be admissible at trial.") (citing Fed. R. Civ. P. 56(c)(2)).

Accordingly, this Court will grant defendant summary judgment on plaintiff's outrage claim.

## CONCLUSION

For the reasons stated above, this Court hereby **GRANTS** Defendant Trooper D.R. Walker's Motion for Summary Judgment **[Doc. 260]** and **DENIES** Plaintiff's Motion for Partial Summary Judgment **[Doc. 262]**. Accordingly, this case is hereby **DISMISSED WITH PREJUDICE**. Defendant Trooper D.R. Walker's Motion to Strike Plaintiff's Affidavit in Support of her Motion for Partial Summary Judgment **[Doc. 279]** is **GRANTED IN PART**, in accordance with this Court's discussion herein. Further, all other pending motions **[Docs. 292–299, 313]** are hereby **DENIED AS MOOT**. The Clerk is **DIRECTED** to enter judgment in favor of the defendant  and to **STRIKE** this action from the active docket of this Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record herein.

**DATED**: May 18, 2020.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE